**EXECUTION COPY**

## SECURITY AGREEMENT

Dated as of November 18, 2005

From

DANA CORPORATION

and

the other Grantors referred to herein

<u>as Grantors</u>

to

CITICORP USA, INC.

<u>as Agent</u>

A00025
A0025

# TABLE OF CONTENTS

**Section**                                                               **Page**

Section 1.    Grant of Security ............................................................................... 2

Section 2.    Security for Obligations ..................................................................... 4

Section 3.    Grantors Remain Liable; Limitations on Grant; Transfer of Assets........................... 4

Section 4.    Delivery and Control of Security Collateral ............................................. 5

Section 5.    Maintaining the Account Collateral ....................................................... 5

Section 6.    Representations and Warranties.............................................................. 6

Section 7.    Further Assurances ....................................................................... 8

Section 8.    As to Equipment and Inventory ........................................................... 8

Section 9.    Insurance .............................................................................. 9

Section 10.   Post-Closing Changes; Bailees; Collections on Receivables and Related
Contracts .......................................................................................... 10

Section 11.   Voting Rights; Dividends; Etc ........................................................... 11

Section 12.   Transfers and Other Liens; Additional Equity Interests ................................. 12

Section 13.   Agent Appointed Attorney-in-Fact......................................................... 12

Section 14.   Agent May Perform ....................................................................... 12

Section 15.   The Agent's Duties ...................................................................... 12

Section 16.   Remedies ................................................................................ 13

Section 17.   Indemnity and Expenses .................................................................. 14

Section 18.   Amendments; Waivers; Additional Grantors; Etc........................................... 15

Section 19.   Notices; Etc ............................................................................ 15

Section 20.   Continuing Security Interest; Assignments under the Credit Agreement .................... 15

Section 21.   Release; Termination .................................................................... 16

Section 22.   Execution in Counterparts ............................................................... 16

Section 23.   Governing Law ........................................................................... 16

(Dana Security Agreement)

A00026

A0026

| Schedules I | - | Location, Type Of Organization, Jurisdiction Of Organization and Organizational Identification Number |
| Schedule II | - | Pledged Equity |
| Schedule III | - | Locations of Equipment and Inventory |
| Schedule IV | - | Changes in Name, Location, Etc. |
| Schedule V | - | Pledged Deposit Accounts; Securities Accounts |

Exhibits

| Exhibit A | - | Form of Financing Statement |
| Exhibit B | - | Form of Security Agreement Supplement |

A00027

A0027

## SECURITY AGREEMENT

SECURITY AGREEMENT dated as of November 18, 2005 (this "Agreement") made by DANA CORPORATION, a Virginia corporation (the "Borrower"), the other Persons listed on the signature pages hereof and the Additional Grantors (as defined in Section 18) (the Borrower, the Persons so listed and the Additional Grantors being, collectively, the "Grantors"), to CITICORP USA, INC. as administrative agent (together with any successor Agent appointed pursuant to Article VII of the Credit Agreement (as hereinafter defined), the "Agent") for the Secured Parties.

### PRELIMINARY STATEMENTS.

(1) The Borrower has entered into a Five Year Credit Agreement dated as of March 4, 2005 (as amended, modified or otherwise supplemented prior to the date hereof and as may be further amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") with the Lenders parties thereto and the Agent, as administrative agent. Terms defined in the Credit Agreement are used herein as therein defined.

(2) On November 18, 2005, the Borrower, the Agent and the Required Lenders entered into that certain Amendment and Waiver No. 3, pursuant to which the Required Lenders agreed, among other things, to waive all Defaults or Events of Default under the Credit Agreement resulting solely from the announced restatements of the Borrower's financial statements for the fiscal quarter ended September 30, 2005 and to permit the Borrower to request additional Advances under the Credit Agreement in consideration for, in part, the entering into by the Grantors of this Agreement.

(3) The Borrower and its Subsidiaries have entered into or may from time to time enter into lines of credit (including letters of credit) and other similar arrangements with Lenders or their Affiliates (collectively, the "Bilateral Obligations").

(4) The Borrower and its Subsidiaries may from time to time enter into hedging agreements (the "Secured Hedge Agreements") with Lenders or their Affiliates.

(5) Each Grantor is the owner of the membership interests in Dana Asset Funding LLC (the "Initial Pledged Equity") set forth opposite such Grantor's name on and as otherwise described on Schedule II hereto and issued by the Persons named therein.

(6) Each Grantor is the owner of the domestic securities accounts (the "Securities Accounts") and the domestic deposit accounts (the "Pledged Deposit Accounts") set forth opposite such Grantor's name on Schedule V hereto.

(7) Each Grantor is entering into this Agreement in order to grant to the Agent for the ratable benefit of the Lenders, the Agent, the Lenders and their Affiliates that are counterparties to the Secured Hedge Agreements and the Lenders and their Affiliates that are providers of the Bilateral Obligations (collectively, the "Secured Parties") a security interest in the Collateral (as hereinafter defined).

(8) It is a condition precedent to the effectiveness of Amendment and Waiver No. 3, the making of additional Advances under the Credit Agreement and the entry into Secured Hedge Agreements by the Secured Parties that each Grantor shall have granted the assignment and security interest and made the pledge and assignment pursuant to and contemplated by this Agreement.

(9) Each Grantor will derive substantial direct and indirect benefit from the transactions

A00028
A0028

contemplated by the Secured Documents. For all purposes of this Agreement, "Secured Documents" mean, collectively, the "Loan Documents" as defined in the Credit Agreement, the Secured Hedge Agreements and the agreements, documents and instruments evidencing the Bilateral Obligations, in each case, as amended.

(10)    Terms defined in the Credit Agreement and not otherwise defined in this Agreement are used in this Agreement as defined in the Credit Agreement. Further, unless otherwise defined in this Agreement or in the Credit Agreement, terms defined in Article 9 of the UCC (as defined below) are used in this Agreement as such terms are defined in such Article 9. "UCC" means the Uniform Commercial Code as in effect, from time to time, in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

NOW, THEREFORE, in consideration of the premises and in order to induce the Secured Parties to make additional Advances under the Credit Agreement, to enter into Secured Hedge Agreements and to provide or continue to provide the Bilateral Obligations from time to time each Grantor hereby agrees with the Agent for the ratable benefit of the Secured Parties as follows:

Section 1.    Grant of Security. Each Grantor hereby pledges to the Agent, for the ratable benefit of the Secured Parties, and hereby grants to the Agent, for the ratable benefit of the Secured Parties, a security interest in, such Grantor's right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by such Grantor, wherever located, and whether now or hereafter existing or arising (collectively, the "Collateral"):

(a)    all equipment in all of its forms, including, without limitation, all machinery, tools, vessels, furniture and fixtures, and all parts thereof and all accessions thereto, including, without limitation, computer programs and supporting information that constitute equipment within the meaning of the UCC (any and all such property being the "Equipment"), but excluding motor vehicles and aircraft;

(b)    all inventory in all of its forms, including, without limitation, (i) all raw materials, work in process, finished goods and materials used or consumed in the manufacture, production, preparation or shipping thereof, and (ii) finished goods that are returned to or repossessed or stopped in transit by such Grantor, and all accessions thereto and all software that is imbedded in and is part of the inventory (any and all such property being the "Inventory");

(c)    subject to the Receivables Intercreditor Agreement dated as of the date hereof, among the Borrower, the Agent and Wachovia Bank, National Association and JPMorgan Chase Bank, N.A., as program agents, (as amended, modified or supplemented from time to time, the "Receivables Intercreditor Agreement"), all accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), letter-of-credit rights and general intangibles (including, without limitation, payment intangibles) whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance, and all rights now or hereafter existing in and to all supporting obligations including, without limitation, all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing the foregoing property (any and all of such accounts, chattel paper, instruments, letter-of-credit rights and general intangibles being the "Receivables", and any and all such supporting obligations

(Dana Security Agreement)

A00029

A0029

being the "Related Contracts");

      (d)    the following (the "Security Collateral"):

      (i)    the Initial Pledged Equity (including to the extent such membership interests constitute general intangibles) and the certificates, if any, representing the Initial Pledged Equity, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Initial Pledged Equity and all subscription warrants, rights or options issued thereon or with respect thereto;

      (ii)    all additional membership interests of Dana Asset Funding LLC, or any successor entity from time to time acquired by such Grantor in any manner (including to the extent such membership interests constitute general intangibles) (such equity interests, together with the Initial Pledged Equity, being the "Pledged Equity"), and the certificates, if any, representing such additional shares or other equity interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such membership interests or other equity interests and all subscription warrants, rights or options issued thereon or with respect thereto;

      (iii)    all indebtedness from time to time owed to such Grantor by the Borrower or any of its Subsidiaries (the "Pledged Debt") and the instruments, if any, evidencing such indebtedness, and all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness;

      (iv)    the Securities Accounts, all security entitlements with respect to all financial assets from time to time credited to the Securities Accounts, and all financial assets, and all dividends, distributions, return of capital, interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such security entitlements or financial assets and all warrants, rights or options issued thereon or with respect thereto;

      (e)    the following (collectively, the "Account Collateral"):

      (i)    the Pledged Deposit Accounts and all funds and financial assets from time to time credited thereto, and all certificates and instruments, if any, from time to time representing or evidencing the Pledged Deposit Accounts;

      (ii)    all promissory notes, certificates of deposit, checks and other instruments from time to time delivered to or otherwise possessed by the Agent for or on behalf of such Grantor in substitution for or in addition to any or all of the then existing Account Collateral; and

      (iii)    all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Account Collateral; and

      (f)    all proceeds of any and all of the Collateral (other than, subject to the Receivables Intercreditor Agreement, in the case of any Inventory, any proceeds thereof

A00030

A0030

constituting Receivables or Related Contracts) and, to the extent not otherwise included all (A) payments under insurance (whether or not the Agent is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral.

Notwithstanding the foregoing (x) the pledge, security interest and lien granted in this Section 1 shall be released in certain of the above Collateral as and to the extent set forth in the Receivables Intercreditor Agreement, at which time such property shall no longer constitute Collateral (y), the "Receivables" shall exclude (i) accounts owing from Persons other than customers for the purchase of goods and services in the ordinary course of the Borrower and its Subsidiaries and (ii) accounts owing in respect of tooling and (z) the "Collateral" shall not include and no Grantor shall be deemed to have granted a security interest in any property or agreement of such Grantor to the extent (but only to the extent) the granting of a security interest thereunder is prohibited by applicable law, requires a consent not obtained of any governmental authority or regulatory body pursuant to applicable law or is prohibited by, or constitutes a breach or default under, or results in the termination, of or requires any consent not obtained under, any contract, agreement, instrument or other document giving rise to such property, in each case solely to the extent that such breach or default is not rendered ineffective by any of Sections 9-406, 9-407 or 9-408 of the UCC or other applicable law or, in the case of any consent, such consent is actually required to grant such security interest under applicable law.

Section 2.    Security for Obligations.  This Agreement secures, in the case of each Grantor, all obligations of the Borrower or such Grantor now or hereafter existing under the Secured Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such obligations being the "Secured Obligations").  Notwithstanding anything in this Agreement or the Credit Agreement to the contrary, (i) the aggregate principal amount of all Secured Obligations of the Grantors secured by the Pledged Debt and the Pledged Equity from time to time shall, taken together with all other Secured Debt (as defined in the Existing Indentures), not exceed 15% of "Consolidated Net Tangible Assets" ("Consolidated Net Tangible Assets" means the total assets (less applicable reserved and other properly deductible items) on the balance sheet of the Borrower and its consolidated Subsidiaries for the most recent fiscal quarter less (x) all current liabilities and (y) goodwill, trade names patents, organization expenses and other like intangibles of the Borrower and its consolidated Subsidiaries), (ii) the aggregate principal amount of all Bilateral Obligations secured hereby shall not exceed $225,000,000 and (iii) to the extent that Bilateral Obligations are cash collateralized or otherwise secured (other than pursuant to this Agreement), such Bilateral Obligations shall not be secured hereby.

Section 3.    Grantors Remain Liable; Limitations on Grant; Transfer of Assets.  (a) Anything herein to the contrary notwithstanding, (i) each Grantor shall remain liable under the contracts and agreements included in such Grantor's Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Agent of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral and (iii) no Secured Party shall have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement or any other Secured Document, nor shall any Secured Party be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(b)    Each Grantor, and by its acceptance of this Agreement, the Agent and each Lender, hereby confirms that it is the intention of all such Persons that this Agreement and the obligations of each Grantor (other than the Borrower) hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer

A00031
A0031

Act or any similar foreign, federal or state law to the extent applicable to this Agreement and the obligations of each Grantor (other than the Borrower) hereunder. To effectuate the foregoing intention, the Agent, the Lenders and the Grantors hereby irrevocably agree that the obligations of each Grantor (other than the Borrower) under this Agreement at any time shall be limited to the maximum amount as will result in the obligations of such Grantor under this Agreement not constituting a fraudulent transfer or conveyance.

(c)    No Grantor will transfer or otherwise dispose of any material portion of its assets constituting Collateral to any Subsidiary of the Borrower that is not a Grantor, except in the ordinary course of business consistent with past practices.

Section 4.    Delivery and Control of Security Collateral. (a) All instruments representing or evidencing Security Collateral shall be delivered to and held by or on behalf of the Agent pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Agent. The Agent shall have the right, at any time that an Event of Default shall be continuing and without notice to any Grantor, to transfer to or to register in the name of the Agent or any of its nominees any or all of the Security Collateral, subject only to the revocable rights specified in Section 11(a). The Agent shall have the right at any time to exchange instruments representing or evidencing Security Collateral for certificates or instruments of smaller or larger denominations.

(b)    Commencing on the date that is 45 days following the Amendment and Waiver No. 3 Effective Date (or such later date as the Agent may agree in its reasonable discretion), with respect to the Securities Accounts and any Security Collateral that constitutes a security entitlement as to which the financial institution acting as Agent hereunder is not the securities intermediary, the relevant Grantor will cause the securities intermediary with respect to each such account or security entitlement either (i) to identify in its records the Agent as the entitlement holder thereof or (ii) to agree with such Grantor and the Agent that such securities intermediary will comply with entitlement orders originated by the Agent without further consent of such Grantor, such agreement to be in form and substance reasonably satisfactory to the Agent (a "Securities Account Control Agreement").

(c)    Commencing on the date that is 45 days following the Amendment and Waiver No. 3 Effective Date (or such later date as the Agent may agree in its reasonable discretion), with respect to any Security Collateral in which any Grantor has any right, title or interest and that constitutes an uncertificated security, such Grantor will cause the issuer thereof either (i) to register the Agent as the registered owner of such security or (ii) to agree in an authenticated record with such Grantor and the Agent that such issuer will comply with instructions with respect to such security originated by the Agent without further consent of such Grantor, such authenticated record to be in form and substance satisfactory to the Agent.

Section 5.    Maintaining the Account Collateral. Commencing on the date that is 45 days following the Amendment and Waiver No. 3 Effective Date (or such later date as the Agent may agree in its reasonable discretion), and for so long as any Advance or any other Obligation of any Loan Party under any Loan Document shall remain unpaid, any Letter of Credit shall be outstanding or any Lender shall have any Commitment:

(a)    Each Grantor will maintain deposit accounts only with the financial institution acting as Agent hereunder or with a bank (a "Pledged Account Bank") that has agreed with such Grantor and the Agent to comply with instructions originated by the Agent directing the disposition of funds in such deposit account without the further consent of such Grantor, such agreement to be in form and substance reasonably satisfactory to the Agent (a "Deposit Account

A00032

A0032

Control Agreement"); provided, however, that this Section 5(a) shall not apply to (i) cash collateral accounts for letters of credit, surety bonds and existing equipment leases (solely for purposes of collateralizing such letters of credit, surety bonds and existing equipment leases and solely to the extent permitted by Section 5.02(a) of the Credit Agreement), (ii) payroll accounts maintained in the ordinary course of business, (iii) disbursement accounts maintained with the Lenders in the ordinary course of business for the prompt disbursement of amounts payable in the ordinary course of business, and (iv) deposit accounts to the extent the aggregate amount on deposit in each such deposit account does not exceed $1,000,000 at any time and the aggregate amount on deposit in all deposit accounts under this clause (iv) does not exceed $5,000,000 at any time (the accounts described in the foregoing clauses (i) through (iv) being, collectively, the "Excluded Deposit Accounts").

(b)     Each Grantor will immediately instruct each Person obligated at any time to make any payment in respect of the Collateral to such Grantor for any reason (an "Obligor") to make such payment to a Pledged Deposit Account, or to such Grantor for such Grantor to deposit into a Pledged Deposit Account.

(c)     The Borrower will cause all proceeds of each Borrowing under the Credit Agreement to be deposited forthwith into a Pledged Deposit Account.

(d)     Solely during the period that an Event of Default shall have occurred and be continuing, the Agent may, at any time and without notice to, or consent from, the Grantor, transfer, or direct the transfer of, funds from the Pledged Deposit Accounts or any other deposit accounts of such Grantor to satisfy the Grantor's obligations under the Secured Documents.

(e)     Upon any termination by a Grantor of any Pledged Deposit Account (other than an Excluded Deposit Account), such Grantor will immediately (i) transfer all funds and property held in such terminated Pledged Deposit Account to another Pledged Deposit Account and (ii) notify all Obligors that were making payments to such Pledged Deposit Account to make all future payments to another Pledged Deposit Account, or to such Grantor to deposit into a Pledged Deposit Account, in each case so that the Agent shall have a continuously perfected security interest in such Account Collateral, funds and property.

Section 6.     Representations and Warranties.  Each Grantor represents and warrants as follows:

(a)     Such Grantor's exact legal name, as defined in Section 9-503(a) of the UCC, is correctly set forth in Schedule I hereto.  Such Grantor is located (within the meaning of Section 9-307 of the UCC) in the state or jurisdiction set forth in Schedule I hereto.  The information set forth in Schedule I hereto with respect to such Grantor is true and accurate in all respects.  Except as set forth on Schedule IV, within the last five years such Grantor has not changed its name, location, type of organization, jurisdiction of organization or organizational identification number from those set forth in Schedule I hereto.

(b)     All of the Inventory of such Grantor in the United States is located at the places specified therefor in Schedule III hereto, as such Schedule III may be amended from time to time pursuant to Section 8(a).  All Security Collateral consisting of certificated securities and instruments have been delivered to the Agent.

(c)     Such Grantor is the legal and beneficial owner of the Collateral of such Grantor free and clear of any Lien, claim, option or right of others, except for the security interest

A00033

A0033

under the Receivables Intercreditor Agreement, this Agreement or as otherwise permitted under the Credit Agreement. No effective financing statement or other instrument similar in effect covering all or any part of such Collateral or listing such Grantor or any trade name of such Grantor as debtor is on file in any recording office, except such as may have been filed in favor of the purchase agents under the Amendment and Restated Purchase and Contribution Agreement, the Agent relating to the Secured Documents or as otherwise permitted under the Credit Agreement.

(d)     Such Grantor has exclusive possession and control of the Equipment and Inventory of such Grantor other than Equipment and Inventory stored at any leased premises, customer facility or warehouse which leased premises, customer facility or warehouse is so indicated by an asterisk on Schedule III hereto, as such Schedule III may be amended from time to time pursuant to Section 8(a). In the case of Equipment and Inventory located on leased premises or in warehouses, no lessor or warehouseman of any premises or warehouse upon or in which such Equipment or Inventory is located has (i) issued any warehouse receipt or other receipt in the nature of a warehouse receipt in respect of any Inventory, (ii) issued any document for any of such Grantor's Equipment or Inventory, (iii) received notification of any secured party's interest (other than the security interest to be granted hereunder) in such Grantor's Equipment or Inventory or (iv) any Lien, claim or charge (based on contract, statute or otherwise) on such Equipment or Inventory. Each Grantor shall provide the Agent with a landlord or warehouseman's agreement in form and substance satisfactory to the Agent for Equipment and Inventory having a value exceeding $1,000,000 located at premises leased by such Grantor.

(e)     The Pledged Equity pledged by such Grantor hereunder has been duly authorized and validly issued and is fully paid and non-assessable. Such Grantor has notified each such issuer of Pledged Equity that such Pledged Equity is subject to the security interest granted hereunder, and if such Grantor is an issuer of Pledged Equity, such Grantor confirms that it has received notice of such security interest.

(f)     The Initial Pledged Equity pledged by such Grantor constitutes the percentage of the issued and outstanding equity interest of the issuers thereof indicated on Schedule II hereto.

(g)     Such Grantor has no securities accounts or deposit accounts other than the Securities Accounts, the Excluded Deposit Accounts and the Pledged Deposit Accounts listed on Schedule V hereto and additional Securities Accounts and Pledged Deposit Accounts as to which such Grantor has complied with the requirements of Section 4 or Section 5, as applicable.

(h)     Upon (i) the proper filing and acceptance of a financing statement in the form of Exhibit A hereto with the Secretary of State of the jurisdiction in which such Grantor is organized, (ii) the taking of the actions described in Section 4 with respect to Security Collateral and (iii) the taking of the actions described in Section 5 with respect to Account Collateral, all filings and other actions necessary to perfect the security interest in the Collateral of such Grantor created under this Agreement will have been duly made or taken and will be in full force and effect and this Agreement will create in favor of the Agent for the benefit of the Secured Parties a valid and, together with such filings and other actions, perfected security interest in the Collateral of such Grantor, securing the payment of the Secured Obligations.

(i)     No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the grant by such Grantor of the assignment, pledge and security interest granted hereunder or for the

A00034

A0034

execution, delivery or performance of this Agreement by such Grantor or (ii) the perfection or maintenance of the assignment, pledge and security interest created hereunder, except for the filing of financing and continuation statements under the UCC, which financing statements will, upon the filing of a financing statement in the form of Exhibit A hereto with the Secretary of State of the jurisdiction in which such Grantor is organized have been duly filed and will be in full force and effect, the actions described in Section 4 with respect to Security Collateral and the actions described in Section 5 with respect to Account Collateral, or (iii) the exercise by the Agent its rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with the disposition of any portion of the Security Collateral by laws affecting the offering and sale of securities generally.

(j)    The Inventory that has been produced or distributed by such Grantor has been produced in material compliance with all requirements of applicable law, including, without limitation, the Fair Labor Standards Act.

Section 7.    Further Assurances. (a) Each Grantor agrees that from time to time, at the expense of such Grantor, such Grantor will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Agent may request, in order to perfect and protect any pledge or security interest granted or purported to be granted by such Grantor hereunder or to enable the Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral of such Grantor. Without limiting the generality of the foregoing, each Grantor will promptly, with respect to the Collateral of such Grantor, after an Event of Default: (i) mark conspicuously each document included in Inventory, each chattel paper included in Receivables, each Related Contract and, at the request of the Agent, each of its records pertaining to such Collateral with a legend, in form and substance satisfactory to the Agent, indicating that such document, chattel paper, Related Contract or Collateral is subject to the security interest granted hereby; (ii) execute or authenticate and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Agent may request, in order to perfect and preserve the security interest granted or purported to be granted by such Grantor hereunder; (iii) deliver and pledge to the Agent for benefit of the Secured Parties certificates representing Security Collateral that constitutes certificated securities, accompanied by undated powers executed in blank; and (iv) deliver to the Agent evidence that all other action that the Agent may deem reasonably necessary or desirable in order to perfect and protect the security interest created by such Grantor under this Agreement has been taken.

(b)    Each Grantor hereby authorizes the Agent at any time to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover the Collateral of such Grantor, in each case without the signature of such Grantor. A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(c)    Each Grantor will furnish to the Agent from time to time statements and schedules further identifying and describing the Collateral of such Grantor and such other reports in connection with such Collateral as the Agent may reasonably request, all in reasonable detail.

Section 8.    As to Equipment and Inventory. (a) Each Grantor will keep the Equipment and Inventory of such Grantor (other than Inventory sold in the ordinary course of business or Equipment or Inventory having a value of less than $1,000,000) at the places therefor specified in Section 6(b) or, upon 10 days' prior written notice to the Agent, at such other places designated by such Grantor in such notice. Upon the giving of such notice, Schedule III shall be automatically amended to

(Dana Security Agreement)

A00035

A0035

add any new locations specified in the notice.

(b)     Each Grantor will promptly furnish to the Agent a statement respecting any material loss or damage exceeding $5,000,000 to any of the Equipment or Inventory of such Grantor.

(c)     Each Grantor will pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including, without limitation, claims for labor, materials and supplies) against, its Equipment or Inventory; provided, however, that no Grantor shall be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its creditors.  In producing its Inventory, each Grantor will materially comply with all requirements of applicable law, including, without limitation, the Fair Labor Standards Act.

Section 9.     Insurance.  (a) Each Grantor will, at its own expense, maintain insurance with respect to the Equipment and Inventory of such Grantor in such amounts, against such risks, in such form and with such insurers, as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which such Grantor operates.  Each policy of each Grantor for liability insurance shall provide for all losses to be paid on behalf of the Agent and such Grantor as their interests may appear, and each policy for property damage insurance shall provide for all losses (except for losses of less than $10,000,000 per occurrence) to be paid directly to the Agent.  Within 15 days after the Amendment and Waiver No. 3 Effective Date (or such later date as the Agent may agree in its reasonable discretion), each such policy shall in addition (i) name such Grantor and the Agent as insured parties thereunder (without any representation or warranty by or obligation upon the Agent) as their interests may appear, (ii) contain the agreement by the insurer that any loss thereunder shall be payable to the Agent notwithstanding any action, inaction or breach of representation or warranty by such Grantor, and (iii) provide that there shall be no recourse against the Agent for payment of premiums or other amounts with respect thereto.  Each Grantor will, if so requested by the Agent, deliver to the Agent original or duplicate policies of such insurance and, as often as the Agent may reasonably request, a report of a reputable insurance broker with respect to such insurance.  Further, each Grantor will, at the request of the Agent, duly execute and deliver instruments of assignment of such insurance policies to comply with the requirements of Section 8 and cause the insurers to acknowledge notice of such assignment.

(b)     Reimbursement under any liability insurance maintained by any Grantor pursuant to this Section 9 may be paid directly to the Person who shall have incurred liability covered by such insurance.  In case of any loss involving damage to Equipment or Inventory when subsection (c) of this Section 9 is not applicable, the applicable Grantor will make or cause to be made the necessary repairs to or replacements of such Equipment or Inventory, and any proceeds of insurance properly received by or released to such Grantor shall be used by such Grantor, except as otherwise required hereunder or by the Credit Agreement, to pay or as reimbursement for the costs of such repairs or replacements.

(c)     So long as no Event of Default shall have occurred and be continuing, all insurance payments received by the Agent in connection with any loss, damage or destruction of any Equipment or Inventory will be released by the Agent to the applicable Grantor for the repair, replacement or restoration thereof, subject to such terms and conditions with respect to the release thereof as the Agent may reasonably require.  Upon the occurrence and during the continuance of any Event of Default or the actual or constructive total loss (in excess of $ 10,000,000 per occurrence) of any Equipment or Inventory, all insurance payments in respect of such Equipment or Inventory shall be paid to the Agent and shall, in the Agent's sole discretion, (i) be released to the applicable Grantor to be applied as set forth in the first sentence of this subsection (c) or (ii) be held as additional Collateral

A00036

A0036

hereunder or applied as specified in Section 16(b).

Section 10.    Post-Closing Changes; Bailees; Collections on Receivables and Related Contracts. (a) No Grantor will change its name, type of organization, jurisdiction of organization, organizational identification number or location from those set forth in Section 6(a) of this Agreement without first giving at least 30 days' prior written notice to the Agent and taking all action required by the Agent for the purpose of perfecting or protecting the security interest granted by this Agreement. No Grantor will become bound by a security agreement authenticated by another Person (determined as provided in Section 9-203(d) of the UCC) without giving the Agent 10 days' prior written notice thereof and taking all action required by the Agent to ensure that the perfection of the Agent's security interest in the Collateral will be maintained. Each Grantor will hold and preserve its records relating to the Collateral, including, without limitation, the Related Contracts, and will permit representatives of the Agent at anytime during normal business hours to inspect and make abstracts from such records and other documents. If any Grantor does not have an organizational identification number and later obtains one, it will forthwith notify the Agent of such organizational identification number.

(b)    If any Collateral of any Grantor is at any time in the possession or control of a warehouseman, bailee or agent, or if the Agent so requests at any time such Grantor will (i) notify such warehouseman, bailee or agent of the security interest created hereunder, (ii) instruct such warehouseman, bailee or agent to hold all such Collateral solely for the Agent's account subject only to the Agent's instructions (which shall permit such Collateral to be removed by such Grantor in the ordinary course of business until the Agent notifies such warehouseman, bailee or agent that an Event of Default has occurred and is continuing), (iii) use commercially reasonable efforts, to cause such warehouseman, bailee or agent to authenticate a record acknowledging that it holds possession of such Collateral for the Agent's benefit and shall act solely on the instructions of the Agent without the further consent of such Grantor or any other Person, and (iv) make such authenticated record available to the Agent.

(c)    Except as otherwise provided in this subsection (c), each Grantor will continue to collect, at its own expense, all amounts due or to become due such Grantor under the Receivables and Related Contracts. In connection with such collections, such Grantor may take (and, at the Agent's direction, will take) such action as such Grantor or the Agent may deem necessary or advisable to enforce collection of the Receivables and Related Contracts; provided, however, that the Agent shall have the right at any time that an Event of Default has occurred and is continuing, subject to the Receivables Intercreditor Agreement, upon written notice to such Grantor of its intention to do so, to notify the obligors under any Receivables and Related Contracts of the assignment of such Receivables and Related Contracts to the Agent and to direct such obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Agent and, upon such notification and at the expense of such Grantor, to enforce collection of any such Receivables and Related Contracts, to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including, without limitation, those set forth in Section 9-607 of the UCC. After receipt by any Grantor of the notice from the Agent referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including, without limitation, instruments) received by such Grantor in respect of the Receivables and Related Contracts of such Grantor shall be received in trust for the benefit of the Agent hereunder, shall be segregated from other funds of such Grantor and, if any Event of Default shall have occurred and be continuing, shall be forthwith paid over to the Agent in the same form as so received (with any necessary indorsement) to be applied as provided in Section 16(b) and (ii) such Grantor will not adjust, settle or compromise the amount or payment of any Receivable or amount due on any Related Contract, release wholly or partly any obligor thereof, or allow any credit or discount thereon. No Grantor will permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the obligor thereof.

A00037

A0037

Section 11.    <u>Voting Rights; Dividends; Etc.</u>  (a)  So long as no Event of Default shall have occurred and be continuing:

(i)    Each Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Security Collateral of such Grantor or any part thereof for any purpose; <u>provided</u> <u>however</u>, that such Grantor will not exercise or refrain from exercising any such right if such action would have a material adverse effect on the value of the Security Collateral or any part thereof.

(ii)    Each Grantor shall be entitled to receive and retain any and all dividends, interest and other distributions paid in respect of the Security Collateral of such Grantor if and to the extent that the payment thereof is not otherwise prohibited by the terms of the Secured Documents; <u>provided</u>, <u>however</u>, that any and all

(A)    dividends, interest and other distributions paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Security Collateral,

(B)    dividends and other distributions paid or payable in cash in respect of any Security Collateral in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus and

(C)    cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Security Collateral

shall be, and shall be forthwith delivered to the Agent to hold as, Security Collateral and shall, if received by such Grantor, be received in trust for the benefit of the Agent, be segregated from the other property or funds of such Grantor and be forthwith delivered to the Agent as Security Collateral in the same form as so received (with any necessary indorsement).

(iii)    The Agent will execute and deliver (or cause to be executed and delivered) to each Grantor all such proxies and other instruments as such Grantor may reasonably request for the purpose of enabling such Grantor to exercise the voting and other rights that it is entitled to exercise pursuant to paragraph (i) above and to receive the dividends or interest payments that it is authorized to receive and retain pursuant to paragraph (ii) above.

(b)    Upon the occurrence and during the continuance of an Event of Default:

(i)    All rights of each Grantor (x) to exercise or refrain from exercising the voting and other consensual rights that it would otherwise be entitled to exercise pursuant to Section 11(a)(i) shall, upon notice to such Grantor by the Agent, cease and (y) to receive the dividends, interest and other distributions that it would otherwise be authorized to receive and retain pursuant to Section 11(a)(ii) shall automatically cease, and all such rights shall thereupon become vested in the Agent, which shall thereupon have the sole right to exercise or refrain from exercising such voting and other consensual rights and to receive and hold as Security Collateral such dividends, interest and other distributions.

(ii)    All dividends, interest and other distributions that are received by any Grantor contrary to the provisions of paragraph (i) of this Section 11(b) shall be received in trust for the benefit of the Agent, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Agent as Security Collateral in the same form as so received (with any

A00038
A0038

necessary indorsement).

Section 12.    Transfers and Other Liens: Additional Equity Interests.    (a) Each Grantor agrees that it will not (i) sell, assign or otherwise dispose of, or grant any option with respect to, any of the Collateral, other than sales, assignments and other dispositions of Collateral, and options relating to Collateral, permitted under the terms of the Credit Agreement or the Receivables Intercreditor Agreement or (ii) create or suffer to exist any Lien upon or with respect to any of the Collateral of such Grantor, except for the pledge, assignment and security interest created under this Agreement and Liens permitted under the Credit Agreement or the Receivables Intercreditor Agreement.

(b) Each Grantor agrees that it will pledge hereunder, immediately upon its acquisition (directly or indirectly) thereof, any and all additional equity interests or other securities of Dana Asset Funding LLC.

Section 13.    Agent Appointed Attorney-in-Fact.    Each Grantor hereby irrevocably appoints the Agent such Grantor's attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time upon the occurrence and during the continuance of an Event of Default, in the Agent's discretion, to take any action and to execute any instrument that the Agent may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)    to obtain and adjust insurance required to be paid to the Agent pursuant to Section 9,

(b)    to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(c)    to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) or (b) above, and

(d)    to file any claims or take any action or institute any proceedings that the Agent may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce compliance with the terms and conditions of any Assigned Agreement or the rights of the Agent with respect to any of the Collateral.

Section 14.    Agent May Perform.    If any Grantor fails to perform any agreement contained herein, the Agent may, as the Agent deems necessary to protect the security interest granted hereunder in the Collateral or to protect the value thereof, but without any obligation to do so and with notice to Borrower and such Grantor, itself perform, or cause performance of, such agreement, and the expenses of the Agent incurred in connection therewith shall be payable by such Grantor under Section 17.

Section 15.    The Agent's Duties.    (a) The powers conferred on the Agent hereunder are solely to protect the Secured Parties' interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Agent shall have no duty as to any Collateral, as to ascertaining or taking action with respect to exchanges, maturities or other matters relative to any Collateral, whether or not any Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Agent shall be deemed to have exercised reasonable care in the custody

NYDOCS03/788177.9

A00039
A0039

and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

(b)     Anything contained herein to the contrary notwithstanding, the Agent may from time to time, when the Agent deems it to be necessary, appoint one or more subagents (each a "Subagent") for the Agent hereunder with respect to all or any part of the Collateral. In the event that the Agent so appoints any Subagent with respect to any Collateral, (i) the assignment and pledge of such Collateral and the security interest granted in such Collateral by each Grantor hereunder shall be deemed for purposes of this Security Agreement to have been made to such Subagent, in addition to the Agent, for the ratable benefit of the Secured Parties, as security for the Secured Obligations of such Grantor, (ii) such Subagent shall automatically be vested, in addition to the Agent, with all rights, powers, privileges, interests and remedies of the Agent hereunder with respect to such Collateral, and (iii) the term "Agent", when used herein in relation to any rights, powers, privileges, interests and remedies of the Agent with respect to such Collateral, shall include such Subagent; provided, however, that no such Subagent shall be authorized to take any action with respect to any such Collateral unless and except to the extent expressly authorized in writing by the Agent.

Section 16.     Remedies. If, any Event of Default shall have occurred and be continuing:

(a)     The Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may: (i) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Agent forthwith, assemble all or part of the Collateral of such Grantor as directed by the Agent (to the extent that such assembly is commercially reasonable) and make it available to the Agent at a place and time to be designated by the Agent that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Agent may deem commercially reasonable; (iii) occupy any premises owned or leased by any of the Grantors where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to such Grantor in respect of such occupation; and (iv) exercise any and all rights and remedies of any Grantors under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, (A) any and all rights of such Grantor to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables, the Related Contracts and the other Collateral, (B) exercise all other rights and remedies with respect to the Receivables, the Related Contracts and the other Collateral, including, without limitation, those set forth in Section 9-607 of the UCC and (C) withdraw, or cause or direct the withdrawal, of all funds with respect to the Account Collateral. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     The Agent may, without notice to any Grantor except as required by law and at any time or from time to time, charge, set-off and otherwise apply any funds held with

A00040
A0040

respect to the Account Collateral or in any other deposit account against all or any part of the Secured Obligations.

(c)     The Agent may send to each bank, securities intermediary or issuer party to any Deposit Account Control Agreement or Securities Account Control Agreement a "Notice of Exclusive Control" as defined in and under such Agreement

(d)     Any cash held by or on behalf of the Agent and all cash proceeds received by or on behalf of the Agent in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Agent, be held by the Agent as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Agent pursuant to Section 17) in whole or in part by the Agent for the ratable benefit of the Secured Parties against, all or any part of the Secured Obligations, in the following manner:

(i)     first, paid to the Agent for any amounts then owing to the Agent pursuant to the Credit Agreement or otherwise under the Secured Documents; and

(ii)     second, ratably paid to the Secured Parties for any amounts then owing to them in respect of the Secured Obligations ratably in accordance with such respective amounts then owing to such Secured Parties, provided that, for purposes of this Section 16, the amount owing to any such counterparty pursuant to any Secured Hedge Agreement to which it is a party (other than any amount therefore accrued and unpaid) shall be deemed to be equal to the Agreement Value therefor. "Agreement Value" means the mark-to-market value of each Secured Hedge Agreement, which will be the unrealized loss on such Secured Hedge Agreement to the Grantor party to such Secured Hedge Agreement determined by the Agent as the amount, if any, by which (i) the present value of the future cash flows to be paid by such Grantor exceeds (ii) the present value of the future cash flows to be received by such Grantor pursuant to such Secured Hedge Agreement.

Any surplus of such cash or cash proceeds held by or on the behalf of the Agent and remaining after payment in full of all the Secured Obligations shall be paid over to the applicable Grantor or to whomsoever may be lawfully entitled to receive such surplus.

(e)     All payments received by any Grantor under or in connection with or in respect of the Collateral shall be received in trust for the benefit of the Agent, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Agent in the same form as so received (with any necessary indorsement).

Section 17.    Indemnity and Expenses. (a) Each Grantor agrees to indemnify, defend and save and hold harmless each Secured Party and each of their Affiliates and their respective officers, directors, employees, agents and advisors (each, an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claim, damage, loss, liability or expense has resulted from such Indemnified Party's gross negligence or willful misconduct.

(b)     Each Grantor will upon demand pay to the Agent the amount of any and all

A00041
A0041

reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts and agents, that the Agent may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral of such Grantor, (iii) the exercise or enforcement of any of the rights of the Agent or the other Secured Parties hereunder or (iv) the failure by such Grantor to perform or observe any of the provisions hereof.

Section 18.    Amendments; Waivers; Additional Grantors; Etc.   (a)  No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure on the part of the Agent or any other Secured Party to exercise, and no delay in exercising any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

(b)    Upon the execution and delivery, or authentication, by any Person of a security agreement supplement in substantially the form of Exhibit B hereto (each a "Security Agreement Supplement"), (i) such Person shall be referred to as an "Additional Grantor" and shall be and become a Grantor hereunder, and each reference in this Agreement and the other Secured Documents to "Grantor" shall also mean and be a reference to such Additional Grantor, and each reference in this Agreement and the other Secured Documents to "Collateral" shall also mean and be a reference to the Collateral of such Additional Grantor, and (ii) the supplemental schedules I-V attached to each Security Agreement Supplement shall be incorporated into and become a part of and supplement Schedules I-V, respectively, hereto, and the Agent may attach such supplemental schedules to such Schedules; and each reference to such Schedules shall mean and be a reference to such Schedules as supplemented pursuant to each Security Agreement Supplement.

Section 19.    Notices; Etc.   All notices and other communications provided for hereunder shall be either (i) in writing (including telegraphic, telecopier or telex communication) and mailed, telegraphed, telecopied, telexed or otherwise delivered or (ii) by electronic mail (if electronic mail addresses are designated as provided below) confirmed immediately in writing, in the case of the Borrower or the Agent, addressed to it at its address specified in the Credit Agreement and, in the case of each Grantor other than the Borrower, addressed to it as its address set forth opposite such Grantor's name on the signature pages hereto or on the signature page to the Security Agreement Supplement pursuant to which it became a party; or, as to any party, at such other address as shall be designated by such party in a written notice to the other parties. All such notices and other communications shall, when mailed, telegraphed, telecopied, telexed, sent by electronic mail or otherwise, be effective when deposited in the mails, delivered to the telegraph company, telecopied, confirmed by telex answerback, sent by electronic mail and confirmed in writing, or otherwise delivered (or confirmed by a signed receipt), respectively, addressed as aforesaid. Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or of any Security Agreement Supplement or Schedule hereto shall be effective as delivery of an original executed counterpart thereof.

Section 20.    Continuing Security Interest; Assignments under the Credit Agreement. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the latest of (i) the payment in full in cash of the Secured Obligations under the Loan Documents, (ii) the Termination Date and (iii) the termination or expiration of all Letters of Credit, (b) be binding upon each Grantor, its successors and assigns and (c) inure, together with the rights and remedies of the Agent hereunder, to the benefit of the Secured Parties and their respective successors, transferees and assigns. Without limiting the generality of the foregoing clause (c), if a Secured Party shall assign or otherwise transfer all or any portion of its rights and obligations in accordance with the

A00042
A0042

terms of the Credit Agreement (including, without limitation, all or any portion of its Commitments, the Advances owing to it and the Note or Notes, if any, held by it) to any other Person, such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Party herein or otherwise, in each case as provided in the Credit Agreement.

Section 21.    Release; Termination.  (a) Upon any sale, lease, transfer or other disposition of any item of Collateral of any Grantor in accordance with the terms of the Loan Documents or the Receivables Intercreditor Agreement (other than sales of Inventory in the ordinary course of business), such item shall no longer constitute Collateral and the Agent will, at such Grantor's expense, execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted hereby; provided, however, that (i) at the time of such request and such release, no Event of Default shall have occurred and be continuing and (ii) such Grantor shall have delivered to the Agent, at least five Business Days prior to the date of the proposed release, a written request for release describing the item of Collateral and the terms of the sale, lease, transfer or other disposition in reasonable detail, together with a form of release for execution by the Agent and a certificate of such Grantor to the effect that the transaction is in compliance with the Loan Documents and as to such other matters as the Agent may request.

(b)    Subject to Sections 1 and 21(a), upon the latest of (i) the payment in full in cash of the Secured Obligations under the Loan Documents, (ii) the Termination Date and (iii) the termination or expiration of all Letters of Credit, the pledge and security interest granted hereby shall terminate in full and all rights to the Collateral shall revert to the applicable Grantor.  Upon any such termination, the Agent will, at the applicable Grantor's expense, execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

Section 22.    Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of an original executed counterpart of this Agreement.

Section 23.    Governing Law .  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

[SIGNATURE PAGES FOLLOW.]

A00043

A0043

IN WITNESS WHEREOF, each Grantor has caused this Agreement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

DANA CORPORATION

By _____
   Name:   Teresa Mulawa
   Title:   Treasurer


By _____
   Name:   Robert C. Richter
   Title:   Vice President & Chief Financial
            Officer

BRAKE SYSTEMS, INC.

By _____
   Name:   Teresa Mulawa
   Title:   Vice President and Treasurer

BWDAC, INC.

By _____
   Name:   Teresa Mulawa
   Title:   Vice President and Treasurer

CCD AIR, FIFTY LLC

By _____
   Name:   Teresa Mulawa
   Title:   Vice President

COUPLED PRODUCTS, INC.

By _____
   Name:   Teresa Mulawa
   Title:   Vice President and Treasurer

(Dana Security Agreement)
17

A00044
A0044



DANA ATLANTIC LLC FKA GLACIER DAIDO
AMERICA, LLC

By       _Teresa Mulawa_
          Name:   Teresa Mulawa
          Title:    Vice President

DANA AUTOMOTIVE AFTERMARKET, INC.

By       _Teresa Mulawa_
          Name:   Teresa Mulawa
          Title:    Treasurer

DANA INTERNATIONAL FINANCE INC.

By       _Teresa Mulawa_
          Name:   Teresa Mulawa
          Title:    President

DANA INTERNATIONAL HOLDINGS, INC.

By       _Teresa Mulawa_
          Name:   Teresa Mulawa
          Title:    Treasurer

DANA REALTY FUNDING LLC

By       _Teresa Mulawa_
          Name:   Teresa Mulawa
          Title:    Treasurer

NYDCC303/733177.5

A00045
A0045

DANA RISK MANAGEMENT SERVICES, INC.

By _____
Name:    Teresa Mulawa
Title:    Vice President

DANA TECHNOLOGY INC.

By _____
Name:    Teresa Mulawa
Title:    Treasurer

DANA WORLD TRADE CORPORATION

By _____
Name:    Teresa Mulawa
Title:    Treasurer

DANDOOR L.L.C.

By _____
Name:    Teresa Mulawa
Title:    Vice President

DORR LEASING CORPORATION

By _____
Name:    Teresa Mulawa
Title:    Vice President and Treasurer

DTF TRUCKING, INC.

By _____
Name:    Teresa Mulawa
Title:    Vice President and Treasurer

(Dana Security Agreement)
19

A00046
A0046

ECHLIN-PONCE, INC.

By _____
Name:     Teresa Mulawa
Title:     Vice President and Treasurer

EFMG LLC

By _____
Name:     Teresa Mulawa
Title:     Vice President and Treasurer

EPE, INC.

By _____
Name:     Teresa Mulawa
Title:     Vice President and Treasurer

ERS LLC

By _____
Name:     Teresa Mulawa
Title:     Vice President and Treasurer

FLIGHT OPERATIONS, INC.

By _____
Name:     Teresa Mulawa
Title:     Vice President

FRICTION INC.

By _____
Name:     Teresa Mulawa
Title:     Vice President and Treasurer

A00047
A0047

FRICTION MATERIALS, INC.

By     _Teresa Mulawa_

Name:     Teresa Mulawa
Title:     Vice President and Treasurer

GLACIER VANDERVELL INC.

By     _Teresa Mulawa_

Name:     Teresa Mulawa
Title:     Vice President and Treasurer

HOSE & TUBING PRODUCTS, INC.

By     _Teresa Mulawa_

Name:     Teresa Mulawa
Title:     Vice President and Treasurer

LIPE CORPORATION

By     _Teresa Mulawa_

Name:     Teresa Mulawa
Title:     Vice President and Treasurer

LONG AUTOMOTIVE LLC

By     _Teresa Mulawa_

Name:     Teresa Mulawa
Title:     Vice President and Treasurer

LONG COOLING LLC

By     _Teresa Mulawa_

Name:     Teresa Mulawa
Title:     Vice President and Treasurer

(Dana Security Agreement)
21

A00048

A0048

LONG USA LLC

By _____
    Name:    Teresa Mulawa
    Title:    Vice President and Treasurer

MIDLAND BRAKE, INC.

By _____
    Name:    Teresa Mulawa
    Title:    Vice President and Treasurer

PRATTVILLE MFG., INC.

By _____
    Name:    Teresa Mulawa
    Title:    Vice President and Treasurer

REINZ WISCONSIN GASKET COMPANY

By _____
    Name:    Teresa Mulawa
    Title:    Vice President

SPICER HEAVY AXLE & BRAKE, INC.

By _____
    Name:    Teresa Mulawa
    Title:    Vice President and Treasurer

SPICER HEAVY AXLE HOLDINGS, INC.

By _____
    Name:    Teresa Mulawa
    Title:    Treasurer

NYDOCS03/733177.6

A00049

A0049

SPICER OUTDOOR POWER EQUIPMENT
COMPONENTS LLC

By _____
        Name:   Teresa Mulawa
        Title:    Vice President

TORQUE-TRACTION INTEGRATION
TECHNOLOGIES, INC.

By _____
        Name:   Teresa Mulawa
        Title:    Vice President and Treasurer

TORQUE-TRACTION MANUFACTURING
TECHNOLOGIES, INC.

By _____
        Name:   Teresa Mulawa
        Title:    Vice President and Treasurer

TORQUE-TRACTION TECHNOLOGIES, INC.

By _____
        Name:   Teresa Mulawa
        Title:    Vice President and Treasurer

UNITED BRAKE SYSTEMS INC.

By _____
        Name:   Teresa Mulawa
        Title:    Vice President and Treasurer

WIX FILTRON LLC

By _____
        Name:   Teresa Mulawa
        Title:    Vice President

(Dana Security Agreement)
23

NYDOCS03/788177.6

A00050

A0050

Schedule 1 to the
Security Agreement

LOCATION, TYPE OF ORGANIZATION, JURISDICTION OF ORGANIZATION AND
ORGANIZATIONAL IDENTIFICATION NUMBERS

| Grantor | Location | Type of Organization | Jurisdiction | Organizational ID (CA, MI, VA) |
|---|---|---|---|---|
| Dana Corporation | 4500 Dorr Street, Toledo OH 43615 | Corporation | VA | 0014815 |
| Brake Systems, Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| BWDAC, Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| CCD Air, Fifty LLC | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| Coupled Products, Inc. | See note 3 | Corporation | VA | 0584972 |
| Dana Atlantic LLC | 60428 Marne Road, Atlantic IA 50022 | Limited Liability Company | DE | |
| Dana Automotive Aftermarket, Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| Dana International Finance Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |

(Dana Security Agreement)

NY1DOCS/827/449492.2

A00051

A0051

| Name | Address | Type | State | Number |
|---|---|---|---|---|
| Dana International Holdings, Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| Dana Realty Funding LLC | 4500 Dorr Street, Toledo OH 43615 | Limited Liability Company | DE | |
| Dana Risk Management Services, Inc. | 1801 Richards Rd., Toledo OH 43607 | Corporation | OH | |
| Dana Technology Inc. | 8000 Yankee Rd., Ottawa Lake MI 49267 | Corporation | MI | 441965 |
| Dana World Trade Corporation | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| Dandoor L.L.C. | 4500 Dorr Street, Toledo OH 43615 | Limited Liability Company | DE | |
| Dorr Leasing Corporation | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| DTF Trucking, Inc. | 2630 South 800 East, Columbia City IN 46725 | Corporation | DE | |
| Echlin-Ponce, Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| EFMG LLC | 2910 Waterview Dr, Rochester Hills MI 48301 | Limited Liability Company | VA | S 083900-3 |
| EPE, Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | CA | C 0429991 |
| ERS LLC | 4500 Dorr Street, Toledo OH 43615 | Limited Liability | VA | S 083899-7 |

| | 43615 | Company | | |
|---|---|---|---|---|
| Flight Operations, Inc. | 11451 W. Airport Service Rd., Swanton OH 43558 | Corporation | DE | |
| Friction Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| Friction Materials, Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | MA | |
| Glacier Vandervell Inc. | 27404 Drake Rd., Farmington Hills MI 48331; 17226 CR 57, Caldwell OH 43724; 5130 N SR 60, McConnelsville OH 43756 | Corporation | MI | 407315 |
| Hose & Tubing Products, Inc. | 2120 Defiance Str., Archbold OH 43502 | Corporation | VA | 0584973 |
| Lipe Corporation | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |
| Long Automotive LLC | 4500 Dorr Street, Toledo OH 43615 | Limited Liability Company | VA | S 085021-6 |
| Long Cooling LLC | 501 Commerce Dr., Danville IN 46122 | Limited Liability Company | VA | S 084246-0 |
| Long USA LLC | 103 Horton Str., Sheffield PA 16347 | Limited Liability Company | VA | S 083901-1 |
| Midland Brake, Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE | |

NYDOCS02/744972.2

(Pann Security Agreement)

|  | 43615 |  |  |  |
| --- | --- | --- | --- | --- |
| Prattville Mfg., Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | DE |  |
| Reinz Wisconsin Gasket Company | 11500 W. Brown Deer Rd., Milwaukee WI 53224 | Corporation | DE |  |
| Spicer Heavy Axle & Brake, Inc. | 6938 Elm Valley Dr., Kalamazoo MI 49009 | Corporation | MI | 522530 |
| Spicer Heavy Axle Holdings, Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | MI | 085871 |
| Spicer Outdoor Power Equipment Components LLC | 4500 Dorr Street, Toledo OH 43615 | Limited Liability Company | OH |  |
| Torque-Traction Integration Technologies, Inc. | See Note 1 | Corporation | OH |  |
| Torque-Traction Manufacturing Technologies, Inc. | See Note 2 | Corporation | OH |  |
| Torque-Traction Technologies, Inc. | 3939 Technology Dr., Maumee OH 43537 | Corporation | OH |  |
| United Brake Systems Inc. | 4500 Dorr Street, Toledo OH 43615 | Corporation | OH |  |
| Wix Filtron LLC | 4500 Dorr Street, Toledo OH 43615 | Limited Liability Company | VA | S 115488-1 |

Note 1:

(Dana Security Agreement)

NYDOCS02/744492.2

A00054

A00054

125 S. Keim Street, Pottstown PA 19464
400 S. Miller Avenue, Marion IN 46953
777 Bible Road, Lima OH 45887
501 W. Railroad Street, Syracuse IN 46567
2075 Corporate Circle, Cape Girardeau MO 63701
2100 W. State Blvd., Fort Wayne IN 46808

Note 2:
187 Spicer Drive, Gordonsville TN 38563
6900-C Northpark Blvd., Charlotte NC 28216
12720 Westport Rd., Ste F, Louisville KY 40223
2001 Eastwood Drive, Sterling IL 61081
2400 Lemone Industrial Blvd., Columbia MO 65201
3200 Green Forest Avenue, Buena Vista VA 24416
10000 Business Blvd., Dry Ridge KY 41035
174 Millenium Drive, Orangeburg SC 29115
401 East Park Drive, Albion IN 46701

Note 3:
9101 Ely Street, Pensacola FL 32514
303 N. Jackson, Andrews IN 46702
2651 South 600 East, Columbia City IN 46725
1201 W. Orchard, Mitchell IN 47446
200 E. Wyandot Street, Wharton OH 43359
500 Raybestos Drive, Upper Sandusky OH 43351

(Duna Security Agreement)

NY1DOCS02/744492.2

Schedule II to the
Security Agreement

PLEDGED EQUITY

| Grantor | Issuer | Class of Equity Interest | Percentage Interest* |
|---|---|---|---|
| Dana Corporation | Dana Asset Funding LLC | Membership Interest | 59.65% |
| Coupled Products, Inc. | Dana Asset Funding LLC | Membership Interest | 3.9% |
| EFMG LLC | Dana Asset Funding LLC | Membership Interest | 0.16% |
| Glacier Vandervell Inc. | Dana Asset Funding LLC | Membership Interest | 0.97% |
| Hose & Tubing Products, Inc. | Dana Asset Funding LLC | Membership Interest | 0.68% |
| Torque-Traction Integration Technologies, Inc. | Dana Asset Funding LLC | Membership Interest | 33% |
| Torque-Traction Technolgies, Inc. | Dana Asset Funding LLC | Membership Interest | 0.51% |
| Reinz Wisconsin Gasket Company | Dana Asset Funding LLC | Membership Interest | 0.53% |
| Victor Reinz Valve Seals LLC (70% JV) | Dana Asset Funding LLC | Membership Interest | 0.56% |

*Based on outstanding A/R Balance as of October 31, 2005

(Dana Security Agreement)

NY1:\1405582\02\10449Z.2

A0056

Schedule III to the
Security Agreement

LOCATIONS OF EQUIPMENT AND INVENTORY

| Grantor | Location | Jurisdiction of Organization |
|---|---|---|
| Dana Corporation | 4500 Dorr Street, Toledo OH 43615 | VA |
| Brake Systems, Inc. | 4500 Dorr Street, Toledo OH 43615 | DE |
| BWDAC, Inc. | 4500 Dorr Street, Toledo OH 43615 | DE |
| CCD Air, Fifty LLC | 4500 Dorr Street, Toledo OH 43615 | DE |
| Coupled Products, Inc. | See note 3 | VA |
| Dana Atlantic LLC | 60428 Marne Road, Atlantic IA 50022 | DE |
| Dana Automotive Aftermarket, Inc. | 4500 Dorr Street, Toledo OH 43615 | DE |
| Dana International Finance Inc. | 4500 Dorr Street, Toledo, OH 43615 | DE |
| Dana International Holdings, Inc. | 4500 Dorr Street, Toledo OH 43615 | DE |
| Dana Realty Funding LLC | 4500 Dorr Street, Toledo OH 43615 | DE |
| Dana Risk Management Services, | 1801 Richards Rd., Toledo OH 43607 | OH |

(Dana Security Agreement)

NY1:DOCS07/744492.2

| Inc. | | |
|---|---|---|
| Dana Technology Inc. | 8000 Yankee Rd., Ottawa Lake MI 49267 | MI |
| Dana World Trade Corporation | 4500 Dorr Street, Toledo OH 43615 | DE |
| Dandoor L.L.C. | 4500 Dorr Street, Toledo OH 43615 | DE |
| Dorr Leasing Corporation | 4500 Dorr Street, Toledo OH 43615 | DE |
| DTF Trucking, Inc. | 2630 South 800 East, Columbia City IN 46725 | DE |
| Echlin-Ponce, Inc. | 4500 Dorr Street, Toledo OH 43615 | DE |
| EFMG LLC | 2910 Waterview Dr, Rochester Hills MI 48301 | VA |
| EPE, Inc. | 4500 Dorr Street, Toledo OH 43615 | CA |
| ERS LLC | 4500 Dorr Street, Toledo OH 43615 | VA |
| Flight Operations, Inc. | 11451 W. Airport Service Rd., Swanton OH 43558 | DE |
| Friction Inc. | 4500 Dorr Street, Toledo OH 43615 | DE |
| Friction Materials, Inc. | 4500 Dorr Street, Toledo OH 43615 | MA |
| Glacier Vandervell Inc. | 27404 Drake Rd., Farmington Hills MI 48331; 17226 CR 57, Caldwell OH 43724; 5130 N SR 60, McConnelsville OH 43756 | MI |
| Hose & Tubing Products, Inc. | 2120 Defiance Str, Archbold OH 43502 | VA |

(Dana Security Agreement)

A00058

A0058

| Lipe Corporation | 4500 Dorr Street, Toledo OH 43615 | DE |
|---|---|---|
| Long Automotive LLC | 4500 Dorr Street, Toledo OH 43615 | VA |
| Long Cooling LLC | 501 Commerce Dr., Danville IN 46122 | VA |
| Long USA LLC | 103 Horton Str., Sheffield PA 16347 | VA |
| Midland Brake, Inc. | 4500 Dorr Street, Toledo OH 43615 | DE |
| Prattville Mfg., Inc. | 4500 Dorr Street, Toledo OH 43615 | DE |
| Reinz Wisconsin Gasket Company | 11500 W. Brown Deer Rd., Milwaukee WI 53224 | DE |
| Spicer Heavy Axle & Brake, Inc. | 6938 Elm Valley Dr., Kalamazoo MI 49009 | MI |
| Spicer Heavy Axle Holdings, Inc. | 4500 Dorr Street, Toledo OH 43615 | MI |
| Spicer Outdoor Power Equipment Components LLC | 4500 Dorr Street, Toledo OH 43615 | OH |
| Torque-Traction Integration Technologies, Inc. | See Note 1 | OH |
| Torque-Traction Manufacturing Technologies, Inc. | See Note 2 | OH |
| Torque-Traction Technologies, Inc. | 3939 Technology Dr., Maumee OH 43537 | OH |
| United Brake Systems Inc. | 4500 Dorr Street, Toledo OH 43615 | DE |
| Wix Filtron LLC | 4500 Dorr Street, Toledo OH 43615 | VA |

(Dana Security Agreement)

NY DOCS02/744492.2

Note 1:
125 S. Keim Street, Pottstown PA 19464
400 S. Miller Avenue, Marion IN 46953
777 Bible Road, Lima OH 45887
501 W. Railroad Street, Syracuse IN 46567
2075 Corporate Circle, Cape Girardeau MO 63701
2100 W. State Blvd., Fort Wayne IN 46808

Note 2:
187 Spicer Drive, Gordonsville TN 38563
6900-C Northpark Blvd., Charlotte NC 28216
12720 Westport Rd., Ste F, Louisville KY 40223
2001 Eastwood Drive, Sterling IL 61081
2400 Lenone Industrial Blvd., Columbia MO 65201
3200 Green Forest Avenue, Buena Vista VA 24416
10000 Business Blvd., Dry Ridge KY 41035
174 Millenium Drive, Orangeburg SC 29115
401 East Park Drive, Albion IN 46701

Note 3:
9101 Ely Street, Pensacola FL 32514
303 N. Jackson, Andrews IN 46702
2651 South 600 East, Columbia City IN 46725
1201 W. Orchard, Mitchell IN 47446
200 E. Wyandot Street, Wharton OH 43359
500 Raybestos Drive, Upper Sandusky OH 43351

(Data Security Agreement)

NYDOCS02/744492.2