Schedule IV to the
Security Agreement

## CHANGES IN NAME, LOCATION, ETC.

1.    Changes in the Debtor's Name (including new debtor with a new name and names associated with all predecessors in interest of the Debtor)

1.  Torque-Traction Integration Technologies was formerly known as Spicer Driveshaft Assembly, Inc. Spicer Axle Inc. was merged into Spicer Driveshaft Assembly, Inc.

2.  Torque-Traction Manufacturing Technologies, Inc. was formerly known as Spicer Driveshaft Manufacturing, Inc.

3.  Hose & Tubing Products, Inc. was formerly known as Hose & Tubing, Inc.

4.  Dana Atlantic LLC was formerly a 70% joint venture interest by the name Glacier Daido America LLC.

5.  BWDAC, Inc. was formerly known as BWD Automotive Corporation.

Changes in the Debtor's Location

None

Changes in the Type of Organization

1.  Long Automotive, Inc. merged with and into Long Automotive LLC.

2.  Long Cooling Systems, Inc. merged with and into Long Cooling Systems LLC.

3.  Long USA Inc. merged with and into Long USA LLC.

4.  Hydraulics, Inc. merged with and into Hydraulics LLC. Multitec PTG, Inc. merged with and into Multitec LLC. Preferred Technical Group, Inc. merged with and into Preferred Technical Group LLC. Multitec LLC, Hydraulics LLC and Preferred Technical Group LLC merged with and into Coupled Products, Inc.

5.  Preferred Technical Group International, Inc. merged with and into PTGI LLC. EFMG LLC merged with and into PTGI LLC, with PTGI LLC being the surviving entity. PTGI LLC then changed its name to EFMG LLC.

6.  Hose & Tubing LLC merged with and into Hose & Tubing, Inc.

A00061
A0061

7.  Tekonsha Engineering Company merged with and into ERS LLC.

Changes in the Jurisdiction of Organization

1.  Hydraulics, Inc., a Delaware corporation merged with and into Hydraulics LLC, a Virginia limited liability company.

2.  Long Automotive, Inc., a Texas corporation merged with and into Long Automotive LLC, a Virginia limited liability company.

3.  Long Cooling Systems Inc., a Delaware corporation merged with and into Long Cooling Systems LLC, a Virginia limited liability company.

4.  Preferred Technical Group, Inc., a Delaware corporation merged with and into Preferred Technical Group LLC, a Virginia limited liability company.

5.  Multitec PTG, Inc., a Delaware corporation merged with and into Multitec LLC, a Virginia limited liability company.

6.  Long USA Inc., a Delaware corporation merged with and into Long USA LLC, a Virginia limited liability company.

7.  Preferred Technical Group International, Inc., a Delaware corporation merged with and into PTGI LLC, a Virginia corporation.

8.  Tekonsha Engineering Company, a Michigan corporation merged with and into ERS LLC, a Virginia limited liability company.

A00062

A0062

Schedule V to the
Security Agreement

## PLEDGED DEPOSIT ACCOUNTS; SECURITIES ACCOUNTS

| Bank | Ownership | Tax Id | Account Number | Purpose of Account |
|---|---|---|---|---|
| **Concentration Account** | | | | |
| JPMorgan Chase Bank | Dana Corporation | 34-4361040 | 144003980 | Concentration / Wire Account |
| **Lockbox / Incoming ACH / Incoming Wire Accounts** | | | | |
| Comerica - Sweep | Dana Corporation | 34-4361040 | 1851279677 | Funds received from the next 3 accounts are swept into this account |
| Comerica | Dana Clevite Engine Parts | 34-4361040 | 1851020337 | Lockbox / ACHs / Wires |
| Comerica | Dana Clevite Engine Parts | 34-4361040 | 1851020345 | Lockbox / ACHs / Wires |
| Comerica | DTF Trucking Inc | 31-1036588 | 1149003137 | Lockbox / ACHs |
| JPMorgan Chase - Detroit | Long Manufacturing (Dana Canada Corp) | 98-0394574 | 183523 | USD Lockbox Receipts |
| Toronto Dominion | Long Manufacturing (Dana Canada Corp) | 98-0394574 | 10207352981 | US Receipts (zero balances to account below) |
| Toronto Dominion | Long Manufacturing (Dana Canada Corp) | 98-0394574 | 10207353007 | US Disbursement |
| Toronto Dominion | Long Manufacturing (Dana Canada Corp) | 98-0394574 | 10205219276 | CAD Receipts (zero balances to account below) |
| Toronto Dominion | Long Manufacturing (Dana Canada Corp) | 98-0394574 | 10205219284 | CAD Disbursement |
| **Disbursement Funding Accounts** | | | | |
| SunTrust | Dana Corporation | 34-4361040 | 8800195276 | Funding Acct - Mainly Benefits Accts. |
| **Miscellaneous Accounts** | | | | |
| Fifth Third Bank | Dana Corporation | 34-4361040 | 07340358378 | Investment Account - Euro Time Deposits |
| KeyBank | Dana Corporation | 34-4361040 | 2100000154 | Plant Miscellaneous Receipt Acct |
| JPMorgan Chase NY | Dana International Holdings, Inc | 34-1937608 | 323946380 | No activity |

(Dana Security Agreement)

NY1DOCS0/774-892.2

A00063
A00063

**Exhibit A to the
Security Agreement**

FORM OF FINANCING STATEMENT

A00064

A00064

**Exhibit B to the**
**Security Agreement**

## FORM OF SECURITY AGREEMENT SUPPLEMENT

[Date of Security Agreement Supplement]

Citicorp USA, Inc.,
    as the Agent for the
    Lenders referred to in the
    Credit Agreement referred to below

_____

_____

Attn: _____

[Name of Additional Grantor]

Ladies and Gentlemen:

    Reference is made to (i) the Five Year Credit Agreement dated as of March 4, 2005 (as amended, amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among Dana Corporation, a Virginia corporation, as Borrower, the Lenders parties thereto and Citicorp USA, Inc. as administrative agent for the Lenders (the "Agent"), (ii) certain hedging agreements into which the Lenders parties to the Credit Agreement and their Affiliates have and will enter into with Dana Corporation or any of its Subsidiaries (the "Secured Hedge Agreements") and (iii) certain lines of credit (including, without limitation, letters of credit) and similar arrangements with Lenders and their Affiliates have and will enter into with Dana Corporation or any of its Subsidiaries (collectively the "Bilateral Obligations"). The Lenders parties to the respective Credit Agreement, the Agent, the Lenders and their Affiliates that are counterparties to the Secured Hedge Agreements and the Lenders and their Affiliates that are providers of the Bilateral Obligations are collectively, the "Secured Parties". Terms defined in the Credit Agreement or the Security Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement or the Security Agreement.

    SECTION 1.  Grant of Security.  The undersigned hereby pledges to the Agent, for the ratable benefit of the Secured Parties, and hereby grants to the Agent, for the ratable benefit of the Secured Parties, a security interest in, all of its right, title and interest in and to all of the Collateral of the undersigned, whether now owned or hereafter acquired by the undersigned, wherever located and whether now or hereafter existing or arising, including, without limitation, the property and assets of the undersigned set forth on the attached supplemental schedules to the Schedules to the Security Agreement.

    SECTION 2.  Security for Obligations.  This Security Agreement Supplement and the Security Agreement secures, in the case of each Grantor, all obligations of the Borrower or such Grantor now or hereafter existing under the Secured Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such obligations being the "Secured Obligations"). Notwithstanding anything in this Security Agreement Supplement, the Security Agreement or the Credit Agreement to the contrary, (i) the aggregate principal amount of all Secured Obligations of the Grantors secured by the Pledged Debt and the Pledged Equity from time to time shall,

A00065

A00065

2

taken together with all other Secured Debt (as defined in the Indentures), not exceed 15% of "Consolidated Net Tangible Assets" ("Consolidated Net Tangible Assets" means the total assets (less applicable reserved and other properly deductible items) on the balance sheet of the Borrower and its consolidated Subsidiaries for the most recent fiscal quarter less (x) all current liabilities and (y) goodwill, trade names patents, organization expenses and other like intangibles of the Borrower and its consolidated Subsidiaries), (ii) the aggregate principal amount of all Bilateral Obligations secured hereby shall not exceed $225,000,000 and (iii) to the extent that Bilateral Obligations are cash collateralized or otherwise secured (other than pursuant to this Agreement), such Bilateral Obligations shall not be secured hereby.

SECTION 3.  Supplements to Security Agreement Schedules.  The undersigned has attached hereto supplemental Schedules I through V to Schedules I through V, respectively, to the Security Agreement, and the undersigned hereby certifies, as of the date first above written, that such supplemental schedules have been prepared by the undersigned in substantially the form of the equivalent Schedules to the Security Agreement and are complete and correct.

SECTION 4.  Representations and Warranties.  The undersigned hereby makes each representation and warranty set forth in Section 6 of the Security Agreement (as supplemented by the attached supplemental schedules) to the same extent as each other Grantor.

SECTION 5.  Obligations Under the Security Agreement.  The undersigned hereby agrees, as of the date first above written, to be bound as a Grantor by all of the terms and provisions of the Security Agreement to the same extent as each of the other Grantors.  The undersigned further agrees, as of the date first above written, that each reference in the Security Agreement to an "Additional Grantor" or a "Grantor" shall also mean and be a reference to the undersigned.

SECTION 6.  Governing Law.  This Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

Very truly yours,

[NAME OF ADDITIONAL GRANTOR]

By _____
    Title:

Address for notices:

_____
_____
_____

A00066

A00066

**Hearing Date and Time: February 28, 2007 at 10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X
                                     :
In re                                :    Chapter 11
                                     :
Dana Corporation, et. al.,           :    Case No. 06-10354 (BRL)
                                     :
            Debtors.                 :    (Jointly Administered)
                                     :
------------------------------------ X

---

**BRIEF OF THE TIMKEN COMPANY, TIMKEN U.S. CORP., TOYOTETSU AMERICA, INC., TOYOTETSU MID AMERICA, LLC IN OPPOSITION TO DEBTORS' ASSERTION OF A PRIOR LIEN DEFENSE TO RECLAMATION CLAIMS**

---

James M. Sullivan (JS-2189)
Gary O. Ravert (GR-3091)
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173-1922
Telephone: 212.547.5400
Facsimile: 212.547.5444

Counsel for The Timken Company, Timken
U.S. Corp., Toyotetsu America, Inc., and
Toyotetsu Mid America, LLC

W. Timothy Miller *(pro hac vice)*
Paige Leigh Ellerman *(pro hac vice)*
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Telephone: 513.357.9359
Facsimile: 513.381.0205

Co-Counsel for Toyotetsu America, Inc.,
and Toyotetsu Mid America, LLC

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT.................................................................................1

II.   GENERAL BACKGROUND ...............................................................................2

III.   LEGAL ARGUMENT...........................................................................................7

    A.    Dana's Reliance Upon Pre-BAPCPA Cases is Misplaced Because BAPCPA Dramatically Changed the Reclamation Landscape in Favor of Suppliers of Goods...........................................................................................7

        1.    BAPCPA Created a New Stronger Federal Right of Reclamation ...........8

        2.    BAPCPA Made Federal Reclamation Rights Subject Only to Prior Existing Liens...................................................................................................9

        3.    The Actions of the Prepetition Lender, Not Dana, Should Control Application of the Prior Lien Defense....................................................10

    B.    Dana's Admissions Demonstrate that the Reclaimed Goods Are No Longer Subject to any Security Interests...........................................................11

        1.    First Fatal Admission:  The Prepetition Liens Were Not Repaid from the Reclaimed Goods .....................................................................11

        2.    Second Fatal Admission:  The Prepetition Liens Were Not Assigned to the DIP Lender..................................................................12

        3.    Third Fatal Admission:  The Value of the Collateral Securing the Prepetition Liens Exceeded the Sum of the Prepetition Indebtedness and the Reclamation Claims ............................................12

    C.    Dana's Reliance upon Dairy Mart is Misplaced.................................................14

        1.    *Dairy Mart* Has No Application in the Context of New 546(c) .............14

        2.    *Dairy Mart* Is Factually Distinguishable ..................................................14

        3.    Even if *Dairy Mart* Were Applicable and Factually Analogous, It Is Not In Line with Prevailing Authority................................................16

        4.    The Doctrine of Marshaling is Irrelevant to a Determination Regarding Dana's Prior Lien Defense, But Should be Applied in Favor of the Reclamation Claimants if the Prior Lien Defense is Sustained .......................................................................................18

    D.    Dana Should Be Equitably Estopped from Asserting the Prior Lien Defense.................................................................................................................23

    E.    Even if the Court Concludes that Dana's Prior Lien Defense Is Viable, The Court Cannot Sustain the Defense until after Discovery and a Hearing Relating to the Prepetition Lender's Good Faith ...............................................26

        1.    To the extent that this Court finds that the Prior Lien Defense Contained in New 546(c) is Identical to the Defense Available Under Old 546(c), a Good Faith Determination is Relevant ...................27

A00068
A00068

**TABLE OF CONTENTS**
(continued)

Page

2.    To the Extent that an Equitable Allocation or Marshaling is a
      Viable Basis to Deny the Prior Lien Defense, the Good Faith
      Status of the Prepetition Lender is Relevant..........................................28

IV.    RESERVATION OF RIGHTS .................................................................28

V.    CONCLUSION .........................................................................................29

A00069

A0069

# I.
## PRELIMINARY STATEMENT

The debtors (collectively, "Dana") have moved to extinguish all of the reclamation claims that have been filed in these jointly administered cases (the "Reclamation Claims") based upon a single assertion - that the existence of certain alleged prepetition liens (the "Prepetition Liens") of Dana's prepetition secured lender on the reclaimed inventory (the "Reclaimed Goods") provides a complete defense to the Reclamation Claims (the "Prior Lien Defense") under 11 U.S.C. § 546(c) ("New 546(c)"). Dana's purported Prior Lien Defense has no merit for a number of reasons:

- Dana has admitted that the Prepetition Liens have been repaid from the proceeds of its postpetition DIP loan, not from the proceeds of the Reclaimed Goods. Accordingly, the Reclamation Claims are no longer subject to the Prepetition Liens.

- Even if the Prepetition Liens had not been repaid from the proceeds of the postpetition DIP loan, the final order approving the postpetition DIP loan contemplates that valid Reclamation Claims would be paid and provides for the subordination of the Prepetition Liens to the Reclamation Claims. Accordingly, upon entry of the final order approving the postpetition DIP loan, the Reclamation Claims were no longer subject to the Prepetition Liens.

- Dana's reliance upon *In re Dairy Mart Convenience Stores, Inc.*, 302 B.R. 128 (Bankr. S.D.N.Y. 2003) is misplaced for a number of reasons. First, *Dairy Mart* is not applicable because it was based on the prior version of 11 U.S.C. § 546(c) ("Old 546(c)"), which incorporated the applicable state reclamation law, and not New 546(c), which preempts state reclamation law in favor of a more expansive federal reclamation right. In addition, even if *Dairy Mart* were applicable, *Dairy Mart* is factually distinguishable. Finally,

-1-

NYK 1077403-8.064980.0025

A00070

A0070

even if *Dairy Mart* were not distinguishable, the holding of *Dairy Mart* upon which Dana relies is not in line with prevailing authority and should not be followed.

Accordingly, The Timken Company, Timken U.S. Corp. (together, "Timken"), Toyotetsu America, Inc. and Toyotetsu Mid America, LLC (together, "Toyotetsu") hereby oppose Dana's request to value their Reclamation Claims at $0.[1]

## II.
## GENERAL BACKGROUND

On March 4, 2005, Dana obtained a $400,000,000 five-year credit facility (the "Prepetition Indebtedness") from Citicorp USA Inc., as agent to a group of lenders (collectively, the "Prepetition Lender").

On November 18, 2005, Dana entered into a security agreement (the "Security Agreement"), pursuant to which the Prepetition Lender was granted the Prepetition Liens in substantially all of Dana's personal property, including inventory, equipment, accounts receivable, and proceeds of the foregoing (collectively, the "Prepetition Collateral") to secure payment of the Prepetition Indebtedness. (*See* Security Agreement attached as Ex. B to Dana's Initial Brief in Support of Prior Lien Defense to Reclamation Claims [Docket No. 3939] (the "Initial Brief")). No new funds were extended to Dana at the time it entered into the Security Agreement.

On March 3, 2006 (the "Petition Date"), Dana commenced its chapter 11 proceedings in this Court. As of the Petition Date, the book value of the Prepetition Collateral was more than

---

[1] Timken and Toyotetsu also hereby join in the briefs filed by any other Reclamation Claimants in connection with the hearing on Dana's purported Prior Lien Defense, including but not limited to the briefs filed by the following creditors: Daido Metal Bellefontaine LLC, Color Box, LLC, NSK Corporation, Meritor Heavy Vehicles Systems, LLC, Meritor Heavy Vehicles Braking Systems U.S.A., Inc., and Meritor WABCO Control Systems, Dofasco Tubular Products Inc. and Dofasco Tubular Products Corporation, Lake Erie Products Corporation and Fittings Products Co. LLC, FANUC Robotics America Inc., Akebono Corporation, TRW Automotive Inc., and Berlin Metals LLC [Docket Nos. 4284, 4611, 4612, 4613, 4620, 4621, 4622, 4624, 4625, 4626].

A00071
A0071

$2.2 billion. (*See* Summaries of Schedules, as defined below, attached as **Exhibit 1** to the Declaration of James M. Sullivan dated as of January 26, 2007 (the "Sullivan Declaration")).

On the Petition Date, Dana filed a motion (the "Reclamation Procedures Motion") to establish procedures for reconciling the Reclamation Claims [Docket No. 22]. The Reclamation Procedures Motion does not reference Dana's intention to extinguish all Reclamation Claims on the basis of the Prior Lien Defense.

On the Petition Date, Dana filed a motion (the "DIP Financing Motion") to obtain postpetition financing (the "DIP Loan") and authority to use cash collateral [Docket No. 30].

On the Petition Date, the Court entered an order approving the DIP Financing Motion on an interim basis [Docket No. 55].

On March 6, 2006, the Court entered an order approving the Reclamation Procedures Motion (the "Reclamation Procedures Order") [Docket No. 82]. Among other things, the Reclamation Procedures Order enjoins holders of Reclamation Claims (the "Reclamation Claimants") from taking actions to enforce their Reclamation Claims and authorizes Dana to enter into settlements with Reclamation Claimants with respect to the validity, amount, and treatment of their Reclamation Claims.

On March 10, 2006, Timken served its reclamation demand on Dana [Docket No. 238, Ex. 1].

On March 22, 2006, Toyotetsu served its reclamation demand on Dana [Docket No. 774, Ex. 1].

On March 29, 2006, this Court entered a final order approving the DIP Financing Motion (the "Final DIP Order") [Docket No. 721]. Among other things, the Final DIP Order

- authorized Dana to repay the Prepetition Indebtedness with the borrowings from the DIP Loan. (Final DIP Order ¶14(b)).

A00072

A0072

- authorized Dana to make payments on any prepetition debts to the extent authorized by the first day orders, including the Reclamation Procedures Order. (*Id.* at ¶14(c)).

- made clear that nothing contained in the Final DIP Order or any DIP Loan document impairs, modifies or otherwise affects the validity, enforceability or priority of any setoff, recoupment or other claim, right or defense of any supplier of Dana in respect of any account, account receivable, payment intangible or any other payment obligation of that supplier to Dana.[2] (*Id.* at ¶30).

- subordinated the Prepetition Liens and claims of the Prepetition Lender to the liens and claims of the postpetition lender (the "DIP Lender"). (*Id.* at ¶3(b)).

In addition, the Final DIP Order provided that all parties in interest were given until June 19, 2006 (the "Challenge Period") to challenge the validity, enforceability, priority or extent of the Prepetition Liens. The Challenge Period was subsequently extended by stipulations dated July 7, 2006, July 18, 2006, September 25, 2006, and September 29, 2006 [Docket Nos. 1680, 2044, 3646, 3703]. As of the date hereof, the Prepetition Lender has stipulated to an open-ended extension of the Challenge Period, solely for the benefit of the Official Committee for Unsecured Creditors and the Ad Hoc Noteholders' Committee.

On March 30, 2006, Dana repaid the Prepetition Indebtedness with borrowings from the DIP Loan. The amount repaid totaled $377,879,482.36. (*See* Payoff Letter attached to the Initial Brief [Docket No. 3939] as Exhibit F).

On June 30, 2006, Dana filed its schedules of assets and liabilities (collectively, the "Schedules"). The Schedules reflect a book value for personal property assets as of the Petition Date totaling in excess of $2.2 billion. (*See* Summaries of Schedules attached at **Exhibit 1** to the Sullivan Declaration).

On June 30, 2006, Dana filed a notice (the "Reclamation Reconciliation Notice") reconciling the Reclamation Claims filed in these cases, which notice valued *all* Reclamation Claims at $0 based on Dana's purported Prior Lien Defense [Docket No. 1650]. The

---

[2] Accordingly, the DIP Loan was made subject to the Reclamation Claims.

-4-

A00073
A0073

Reclamation Reconciliation Notice was the first indication in the record that Dana intended to extinguish all Reclamation Claims on the basis of the Prior Lien Defense.

On July 28, 2006, Toyotetsu filed an objection to the Reclamation Notice [Docket No. 2403].

On August 11, 2006, Timken filed an objection to the Reclamation Notice [Docket No. 2900].

On September 20, 2006, Dana filed a motion to establish discovery and briefing procedures and bifurcate the consideration of issues relating to the Reclamation Claims (the "Bifurcation Motion") so that the Court would determine the validity of the Prior Lien Defense as a matter of law before determining fact-based defenses [Docket No. 3612].

On October 3, 2006, Toyotetsu and Timken each filed objections to the Bifurcation Motion [Docket Nos. 3725, 3745].

On October 13, 2006, this Court entered an order granting the Bifurcation Motion and establishing a briefing and discovery schedule in connection with a hearing on the Prior Lien Defense (the "Prior Lien Defense Scheduling Order") [Docket No. 3865].

On October 23, 2006, Dana served its Initial Brief.

Pursuant to the Prior Lien Defense Scheduling Order, the parties seeking discovery from Dana served discovery requests on or about November 13, 2006 (the "Discovery Requests"). Dana filed approximately 20 sets of responses and objections to those requests on or about December 1, 2006 (the "Discovery Responses and Objections") [Docket No. 4236]. In the Discovery Responses and Objections, Dana admitted that "there was no assignment of the ... Prepetition [Liens to the] DIP [] Lender" (*See* Discovery Responses and Objections to

-5-

A00074
A0074

Allegheny's First Requests For Admissions, Interrogatories, and Requests for Production of Documents, Resp. to Req. No. 3 (the "Assignment Admission")).

On December 15, 2006, Timken and Toyotetsu each filed a reply to the Discovery Responses and Objections (the "Replies") [Docket Nos. 4370, 4378]. In the Replies, Timken and Toyotetsu each stated, among other things, the need for discovery on reclamation issues, including issues relating to valuation and the good faith of the Prepetition Lender.

On December 19, 2006, this Court conducted a hearing on discovery disputes relating to the Bifurcation Motion. At that hearing, Dana, Timken, Toyotetsu, and other Reclamation Claimants resolved their disputes over the scope of discovery concerning the hearing on the Prior Lien Defense (the "Reclamation Discovery Dispute"), which resolution the parties agreed to memorialize in an order to be submitted to the Court.

On January 10, 2007, pursuant to the Prior Lien Defense Scheduling Order, Dana produced documents purportedly responsive to the Discovery Requests.

On January 16, 2007, pursuant to the agreement reached with certain Reclamation Claimants at the December 19, 2006 hearing, Dana served its response to a supplemental interrogatory concerning valuation of the Prepetition Collateral (the "Valuation Interrogatory Response"). A copy of the Valuation Interrogatory Response is attached as **Exhibit 2** to the Sullivan Declaration. In the Valuation Interrogatory Response, Dana admitted that

> based upon the Schedules of Assets and Liabilities filed by [Dana] . . ., the total face amount of the currently outstanding reclamation claims plus the amount of the Prepetition Indebtedness was less than the net book value of [Dana's] assets as of the Petition Date (the "First Valuation Admission"). (Interrog. Resp. at 2.)

On or about January 19, 2007, this Court entered an agreed order resolving the Reclamation Discovery Dispute (the "Reclamation Discovery Dispute Order") [Docket No. 4566]. In the Reclamation Discovery Dispute Order, Dana stipulated:

-6-

NYK 1077403-8.064980.0025

A00075

A0075

that (i) none of the inventory sought to be reclaimed was liquidated for the purposes of paying the prepetition creditors and (ii) the prepetition creditors were not paid from the proceeds of the inventory sought to be reclaimed, but rather from the proceeds of [Dana's] Postpetition secured financing (the "Prepetition Indebtedness Payment Admission"). (Reclamation Discovery Dispute Order at ¶4.)

Finally, by email dated January 18, 2007, counsel for Dana further agreed to clarify its

Valuation Interrogatory Response by stipulating that:

- the book value of the assets securing the prepetition secured claims exceeds the prepetition secured debt and the face amount of the currently outstanding reclamation claims; and

- to the extent value is relevant, the parties will use book value as the measure for purposes of the hearing on the prior lien defense (the "Second Valuation Admission," and with the First Valuation Admission, the "Valuation Admission").

A true and correct copy of this January 18, 2007 email is attached as **Exhibit 3** to

the Sullivan Declaration.

### III.
### LEGAL ARGUMENT

**A.    Dana's Reliance Upon Pre-BAPCPA Cases is Misplaced Because BAPCPA Dramatically Changed the Reclamation Landscape in Favor of Suppliers of Goods**

Dana cites the provisions of Old 546(c) and cases interpreting Old 546(c) to support the

premise that suppliers of goods should get no greater rights in a bankruptcy proceeding than they

would get outside of bankruptcy. *See, e.g., In re Dairy Mart Convenience Stores, Inc.*, 302 B.R.

128, 132-133 (Bankr. S.D.N.Y. 2003); *In re Arlco, Inc.*, 239 B.R. 261, 266 (Bankr. S.D.N.Y.

1999); *In re Victory Markets Inc.,* 212 B.R. 738, 741 (Bankr. N.D.N.Y. 1997); *In re Pittsburgh-Canfield Corp.*, 309 B.R. 277, 284 (B.A.P. 6th Cir. 2004). However, since passage of The

Bankruptcy Abuse Protection and Consumer Protection Act of 2005 ("BAPCPA") in April 2005,

that premise no longer holds true.

-7-

A00076

A00076

1. **BAPCPA Created a New Stronger Federal Right of Reclamation**

BAPCPA overwhelmingly changed the reclamation landscape in favor of suppliers of goods with respect to bankruptcy cases such as Dana's that were commenced on or after October 17, 2005. Favorable changes include: (i) more expansive reclamation rights; and (ii) the grant of an administrative expense claim to suppliers for goods shipped within the twenty days prior to the bankruptcy filing.

BAPCPA's amendments to Old 546(c) created a new federal reclamation right. Old 546(c) specifically made a trustee's avoidance rights subject to "any statutory or common law right of a seller" that sold goods to the debtor in the ordinary course of business while the debtor was insolvent. BAPCPA removed the reference to statutory or common law rights.

New 546(c) provides:

(1) Except as provided in subsection (d) of this section and in section 507(c), and subject to the prior rights of a holder of a security interest in such goods or the proceeds thereof, the rights and powers of the trustee under sections 544(a), 545, 547, and 549 are subject to the right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, within 45 days before the date of the commencement of a case under this title, but such a seller may not reclaim such goods unless such seller demands in writing reclamation of such goods—
(A) not later than 45 days after the date of receipt of such goods by the debtor; or
(B) not later than 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of the case.
(2) If a seller of goods fails to provide notice in the manner described in paragraph (1), the seller may still assert the rights contained in section 503(b)(9).

By striking the reference to statutory or common law rights and expressly including a right to reclaim, Congress created a new strengthened federal reclamation right that preempts weaker state law reclamation rights of the sellers of goods to debtors in bankruptcy. *See Collier on Bankruptcy* ¶ 546.04[1] (Lawrence P. King et al. eds., 15th ed. rev. 2005) ("This alteration in the language of section 546 (c) suggests that a seller's reclamation rights in bankruptcy are now derived exclusively from section 546(c) of the Bankruptcy Code and not from any

-8-

A00077
A0077

nonbankruptcy statutory provision or common law."). Accordingly, Dana's reliance upon Old

546(c) and cases interpreting Old 546(c) is misplaced.

## 2. BAPCPA Made Federal Reclamation Rights Subject Only to Prior Existing Liens

New 546(c) should be read according to its plain meaning and enforced according to its

terms. *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that

when the statute's language is plain, the sole function of the courts – at least where the

disposition required by the text is not absurd – is to enforce it according to its terms."). Thus,

when New 546(c) provides that reclamation rights are "subject to the prior rights of a holder of a

security interest in such goods or the proceeds thereof," this means simply that reclamation rights

are junior to liens created by an agreement prior to the bankruptcy filing. *See* 11 U.S.C. §

101(50) (defining "security interest" to mean a "lien created by an agreement"). Therefore, any

suggestion that the existence of prior liens on the Reclaimed Goods would completely extinguish

the Reclamation Claims instead of simply subordinating such claims would require a strained

interpretation of New 546(c).

The cases interpreting state reclamation law support this conclusion. *See In re Phar-Mor,*

*Inc.*, 301 B.R. 482, 495 (Bankr. N.D. Ohio 2003) (concluding that it is well established that when

a right to reclaim is "subject to" existing interest of secured creditor, such right is subordinate or

inferior to security interest, and not automatically and totally extinguished); *accord In re Pester*

*Refining Co.*, 964 F.2d 842, 845-46 (8th Cir. 1992) (rejecting debtor's contention that mere

presence of secured creditors with superior rights extinguished right of reclamation and finding

that court's interpretation of "subject to" language has been followed in every reported

bankruptcy decision that has considered the question); *Allegiance Healthcare Corp. v. Primary*

*Health Systems, Inc.*, 258 B.R. 111, 116 n.5 (Bankr. D. Del. 2001) (agreeing with *Pester* that

NYK 1077403-8.064980.0025

A00078

A00078

when right to reclaim is "subject to" the rights of a secured creditor, such right is subordinate or inferior to the security interest, and not automatically and totally extinguished); *In re Victory Markets Inc.*, 212 B.R. 738, 742 (Bankr. N.D.N.Y. 1997) (holding that presence of prior perfected security interest in reclaimed goods does not automatically extinguish reclamation claim, but rather subordinates it).

### 3. The Actions of the Prepetition Lender, Not Dana, Should Control Application of the Prior Lien Defense

Whether in the bankruptcy or non-bankruptcy context, courts have historically held that it is the actions of the secured creditor, not the debtor, that should determine the rights of a reclaiming seller. *See, e.g., Pester*, 964 F.2d at 847 ("[I]n the non-bankruptcy context, the secured creditor's decision with respect to its security interest in the goods will determine the value of the seller's right to reclaim."); *Arlco*, 239 B.R. 261, 273 (quoting *Pester*); *In re Phar-Mor, Inc.*, 301 B.R. 482, 497 (Bankr. N.D. Ohio 2003) ("In the bankruptcy context, the secured creditor's decision determines the value of the seller's right to reclaim."); *In re Georgetown Steel Co., LLC*, 318 B.R. 340, 348 (Bankr. D. S.C. 2004) (same). Thus, "if an undersecured creditor forecloses on the goods to be reclaimed and uses the entire proceeds to pay down its secured debt, the seller's reclamation right is extinguished." *Pester*, 964 F.2d at 847; *accord Phar-Mor*, 301 B.R. at 496; *Arlco*, 239 B.R. at 273.

On the other hand, if the secured creditor releases its security interest in the goods to be reclaimed, the seller should be permitted to enforce its rights to reclaim. *See Pester*, 964 F.2d at 847; *Phar-Mor*, 301 B.R. at 497; *Arlco*, 239 B.R. at 273 (stating that the reclaiming seller's right to reclaim depends on the value of the excess goods remaining once the secured creditor's claim is paid or released). For example, in *Phar-Mor*, an Old 546(c) case, the reclamation rights in reclaimed goods were preserved despite the existence of superior liens because the prepetition

NYK 1077403-8.064980.0025

A00079
A0079

secured lenders were paid in full through a post-petition debtor-in-possession facility, and not

from the sale of the reclaimed goods. 301 B.R. at 497. Similarly, in *Pester*, reclaiming

creditors' claims had value despite the existence of superior liens because the secured creditors

released their claims in the goods subject to reclamation through the debtor's plan of

reorganization. 964 F.2d at 848. Further, in *In re Georgetown Steel Company, LLC*, reclamation

claims had value despite the existence of prior liens because the sale of the debtor's assets, which

included the reclaimed goods, was sufficient to repay the secured creditors in full and thus did

not involve competing interests of the reclaiming seller and secured creditor. 318 B.R. 340, 348

(Bankr. D. S.C. 2004).

**B.** **Dana's Admissions Demonstrate that the Reclaimed Goods Are No Longer Subject to any Security Interests**

During the course of discovery in connection with the Prior Lien Defense matter, Dana

made at least three admissions, that are fatal to its Prior Lien Defense.

**1.** **First Fatal Admission: The Prepetition Liens Were Not Repaid from the Reclaimed Goods**

Dana has stipulated that prepetition creditors were repaid in full from the proceeds of the

DIP Loan and that "the [P]repetition [Claimants] were not paid from the proceeds of the

inventory sought to be reclaimed, but rather from the proceeds of [the DIP Loan.]." (*See*

Reclamation Discovery Dispute Order, ¶4). Thus, as in *Phar-Mor*, *Pester*, and *Georgetown*

*Steel*, the Prepetition Lender's claims were satisfied from sources other than the Reclaimed

Goods. Accordingly, the Reclamation Claims are no longer subject to the Prepetition Liens and

should be approved in full.

NYK 1077403-8.064980.0025

A00080

A00080

### 2.    Second Fatal Admission:  The Prepetition Liens Were Not Assigned to the DIP Lender

Dana admits "that there was no assignment of the liens under the Prepetition Credit Facility to the DIP Facility lenders." (*See* Assignment Admission.)  Thus, Dana is not able to argue that the Prepetition Liens were preserved for the benefit of the DIP Lender.  *See Phar-Mor*, 301 B.R. 497 & n.7 (holding that failure to assign prepetition liens to DIP lender resulted in release of prepetition liens for benefit of reclamation claimants).  *Compare In re Pittsburgh-Canfield Corp.*, 309 B.R. 277 (B.A.P. 6th Cir. 2004) (holding that prepetition liens were preserved for the benefit of the DIP lender when such liens were assigned to the DIP lender).  Accordingly, the Reclamation Claims are no longer subject to the Prepetition Liens and should be approved in full.

### 3.    Third Fatal Admission:  The Value of the Collateral Securing the Prepetition Liens Exceeded the Sum of the Prepetition Indebtedness and the Reclamation Claims

Finally, Dana has stipulated that (i) "the book value of the assets securing the prepetition secured claims[3] exceeds the prepetition secured debt[4] and the face amount of the currently outstanding reclamation claims[5] and (ii) to the extent value is relevant, the parties will use book value as the measure for purposes of the hearing on the prior lien defense." (*See* Second Valuation Admission).  Further, based upon the book value of the assets securing the Prepetition Indebtedness as reflected on Dana's Schedules, it appears that the Prepetition Lender was

---

[3] According to Dana's Schedules, it appears that the book value of the assets securing the Prepetition Indebtedness as of the Petition Date was approximately $2.2 billion. (*See generally* Summary of Schedules.)

[4] Dana states in its Initial Brief that the Prepetition Indebtedness was approximately $377 million as of the Petition Date. (Initial Br. at 5).

[5] Dana states in its Initial Brief that the face amount of the currently outstanding Reclamation Claims is approximately $110 million. (Initial Br. at 12).  Based upon representations of Dana's counsel, it is believed that the face amount of the remaining Reclamation Claims is approximately $60 million after deducting the face amount of the Reclamation Claims entitled to administrative priority under 11 U.S.C. § 503(b)(9).  Based upon the value at which Dana's bonds have recently been trading, the amount in dispute in connection with this brief appears to be between $15 million and $18 million.

-12-

A00081
A00081

oversecured by more than $1.8 billion as of the Petition Date. (*See generally* Summary of Schedules). This equity cushion grossly exceeds the face value of the remaining Reclamation Claims. Therefore, even if the Court were to find that the Prepetition Lender was "effectively"[6] repaid with the Prepetition Collateral under the Effective Satisfaction Theory[7] espoused in *Dairy Mart*, there is no reason to find that the Prepetition Lender was "effectively" repaid with the $60 million of Reclaimed Goods for which the remaining Reclamation Claimants are seeking reclamation as opposed to the almost $2 billion of other available Prepetition Collateral. *See Georgetown Steel*, 318 B.R. at 348 (holding that a court should not presume that a senior secured creditor would always assert its rights in a reclaiming creditor's goods). Instead, because the Prepetition Lender has already been repaid and has not objected to the relief requested by the Reclamation Claimants, the Court should presume that the Prepetition Lender chose not to satisfy the Prepetition Indebtedness from the Reclaimed Goods. *Id.* (presuming that secured creditors chose not to satisfy liens from reclaimed goods that were part of collateral pool used to satisfy their debt where excess funds remained for distribution and secured creditors did not object to relief sought by reclamation claimants).

**C.    Dana's Reliance upon *Dairy Mart* is Misplaced**

Dana relies heavily on *In re Dairy Mart Convenience Stores, Inc.*, 302 B.R. 128 (Bankr. S.D.N.Y. 2003) in support of its purported Prior Lien Defense. The obvious reason for such reliance is that it provides an ostensible basis for Dana to avoid the fatal defects to its defense,

---

[6] As set forth in section III.C.3 below, the Court should not recognize an "effective" satisfaction of a $377 million debt with more than $2.2 billion of assets. Only the "actual" satisfaction of a debt with an "actual" asset can defeat the rights of a reclamation claim. *See, e.g., Arlco*, 239 B.R. at 273 (stating that the reclaiming seller's right to reclaim depends on the value of the excess goods remaining once the secured creditor's claim is paid or released). Otherwise a debtor, as opposed to a secured creditor, could extinguish millions of dollars of "actual" reclamation claims through an "effective" satisfaction even where such claims would not likely have been extinguished had the secured debt been satisfied with the proceeds of "actual" assets.

[7] *See* Section III.C.2.b, *infra*, for a description of *Dairy Mart*'s Effective Satisfaction Theory.

-13-

NYK 1077403-8.064980.0025

A00082

A0082

most notably that none of the Reclaimed Goods were used to satisfy the Prepetition

Indebtedness.  Dana's reliance upon *Dairy Mart*, however, is misplaced for a number of reasons.

First, *Dairy Mart* is a vestige of Old 546(c) and has no application to New 546(c).  Second,

*Dairy Mart* is factually distinguishable from this case.  Finally, even if *Dairy Mart* were

applicable and indistinguishable, it should not be followed because it is not in line with

prevailing authority.

### 1. *Dairy Mart* Has No Application in the Context of New 546(c)

*Dairy Mart*, a case interpreting Old 546(c), has no application to New 546(c).  Old 546(c)

was based upon the premise that suppliers of goods should get no greater rights in a bankruptcy

proceeding than they would get outside of bankruptcy.  *See, e.g., In re Dairy Mart Convenience

Stores, Inc.*, 302 B.R. 128, 132-133 (Bankr. S.D.N.Y. 2003); *In re Arlco, Inc.*, 239 B.R. 261, 266

(Bankr. S.D.N.Y. 1999); *In re Victory Markets Inc.*, 212 B.R. 738, 741 (Bankr. N.D.N.Y. 1997);

*In re Pittsburgh-Canfield Corp.*, 309 B.R. 277, 283 (B.A.P. 6th Cir. 2004).  Since the passage of

BAPCPA in April 2005, that premise no longer holds true.  Accordingly, *Dairy Mart* may not

guide the Court's resolution of the merits of Dana's purported Prior Lien Defense.

### 2. *Dairy Mart* Is Factually Distinguishable

In *Dairy Mart*, the bankruptcy court's decision was based upon two alternative factual

bases.  *Dairy Mart*, 302 B.R. at 136.  First, the court found that, to the extent the prepetition loan

was paid down from the proceeds of the sale of the reclaimed goods by cash sweeps directly to

the prepetition lender prior to receipt of the payment by the DIP lender, it was clear that the

proceeds were used to pay the prepetition secured claim (the "Actual Satisfaction Theory").  *Id.*

Next, the court found that to the extent the prepetition lender was not paid from the proceeds of

the sale of reclaimed goods by cash sweeps to the prepetition lender prior to the payment from

-14-

A00083

A00083

the DIP lender, then the reclaimed "goods or their proceeds have *effectively* been 'paid' to the secured creditor" (the "Effective Satisfaction Theory"). *Id.* (emphasis added).

      a.    Actual Satisfaction Theory

Dana may not rely upon the Actual Satisfaction Theory to establish its purported Prior Lien Defense because of the Prepetition Indebtedness Payment Admission, by which Dana stipulated that the Prepetition Lender was not paid from the proceeds of the Reclaimed Goods, but rather from the proceeds of the DIP Loan. (*See* Reclamation Discovery Dispute Order, ¶ 4). Accordingly, Dana may not attempt to satisfy its burden with respect to the Prior Lien Defense through the Actual Satisfaction Theory.

      b.    Effective Satisfaction Theory

Dana also cannot rely upon the Effective Satisfaction Theory because the facts of this case do not support a defense based upon such theory. *Dairy Mart*'s Effective Satisfaction Theory is premised on the court's finding that "the post-petition lender's lien was directly connected with the previous lender's lien because the post-petition lender only lent with the understanding that it was taking over that position." *Dairy Mart*, 302 B.R. at 136. For several reasons, there is no basis for such a finding here.

First, in *Dairy Mart*, the DIP lender's liens were subject to the prepetition lender's liens. Thus, the DIP lender benefited to the extent that the debtor used the proceeds of the DIP loan to repay the prepetition secured debt, as opposed to using such funds for other purposes. In this case, however, the DIP Lender's liens primed the Prepetition Liens. Therefore, the DIP Lender is indifferent as to whether or how Dana used the proceeds of the DIP Loan to either pay down the Prepetition Indebtedness or for some other purpose.

Second, the *Dairy Mart* court found it significant that the DIP lender in that case took over the position of the prepetition lender. *Id.* Unlike *Dairy Mart*, where the DIP lender and the

-15-

A00084
A0084

prepetition lender shared the same collateral, the collateral package given to the DIP Lender in this case is not identical to the Prepetition Collateral held by the Prepetition Lender. Accordingly, it cannot be said that the DIP Loan was part of an integrated transaction with the repayment of the Prepetition Indebtedness. (*See* Security Agreement attached as Ex. B to Dana's Initial Brief and Final DIP Order).

Third, unlike the DIP financing order in *Dairy Mart*, which did not expressly provide for the payment of prepetition obligations such as reclamation claims (other than the prepetition secured debt), the Final DIP Order expressly authorizes Dana to make payments of prepetition debt as provided by the first day orders, including the Reclamation Procedures Order. (Final DIP Order ¶ 14(c); Reclamation Procedures Order ¶¶ 2(g), 2(h), 3, 4).

Finally, unlike the DIP lender in *Dairy Mart*, where the liens of the DIP lender and the prepetition lender were senior to the reclamation claims, the liens of the DIP Lender and the Prepetition Lender were expressly made subject to Reclamation Claims and other valid liens. (Final DIP Order ¶ 30). Again, it is clear that the DIP Lender did not rely upon the Prepetition Lender's liens in extending the DIP Loan.

### 3.    Even if *Dairy Mart* Were Applicable and Factually Analogous, It Is Not In Line with Prevailing Authority

In fabricating the Effective Satisfaction Theory, *Dairy Mart* departed from the fundamental premise that a secured creditor's decision with respect to its security interest in the goods will determine the value of the seller's right to reclaim. (See Section III.A.3, *supra*, and cases cited therein). If followed, the Effective Satisfaction Theory would permit a debtor to choose to extinguish all reclamation claims by refinancing its prepetition secured debt when a partial liquidation of the collateral to satisfy the debt would not result in such a draconian result.

-16-

A00085

A00085

Such a result should not be condoned. *See, e.g., Phar-Mor*, 301 B.R. at 497 (holding that no action on the part of a debtor should be permitted to defeat a seller's right to reclamation).

The absurdity of the Effective Satisfaction Theory can best be understood by using a simple example, such as a debtor with $5,000,000 of debt secured by a floating lien on $500,000,000 of inventory, subject to $200,000,000 of reclamation claims where no one reclamation claim exceeds $5,000,000. According to Dana, such a debtor could extinguish all $200,000,000 of reclamation claims by refinancing its secured debt in accordance with *Dairy Mart*'s Effective Satisfaction Theory. It does not make sense that all $500,000,000 of the inventory would be *effectively* sold to repay a $5,000,000 debt. One might almost akin such a transaction to a fraudulent transfer. Absent an *actual* satisfaction of the reclaimed goods, it would be unfair to presume that the secured creditor would have chosen to satisfy its $5,000,000 debt with any of the reclaimed inventory, much less all of the inventory with a value 100 times the amount of the debt. Under Article 9-610 of the Uniform Commercial Code, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." How can an *effective* disposition, as opposed to an actual one, possibly comply with such a requirement? The simple answer is that it cannot.

What Dana is trying to achieve in this case is not very different from the example provided above. Dana is seeking to extinguish approximately $300,000,000 of reclamation claims by refinancing debt of approximately $377,000,000 secured by a floating lien on more than $2,200,000,000 of personal property. Even if the Effective Satisfaction Theory had some validity, the Court should require that an *effective disposition* of collateral under this theory be handled in a commercially reasonable way. The court in *Georgetown Steel* was correct when it stated that a court should not presume that a senior secured creditor will always assert its rights

-17-

A00086

A0086

in reclaiming creditors' goods. *Georgetown Steel*, 318 B.R. at 348. Instead, where excess funds

remain for distribution following satisfaction in full of a secured creditor's claim from collateral

that includes reclaimed inventory, a court should presume that the secured creditor was not

repaid from the proceeds of the reclaimed inventory. *Id.*; *see also United States v. Westside

Bank*, 732 F.2d 1258, 1259 (5th Cir. 1984) (reclaiming creditor retains priority interest in

proceeds remaining after foreclosure sale of assets that include reclaimed goods). Such an

allocation is not unfair because the issue does not involve the competing interests of secured

creditors and reclamation creditors. *See Georgetown Steel*, 318 B.R. at 348. Accordingly, a

court would not be required to conduct a marshaling analysis but rather an equitable allocation of

the Prepetition Collateral.

    **4.**     **The Doctrine of Marshaling is Irrelevant to a Determination Regarding
Dana's Prior Lien Defense, But Should be Applied in Favor of the
Reclamation Claimants if the Prior Lien Defense is Sustained**

In its Initial Brief, Dana wrongly argues that the Reclamation Claims are valueless

because the doctrine of marshaling does not apply in the reclamation context. Dana's argument

fails for several reasons. First, Dana does not have standing to contest marshaling, which applies

to a dispute between two creditors. Second, the remedy of marshaling is not necessary because

the Prepetition Liens have already been satisfied from a source other than the Reclaimed Goods.

Third, if this Court determines that Dana's Prior Lien Defense would be valid, then just grounds

exist to either equitably allocate the proceeds of the "effective" disposition in a way that will

preserve the Reclamation Claims or to impose marshaling in this case.[8]

The doctrine of marshaling is

---

[8] Timken and Toyotetsu each reserves its right to take discovery to the extent there are factual issues that
would need to be resolved before the Court could impose an equitable allocation or marshaling of the
Prepetition Collateral.

-18-

A00087

A0087

> an equitable doctrine requiring a senior creditor, having two funds available to satisfy a single debt, to resort first to the fund that is not available to a junior creditor of the same debtor in order to avoid the inequity which would result from the senior creditor's election to proceed against the only fund available to the junior creditor, thereby preventing the junior creditor from obtaining any satisfaction of its debt.

*Walther v. Bank of New York*, 772 F.Supp. 754, 766-767 (S.D.N.Y. 1991) (internal cites omitted); *see also Murphy v. Town of Harrison (In re Murphy)*, 331 B.R. 107, 132 (Bankr. S.D.N.Y. 2005) (citing *Walther*). "[The doctrine's] central purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Walther* at 767 (citing *Meyer v. U.S.*, 375 U.S. 233, 237 (1963)).

  a.  Dana Lacks Standing to Object to Marshaling

  Dana lacks standing to object to marshaling. The marshaling doctrine by its nature applies when a *creditor* attempts to satisfy its debts and its attempt thereby compromises a junior lienholder's claim against the same asset. *In re Murphy*, 331 B.R. at 133. Here, there is no dispute between competing creditors. *See In re Georgetown Steel Co. LLC*, 318 B.R. at 348 (marshaling is not applicable where "the issue no longer involves the competing interests of the secured creditors and the Reclamation Creditors."). The party with standing to oppose marshaling in this case is the Prepetition Lender. Yet, the Prepetition Lender has not objected to the position being taken by Reclamation Claimants, namely that the Prepetition Indebtedness has been satisfied from a source other than the Reclaimed Goods.

  b.  Marshaling is Not Necessary Where Prepetition Liens Have Been Satisfied From a Source Other Than the Reclaimed Goods

  The equitable doctrine of marshaling need not be applied if the Court determines that the Prepetition Liens were satisfied from a source other than an "*effective*" disposition of the

NYK 1077403-8.064980.0025

A00088
A0088

Reclaimed Goods.[9]  However, if the Court agrees with Dana and determines that the Prepetition

Lien was "*effectively*" satisfied from a refinancing of the Prepetition Indebtedness, then the Court

should apply the doctrine of marshaling to achieve an equitable result.  It would be inequitable

for Dana to step into the shoes and assert the rights of the Prepetition Lender and argue that, out

of the approximately $2.2 billion in assets securing the Prepetition Indebtedness, it was the $60

million in Reclaimed Goods at stake here that were used to pay off the Prepetition Indebtedness.

As the *Georgetown Steel* court noted,

> [R]ather than presuming that a senior secured creditor would always assert its
> rights in a reclaiming creditor's goods as the valuation cases seem to do, in this
> case no senior secured creditor objected to the relief sought by the Reclamation
> Creditors and at the time of the sale of Debtor's assets, including inventory,
> excess funds remained for distribution.  In effect, the secured creditors in the
> matter before the Court are not choosing to satisfy their liens from reclaimed
> goods.

*Georgetown Steel*, 318 B.R. at 348 (footnote omitted).  Thus, the *Georgetown Steel* court

concluded that it was appropriate to allocate sale proceeds in a way that would not extinguish

reclamation rights where to do so would not adversely impact the secured creditors. *Id.* at 349.  A

similar allocation is appropriate here.

Here, without even standing to do so, Dana wrongly asserts the rights of the Prepetition

Lender and seeks to prevent the Reclamation Claimants from recognizing any value from their

protected interest in the Reclaimed Goods.  This Court possesses the inherent power to order an

allocation of the "*effective*" disposition in a way that will not extinguish the Reclamation Claims

and, if necessary, impose the equitable remedy of marshaling to correct the wrong that would

result if Dana's position were sustained. *Pepper v. Litton*, 308 U.S. 295, 304 (1939) ("[F]or

many purposes courts of bankruptcy are essentially courts of equity") (internal quotes omitted);

---

[9] As set forth above, the Prepetition Lender first subordinated and then released its Prepetition Liens.
Accordingly, there is no basis to find that the Prepetition Liens were satisfied from the Reclaimed Goods.

-20-

A00089

A0089

*In re Maddox*, 84 B.R. 251, 257 (Bankr. N.D. Ga. 1987) ("Bankruptcy courts, as courts of equity, have the power to marshal a debtor's assets in appropriate situations to secure an equitable distribution of funds to creditors of the debtor"); *see also Meyer v. United States*, 375 U.S. 233; *Second National Bank v. Phillips*, 189 F.2d 115 (5th Cir. 1951); *Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co.)*, 53 B.R. 772 (Bankr. S.D.N.Y. 1985)).

Reclamation rights are in the nature of a lien and under New 546(c) are superior to the rights of certain other lien holders and all general unsecured creditors. Under Old 546(c), a reclamation claim was subject to the rights of a good faith purchaser under state law, which was interpreted to include a person that takes by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property. U.C.C. § 1-201(29)-(30) (2001). However, under New 546(c), reclamation claims are only "subject to the prior rights of a holder of a security interest in such goods." 11 U.S.C. § 546(c)(1). The term "security interest" is defined in section 101(51) of the Bankruptcy Code as a "lien created by an agreement." Therefore, New 546(c) makes clear that only liens created by agreement are senior to the rights of a reclamation claim. Therefore, under New 546(c), prior judicial liens and statutory liens are junior to the rights of a reclamation claimant. Accordingly, under New 546(c), it is no longer proper to relegate reclamation claims to the same priority level as general unsecured claims.

Even under Old 546(c), the doctrine of marshaling had not been solely limited to protecting the rights of secured creditors. *See In re Gibson Group, Inc.*, 151 B.R. 133, 135 (Bankr. S.D. Ohio 1993) ("Apart from the debtor, only he who has secured a lien on a part of the assets, *or a right in the nature of a lien,* can exact the court's protection by marshaling.") (emphasis added); *see Maddox*, 84 B.R. at 257, n. 4 ("in other cases the doctrine is defined in

NYK 1077403-8.064980.0025

A00090

A0090

terms of interests which are not limited to secured creditors or even to creditors") (*citing* 53 Am.

Jur. 2d, Marshaling Assets, Section 1 (1970 & Supp. 1987)) (internal quotes omitted). Further, a

reclamation creditor's rights have also been recognized under the provisions of the Bankruptcy

Code. For example, under section 363(e), a reclamation right is an "interest' entitled to adequate

protection. Old 546(c) expressly provided that reclamation claimants could be granted liens in

lieu of their reclamation rights. Accordingly, the Reclamation Claimants should be deemed to

have the status of a junior secured creditor for the purposes of any marshaling analysis.

 As a court of equity, this Court has the authority to, and should, order marshaling if the

Prior Lien Defense is deemed valid. Marshaling may be imposed where (i) there are two or more

creditors of the same debtor, (ii) there are multiple funds belonging to that debtor, and (iii) one

creditor has the ability to resort to all of the funds. *Walther*, 772 F. Supp. 754, 767 (internal cite

omitted). Each of the three elements is established here. First, Timken, Toyotetsu, and the

Prepetition Lender are (or were) creditors of Dana at the time of the payoff of the Prepetition

Indebtedness. Second, Dana possessed an excess of $2.2 billion in Prepetition Collateral from

which it was able to satisfy the Prepetition Liens. Third, the Prepetition Lender was in a position

to look to any part of the $2.2 billion in Prepetition Collateral for payment.

 The Prepetition Lender will not be harmed by applying the marshaling doctrine here

because (i) there was no actual foreclosure, and (ii) the Prepetition Lender was vastly

oversecured. *See Georgetown Steel*, 318 B.R. at 349 (holding that the court "may very well have

allowed recovery on the goods" if such "goods were not necessary to the full payment of the

secured creditor"). Further, there is no reasonable basis not to apply the marshaling doctrine

where the senior secured creditor is indifferent to its application, payment on its claim would not

be delayed, and it would not be "inconvenienced." *See In re Arlco, Inc.*, 239 B.R. 261, 274

-22-

A00091

A00091

(citing *Herkimer County Trust Co. v. Swimelar (In re Prichard)*, 170 B.R. 41, 45 (Bankr.

N.D.N.Y. 1994)). Accordingly, if this Court concludes that the Prior Lien Defense is valid, it

should equitably allocate or marshal the assets in a manner that will not allow Dana to effectively

strip the Reclamation Claimants of their rights in a case where the equity cushion dwarfs the

amount of the Prepetition Indebtedness.

**D.    Dana Should Be Equitably Estopped from Asserting the Prior Lien Defense**

Dana should be equitably estopped from asserting its Prior Lien Defense because it

misled the Reclamation Claimants by only revealing its intention to assert the defense when it

filed the Reclamation Reconciliation Notice, four months after the Petition Date. Equitable

estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the

law in the administration of justice where injustice would otherwise result. *See, e.g., In re

Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996) (citing *Readco, Inc. v. Marine Midland

Bank*, 81 F.3d 295, 301 (2d Cir. 1996)). The doctrine is "imposed by law in the interest of

fairness to prevent the enforcement of rights which would work fraud or injustice upon the

person against whom enforcement is sought and who, in justifiable reliance upon the opposing

party's words or conduct, has been misled into acting upon the belief that such enforcement

would not be sought." *Readco*, 81 F.3d at 301.

The essential elements of equitable estoppel with respect to the party to be estopped are

the following: (1) a conduct which amounts to a false representation or concealment of material

facts, (2) the intention, or at least the expectation, that such conduct will be acted upon by, or

influence, the other party or other persons, and (3) actual or constructive knowledge of the real

facts. *See Chase Manhattan Bank v. Rockefeller Ctr. Props. (In re Rockefeller Ctr. Props.)*,

2002 U.S. Dist. LEXIS 212, *26-27 (S.D.N.Y. Jan. 7, 2002) (citing *In re Texaco*, 254 B.R. 536,

560-61 (Bankr. S.D.N.Y. 2000)). With respect to the party to which representations have been

-23-

A00092

A00092

made, the essential elements of equitable estoppel are: (1) the lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) good faith reliance upon the conduct or statements of the party to be estopped, and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming estoppel to his detriment. See *Chase Manhattan Bank v. Rockefeller Ctr. Props. (In re Rockefeller Ctr. Props.)*, 2002 U.S. Dist. LEXIS 212, *27 (S.D.N.Y. Jan. 7, 2002) (citing *In re Texaco*, 254 B.R. 536, 560-61 (Bankr. S.D.N.Y. 2000)).

As explained in *In re Georgetown Steel Company, LLC*, a case similar to the case at bar, when a debtor establishes reclamation procedures, which propose to treat reclamation claims in a certain way and the reclamation creditors rely upon such procedures to their detriment, such as by not pursuing other courses of conduct available to them to protect their rights, the debtor is estopped from contesting the validity of the reclamation claims. 318 B.R. 340 (Bankr. D.S.C. 2004) (applying equitable estoppel where the actions of the debtor discouraged, if not foreclosed, the reclamation creditors from seeking a tracing or segregation of their goods prior to the sale of the debtor's assets). *Compare In re Pittsburgh-Canfield Corp.*, 309 B.R. 277, 290 (B.A.P. 6th Cir. 2004) (rejecting equitable estoppel argument by reclamation claimants only because the debtor had "consistently asserted that the reclamation claims had no value and were not entitled to a remedy pursuant to § 546(c) because there was a priority floating inventory lien").

In this case, Dana did not inform the Reclamation Claimants of its intention to assert the Prior Lien Defense until the Reclamation Reconciliation Notice was filed, four months after the Petition Date. Neither the Reclamation Procedures Order nor the Final DIP Order alluded to the possibility that Dana would claim, as it later did in the Reclamation Reconciliation Notice, that the value of all Reclamation Claims was $0 based on the mere existence of prior floating liens on

-24-

A00093

A0093

the inventory, a fact that Dana knew when it filed the Reclamation Procedure Motion. Instead,

these orders lulled the Reclamation Claimants into believing that Reclamation Claims would be

allowed once their validity was verified and their amount reconciled.

For example, in the Reclamation Procedures Order:

• Section 2(g) provides that Dana and a Reclamation Claimant may seek to reach an agreement on a Reclamation Claim and may agree on "the validity, amount and/or treatment" of such Reclamation Claim;

• Section 2(h) provides that a Reclamation Claim may be "allowed and treated" in accordance with the terms of a stipulation between Dana and the Reclamation Claimant;

• Section 3 provides that the reclamation procedures set forth in the Reclamation Procedures Order are "the sole and exclusive method for the resolution and payment of reclamation claims asserted against the Debtors;"[10] and

• Section 4 provides that all proceedings relating to Reclamation Claims, whether currently pending or initiated in the future, are stayed and the Reclamation Claims must be resolved exclusively pursuant to the procedures set forth in the Reclamation Procedures Order.

In addition, in the Final DIP Order:

• Section 14(b) provides that Dana is permitted to use advances to refinance the Pre-Petition Indebtedness;

• Section 14(c) provides that Dana is permitted to make payments on any pre-petition debt prior to the effective date of the plan of reorganization as provided in the First Day Orders, which include the Reclamation Procedures Order; and

• Section 30 provides that nothing in the Final DIP Order or the DIP Loan Documents "impairs, modifies or otherwise affects the validity, enforceability or priority of any setoff, recoupment or other claim, right or defense of any customer or supplier of any debtor."[11]

Because the holders of Reclamation Claims relied on Dana's representations in the

Reclamation Procedures Order and the Final DIP Order, they lost their ability to pursue other

remedies to protect their rights, such as, for example, seeking adequate protection of their

interests under section 363(e) of the Bankruptcy Code or seeking to trace or segregate their

---

[10] Any payment against the Prepetition Indebtedness would be expected to improve the position of the Reclamation Claimants.

[11] Such other claim, right or defense would include the Reclamation Claims.

NYK 1077403-8.064980.0025

A00094

A00094

goods. Although Dana likely knew from the outset that it did not intend to afford the Reclamation Claimants any rights, it allowed such claimants to believe otherwise. Dana cannot benefit from its egregious behavior and, therefore, should be equitably estopped from asserting the Prior Lien Defense.

**E.**  **Even if the Court Concludes that Dana's Prior Lien Defense Is Viable, The Court Cannot Sustain the Defense until after Discovery and a Hearing Relating to the Prepetition Lender's Good Faith**

Pursuant to the Reclamation Discovery Dispute Order, the parties were directed to brief the issue of whether the Prepetition Lender's good faith is relevant to a determination of the Prior Lien Defense. (*See* Reclamation Discovery Dispute Order, ¶ 3.)[12] As set forth below, the Prepetition Lender's good faith is relevant to at least two issues. First, if the Court determines that the Prior Lien Defense from Old 546(c) may be carried forward into New 546(c), as is suggested by Dana, then the defense will succeed only if the Prepetition Lender obtained its lien in good faith. In addition, the Prepetition Lender's good faith may be relevant to a determination of whether marshaling of Dana's assets is permissible.

**1.**  **To the extent that this Court finds that the Prior Lien Defense Contained in New 546(c) is Identical to the Defense Available Under Old 546(c), a Good Faith Determination is Relevant**

If, notwithstanding the differences in the wording between New 546(c) and state reclamation laws (made applicable by Old 546(c)), this Court finds that New 546(c) merely carries forward the Prior Lien Defense as applied under Old 546(c), then this Court must make a factual determination as to whether the Prepetition Lender acquired its liens in good faith. As demonstrated in pre-BAPCPA cases, courts must examine all the facts to determine whether a secured creditor is a "good faith purchaser" and therefore has a lien that prevails over the rights

---

[12] It should be noted that the Court need not address this issue unless it finds that the Prior Lien Defense is otherwise viable.

NYK 1077403-8.064980.0025

A00095
A00095

of a reclamation claimant. *See e.g.*, *In re Phar-Mor, Inc.*, 301 B.R. 482, 497 (holding that a DIP lender did not qualify as good faith purchaser because it took liens on inventory with notice of reclamation demands); *see also Graniteville Co. v. Bleckley Lumber Co.*, 687 F. Supp. 589, 593 (M.D. Ga. 1988) (holding that "good faith of a secured party is obviously a material fact") (internal quotes omitted) (citing *Shell Oil Co. v. Mills Oil Co., Inc.*, 717 F.2d 208, 213 (5th Cir.1983)); *Allegiance Healthcare Corp. v. Primary Health Sys., Inc. (In re Primary Health Sys., Inc.)*, 258 B.R. 111, 114 (Bankr. D. Del. 2003) (holding that it is "well-established that, *absent a showing of bad faith*, a creditor with a prior perfected security interest in inventory which contains an after-acquired property clause is a good faith purchaser under the UCC") (emphasis added); *Isaly Klondike co. v. Sunstate Diary & Food Products Co. (In re Sunstate Dairy & Food Products Co.)*, 145 B.R. 341, 344 (Bankr. M.D. Fla. 1992) (holding reclamation claim was limited by rights of secured creditor that qualified as good faith purchaser).

No such good faith determination has been made here. As shown above, the Reclamation Discovery Dispute Order barred the parties from discovery on the issue of the Prepetition Lender's good faith. However, the issue of the Prepetition Lender's good faith is highly relevant to the validity of the Prior Lien Defense. The Prior Lien Defense relies completely on the allegation that the Prepetition Lender is a "good faith purchaser" with a superior lien trumping the Reclamation Claimants' rights. Therefore, the whole basis of the Prior Lien Defense depends upon a factual good faith determination that has not yet been addressed by this Court.

### 2.    To the Extent that an Equitable Allocation or Marshaling is a Viable Basis to Deny the Prior Lien Defense, the Good Faith Status of the Prepetition Lender is Relevant

Because marshaling is an equitable remedy, whether the Prepetition Lender exercised good faith is a relevant consideration for the Court to address when determining how to equitably allocate the Prepetition Collateral that was allegedly used to effectively satisfy the Prepetition

-27-

A00096

A0096

Indebtedness or whether to impose marshaling. As set forth in Section III.C.4 above, marshaling requires a Court to allocate assets to satisfy the debts of two competing creditors in an equitable fashion. Clearly, it would be appropriate for this Court to consider the good faith of the Prepetition Lender when deciding how to properly allocate assets. Therefore, the Reclamation Claimants should be permitted to take discovery pertaining to the Prepetition Lender's good faith if the Court determines that an equitable allocation or marshaling of the Prepetition Collateral may be appropriate in this case.

**IV.**
**RESERVATION OF RIGHTS**

For purposes of the hearing on Dana's Prior Lien Defense, the parties have agreed that the Reclamations Claimants have established a *prima facie* showing under New 546(c). Accordingly, Timken and Toyotetsu are not seeking to offer any evidence relating to the validity of their Reclamation Claims at this time. Timken and Toyotetsu reserve the right to offer evidence establishing the validity and amount of their Reclamation Claims in connection with any future hearing.

Timken and Toyotetsu reserve their rights to move for reconsideration of any adverse decision in connection with the hearing on Dana's Prior Lien Defense should the Prepetition Liens be challenged or avoided.

Timken and Toyotetsu reserve all rights to take further and additional discovery relating to any issues reserved for a later hearing pursuant to the Reclamation Discovery Dispute Order or any other matter which may be relevant to any future hearing.

**V.**
**CONCLUSION**

Timken and Toyotetsu have valid Reclamation Claims. Dana has not satisfied its burden of demonstrating a factual or legal basis for application of its purported Prior Lien Defense. For

-28-

A00097
A00097

all the reasons set forth herein, Timken and Toyotetsu respectfully request that the Court deny

Dana's motion to value their Reclamation Claims at $0 based upon Dana's purported Prior Lien

Defense.

-29-

A00098

A0098

Dated: New York, New York.
     January 26, 2007

Respectfully submitted,

MCDERMOTT WILL & EMERY LLP


By: /s/ James M. Sullivan
    James M. Sullivan (JS-2189)
    Gary O. Ravert (GR-3091)
    340 Madison Avenue
    New York, New York 10173-1922
    212.547.5400

    Counsel for Creditors
    The Timken Company, Timken U.S. Corp.,
    Toyotetsu America, Inc., and Toyotetsu Mid
    America, LLC


TAFT, STETTINIUS & HOLLISTER LLP


By: /s/ W. Timothy Miller
    W. Timothy Miller *(pro hac vice)*
    Paige Leigh Ellerman *(pro hac vice)*
    Taft, Stettinius & Hollister LLP
    425 Walnut Street, Suite 1800
    Cincinnati, Ohio 45202
    Telephone: 513.357.9359
    Facsimile: 513.381.0205

    Co-Counsel for Toyotetsu America, Inc.,
    and Toyotetsu Mid America, LLC

NYK 1077403-8.064980.0025

A00099
A00099