JONES DAY
222 East 41st Street
New York, New York  10017
Telephone: (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)
 - and -
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox (HL 3046)
Jeffrey B. Ellman (JE 5638)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)

Proposed Attorneys for Debtors
 and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------x
:
In re                                       :     Chapter 11
:
Dana Corporation, *et al.*,            :     Case No. 06-_____ (___)
:
                  Debtors.     :     (Jointly Administered)
:
----------------------------------------------------------x

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR (I) AN
INTERIM ORDER SCHEDULING A FINAL HEARING PURSUANT TO
BANKRUPTCY RULES 4001 AND 9014 AND (II) INTERIM AND FINAL
ORDERS AUTHORIZING THEM TO (A) OBTAIN POSTPETITION FINANCING
PURSUANT TO SECTIONS 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3),
364(d)(1), 364(e) AND 507 OF THE BANKRUPTCY CODE; (B) UTILIZE CASH
COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; AND
(C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES
PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE**

A00157
A0157

TO THE HONORABLE
UNITED STATES BANKRUPTCY JUDGE:

      Dana Corporation ("Dana" or the "Borrower") and 40 of its domestic direct and

indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors")

respectfully represent to the Court as follows:

### Background

    1.     On the date hereof (the "Petition Date"), the Debtors commenced their

reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code"). By a motion filed on the Petition Date, the

Debtors have requested that their chapter 11 cases be consolidated for procedural purposes only

and administered jointly.

    2.     The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

    3.     Debtor Dakota New York Corp. ("Dakota") is a New York corporation.

Debtor Dana is the direct or indirect parent of Dakota and each of the other Debtors. Dana

maintains its corporate headquarters in Toledo, Ohio. The Debtors and their nondebtor affiliates

(collectively, the "Dana Companies") have over 100 leased and owned domestic business

locations and have operations in approximately 25 states, as well as in Mexico, Canada,

11 countries in Europe and 14 countries elsewhere in the world.

    4.     The Dana Companies are leading suppliers of modules, systems and

components for original equipment manufacturers and service customers in the light, commercial

and off-highway vehicle markets. The products manufactured and supplied by the Dana

A00158
A0158

Companies are used in cars; vans; sport-utility vehicles; light, medium and heavy trucks; and a wide range of off-highway vehicles.

5.    The Dana Companies operate through two primary business units: the Automotive Systems Group (the "ASG") and the Heavy Vehicle Technologies and Systems Group (the "HVTSG"). The ASG sells axles; driveshafts; drivetrains; frames; sealing, bearing, fluid-management and power-cylinder products; chassis products; and related modules and systems for the automotive vehicle, light vehicle, commercial vehicle, leisure and outdoor power equipment markets. The ASG also provides systems assembly, management and integration services and related service parts. The ASG accounts for nearly three-quarters of the Dana Companies' operating revenues, and its largest customers, comprising nearly 50% of its business, are Ford Motor Company, DaimlerChrysler AG and General Motors Corporation. The HVTSG sells axles, brakes, driveshafts, chassis and suspension modules, ride controls and related modules and systems for the commercial and off-highway vehicle markets and transmission and electronic controls for the off-highway market. The HVTSG accounts for approximately one-quarter of the Dana Companies' revenues, and its largest customers are PACCAR Inc., Volvo Group and International Truck & Engine Corporation. The remainder of the Dana Companies' business is comprised largely of a lease financing business, which is operated by non-debtor Dana Credit Corporation and its subsidiaries. The Dana Companies have been in the process of divesting the assets of their lease financing business for a number of years.

6.    The Debtors commenced these chapter 11 cases after a thorough review of all of their refinancing and restructuring alternatives and only after it became clear that an out-of-court alternative would not be able to be completed in sufficient time to address pressing liquidity issues. Accordingly, to preserve the assets of their estates for the benefit of all of their

A00159

A0159

stakeholders, the Debtors commenced these cases. The Debtors believe that the initiation of these chapter 11 cases will allow them access to the necessary capital to implement their business plan and complete the restructuring of their operations that was commenced prepetition. A more detailed explanation of Dana's businesses and operations, and the events leading to the commencement of these cases, can be found in the Affidavit of Michael J. Burns (the "Burns Affidavit"), which was filed contemporaneously herewith and which is incorporated herein by reference.

7.    As disclosed in Dana's Form 10-Q filed on January 18, 2006, for the nine months ended September 30, 2005, the Dana Companies recorded revenue of more than $7.5 billion and had assets of approximately $7.9 billion and liabilities totaling $6.8 billion. As of the Petition Date, the Dana Companies have approximately 44,000 employees.

## Jurisdiction

8.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

9.    By this Motion, pursuant to sections 105, 362, 363, 364 and 507 of the Bankruptcy Code, Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and General Order No. M-274 of this Court (the "Guidelines"), the Debtors respectfully seek:

      a.    authority, pursuant to an order in substantially the form attached hereto as Exhibit A (the "Interim Order"), to execute and enter into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of March 3, 2006, among the Borrower, the other Debtors as guarantors (the "Guarantors"), Citicorp North America, Inc., as Administrative Agent (the "Administrative Agent"), Bank of

A00160

A0160

America, N.A. and JPMorgan Chase Bank, N.A., as Co-Syndication Agents (together with the Administrative Agent, the "Agents"), acting as Agents for themselves, Citicorp North America, Inc. as Initial Swing Line Lender (the "Initial Swing Line Lender") and Bank of America N.A., Citicorp North America, Inc. and JPMorgan Chase Bank, N.A., as Initial Issuing Banks (collectively, the "Initial Issuing Banks"), and a syndicate of financial institutions (together with the Agents, the Initial Swing Line Lender and the Initial Issuing Banks, the "Lenders"), to be arranged by Citigroup Capital Markets Inc., J.P. Morgan Securities Inc. and Banc of America Securities LLC, as Joint Lead Arrangers and Joint Lead Bookrunners, substantially in the form annexed hereto as Exhibit B (the "DIP Loan Agreement"), and all other documents, agreements or instruments in connection therewith or related thereto (together with the DIP Loan Agreement, as any of the foregoing may be amended or modified from time to time in accordance with the terms of the proposed Interim Order, collectively the "DIP Loan Documents"), which, if approved on a final basis, would provide the Debtors with postpetition secured credit of up to $1,450,000,000 (the "DIP Facility") and to perform such other and further acts as may be contemplated by, or required in connection with, the DIP Loan Documents;

   b. authority, pursuant to the proposed Interim Order, to immediately obtain revolving loans, swing line loans and letters of credit under the DIP Facility up to an aggregate principal or face amount of $800,000,000 to (i) allow certain of the Debtors to repurchase the Receivables Portfolio (as defined in the proposed Interim Order) under the Existing Receivables Facility (as defined in the DIP Loan Agreement) and to satisfy the Existing Corporate Credit Card Obligations (as defined in the proposed Interim Order) in accordance with the terms of the Corporate Credit Card Program (as defined in the proposed Interim Order), both of which would constitute an Extraordinary Provision (an "Extraordinary Provision") as such term is used and defined in the Guidelines, (ii) pay costs and expenses in connection with such repurchase and satisfaction set forth in subparagraph (i), the DIP Loan Documents and these chapter 11 cases, including, but not limited to, any and all fees to be paid upon the Effective Date (as defined in the DIP Loan Agreement) under the DIP Loan Documents and (iii) to provide financing for working capital, letters of credit, capital expenditures and other general corporate purposes of the Debtors (subject to any limitations of borrowings under the DIP Loan Documents), subject, however, to the right of any statutory committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors' Committee"), if any, to challenge such repurchase or satisfaction pursuant to the provisions of paragraphs 25 and 26 of the proposed Interim Order;

   c. authority, pursuant to the proposed Interim Order and section 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, to grant senior first-priority Liens (as defined in the DIP Loan Agreement) to the Administrative Agent (for the ratable benefit of the Lenders) and the other holders (the "Other DIP Obligees") of DIP Obligations (as defined in the DIP Loan Agreement) upon all property of the Debtors' estates (excluding certain Excluded Property (as defined below)) including property that presently is collateral securing the Pre-Petition Secured Indebtedness (as defined in the proposed Interim Order), subject to the Carve-Out (as defined below), which would constitute an Extraordinary Provision;

A00161

A0161

     d.     authority, pursuant to the proposed Interim Order and section 364(c)(1) of the Bankruptcy Code, to grant a Superpriority Claim (as defined below) to the Administrative Agent (for the ratable benefit of the Lenders) and the Other DIP Obligees (collectively, the "Secured DIP Creditors") with priority over any and all administrative expenses, other than the Carve-Out;

     e.     authority, pursuant to the proposed Interim Order, to use Cash Collateral (as defined below);

     f.     authority, pursuant to the proposed Interim Order and sections 361, 363(e), 364(c)(1), 364(c)(3) and 507(b) of the Bankruptcy Code, to grant second-priority liens and incur an unliquidated administrative expense in order to adequately protect the Pre-Petition Secured Creditors (as defined in the proposed Interim Order), for, *inter alia*, the priming of their Liens, the continued use of their Cash Collateral, the repurchase of the Receivables Portfolio under the Existing Receivables Facility and all use and diminution in the value of their Pre-Petition Collateral (as defined in the proposed Interim Order);

     g.     authority, pursuant to the proposed Interim Order, for the Lenders to accelerate the maturity of all Borrowings (as defined in the DIP Loan Agreement) and terminate their Commitments (as defined in the DIP Loan Agreement) upon (i) a Change of Control (as defined in the DIP Loan Agreement) or (ii) the entry of an order or orders granting relief from the automatic stay under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors that have a value in excess of $10,000,000 in the aggregate, each of which would constitute Extraordinary Provisions under the Guidelines;

     h.     approval of certain stipulations by the Debtors with respect to the Pre-Petition Documents (as defined in the DIP Loan Agreement) and the liens and security interests arising therefrom, which would constitute Extraordinary Provisions under the Guidelines; and

     i.     scheduling, pursuant to the proposed Interim Order, a hearing (the "Final Hearing") to be held within 45 days of the entry of the Interim Order to consider the entry of a final order (the "Final Order") granting all of the relief requested in this Motion on a final basis, including (i) the relief requested in the proposed Interim Order, (ii) permitting the Debtors to waive any right to surcharge the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code, the waiver of which would constitute an Extraordinary Provision under the Guidelines, and (iii) authority to borrow under the DIP Facility up to an aggregate principal amount of $1,450,000,000 to (A) refinance all prepetition secured claims of the Pre-Petition Secured Creditors, which would constitute an Extraordinary Provision, (B) pay fees, costs and expenses in connection with the DIP Loan Documents and these chapter 11 cases and (C) to provide financing for working capital, letters of credit, capital expenditures and other general corporate purposes of the Debtors (subject to any limitations in the DIP Loan Documents

A00162

A0162

and to the rights afforded a Creditors' Committee in the Final Order), which would constitute an Extraordinary Provision under the Guidelines.

### The Debtors' Urgent Need for Postpetition Financing

10.    It is essential that the Debtors obtain immediate postpetition financing and authority to use Cash Collateral. This relief will enable them to continue their ordinary course, day-to-day operations, service their customers, accomplish their long-term strategic restructuring goals and effectuate their reorganization. In recent months, the Debtors have faced substantial liquidity constraints because of (a) reduced sales to Dana's OEM customers and increased commodity prices, (b) significantly increased scrutiny and demands from Dana's trade creditors as a result of the restatements of Dana's financials and (c) the constraints in borrowing availability under the Pre-Petition Credit Facility and the Existing Receivables Facility. See Burns Affidavit at ¶ 41. Immediate access to credit under the DIP Facility is necessary therefore to provide working capital during the pendency of these chapter 11 cases to deal with the liquidity constraints described above and provide customers, employees, vendors, suppliers and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course. See id. at ¶ 98. Absent this new liquidity, not only would the Debtors' ability to maximize the value of their estates and reorganize successfully be jeopardized, but the Debtors also could be forced to cease all business operations in the short term and thereby risk the loss of their going-concern value to the direct detriment of all parties in interest. See id. at 97.

11.    Accordingly, without immediate access to postpetition financing, the Debtors could suffer substantial and irreparable harm, which could threaten their ability to reorganize successfully. By contrast, once the DIP Facility is approved, the Debtors' ability to minimize disruption to their business operations and instill confidence in their various

NYI-2248844v1                              -7-

A00163

A0163

stakeholders will be substantially enhanced. The Debtors' need for access to the DIP Facility, therefore, is urgent. In addition, because the Debtors lack sufficient unencumbered funds to meet certain imminent expenses necessary for a smooth transition to chapter 11, it is essential that they obtain interim financing under the DIP Facility before the Court conducts the Final Hearing. See Burns Affidavit at ¶ 97.

### The Proposed Debtor in Possession Financing Facility

12.     The Debtors have determined, in the exercise of their sound business judgment, that they require postpetition financing to meet their ongoing working capital and general business needs and that the terms of the DIP Facility will reasonably address the Debtors' financing requirements and constitute the best alternative available under the circumstances. Accordingly, subject to the Court's approval, the Debtors have determined to enter into the DIP Facility with the Lenders. See Burns Affidavit at ¶ 95. The principal terms of the DIP Facility are summarized below.[1]

(a)     **General Terms**. Extensions of credit by the Lenders will be made to Dana as borrower, guaranteed by each of the other Debtors, and governed by the DIP Loan Documents (including, as applicable, the proposed Interim Order and the Final Order).

(b)     **Total Facilities**. The DIP Facility consists of: (i) a non-amortizing revolving credit and letter of credit facility (the "Revolving Credit Facility") and a swing line facility (the "Swing Line Facility") in a combined amount of up to $800,000,000 until entry of the Final Order and thereafter the lesser of (A) the Borrowing Base or (B) $750,000,000 minus any reductions in the Revolving Credit Commitments on account of mandatory prepayments made under the terms of the DIP Loan Agreement and (ii) a non-amortizing senior secured Term Facility (the "Term

---

[1]     This summary of the DIP Facility is intended only to assist the Court in understanding key aspects of the arrangement and is qualified in its entirety by reference to the DIP Loan Agreement, as it may be modified by the proposed Interim Order and the Final Order. All capitalized terms not otherwise defined herein have the meanings given to them in the DIP Loan Agreement or the proposed Interim Order.

A00164
A0164

Facility") providing for up to $700,000,0000 of senior secured term loans to be made available on the date of the Final Order (the "Term Loans").

(c)    **Use of Proceeds**.  Under the proposed Interim Order, proceeds of the Revolving Credit Facility and the Swing Line Facility will be used to (i) repurchase the Receivables Portfolio under the Existing Receivables Facility and satisfy the Existing Corporate Credit Card Obligations in accordance with the terms of the Corporate Credit Card Program, (ii) pay costs and expenses in connection with such repurchase and satisfaction and the chapter 11 cases, including, but not limited, to the non-refundable payment of any and all fees to be paid under, and in accordance with, the terms of the DIP Loan Documents (including, but not limited to, the Fee Letter (as defined in the proposed Interim Order)) and the reasonable costs and expenses as may be due from time under the DIP Loan Documents, and (iii) to provide financing for working capital, letters of credit, capital expenditures and other general corporate purposes of the Debtors (subject to any limitations of borrowings under the DIP Loan Documents).  Upon entry of the Final Order, proceeds of the Term Loan shall be utilized (x) to refinance the remaining Pre-Petition Secured Indebtedness, (y) to pay costs and expenses in connection with such refinancing and the DIP Facility and (z) for other corporate purposes of the Debtors.

(d)    **Term**.  The "Maturity Date" of the DIP Facility is the earlier of (i) the date that is 18 months following the Effective Date[2] and (ii) the effective date of a reorganization plan for the Debtors.

(e)    **Interest Rates**.  The Debtors shall pay interest at the following rates:

- Base Rate Advances.  A rate per annum equal at all times to the sum of (i) a rate equal to the higher of (A) the rate of interest announced publicly by Citibank, N.A. in New York, New York, from time to time, as Citibank N.A.'s base rate; and (B) 0.50% above the Federal Funds Rate, in effect from time to time plus (ii) 2.25% in the case of Term Advances or 1.25% in the case of Revolving Credit Advances, payable in arrears monthly on the first Business Day of each month during such periods and on the date such Base Rate Advance shall be Converted or paid in full. The rate for advances in respect of the Swingline Facility at any time will be the same as the applicable interest rate on Base Rate Advances under the Revolving Credit Facility.

---

[2]    The "Effective Date" under the DIP Loan Agreement is the date on which the conditions precedent to the obligations of the Revolving Credit Lenders to make Revolving Credit Advances under section 3.01 of the DIP Loan Agreement are satisfied.

A00165
A0165

- Eurodollar Advances.  A rate per annum equal at all times to the sum of (i) the Eurodollar Rate in effect on the first day of the applicable Interest Period plus (ii) 3.25% in the case of Term Advances or 2.25% in the case of Revolving Credit Advances, payable in arrears on the last Business Day of such Interest Period and, if such Interest Period has a duration of more than one month, on the first Business Day of each month that occurs during such Interest Period and on the date such Eurodollar Rate Advance shall be Converted or paid in full.

(f)    **Default Interest Rate**.  During an Event of Default, the loans will bear interest at an additional 2% *per annum.*

(g)    **Unused Commitment Fees**.  The Borrower shall pay to the Administrative Agent for the account of the Revolving Credit Lenders a commitment fee, which shall be payable quarterly in arrears on the first day of each month and on the Termination Date, an unused commitment fee equal to 0.375% *per annum* on the average daily unused portion of the Unused Revolving Credit Commitment of each of the Revolving Credit Lenders.  The Borrower shall also pay to the Administrative Agent for the account of the Term Lenders an unused commitment fee, payable quarterly in arrears on the first day of each month and on the Termination Date at the rate of 0.50% *per annum* on the average daily unused portion of the Unused Term Commitment of each of the Term Lenders.

(h)    **Letter of Credit Fee**.

- A percentage *per annum* equal to the Applicable Margin for Eurodollar Rate Advances under the Revolving Credit Facility.

- A fee to the Issuing Bank, for its own account, (i) a fronting fee, payable in arrears on the first Business Day of each month and on the Termination Date, on the average daily amount of its Letter of Credit Commitment during such month, from the Effective Date to the Termination Date at the rate of 0.25% *per annum* and (i) the customary issuance, presentation, amendment and other processing fees and other standard costs and charges, of the Issuing Bank.

(i)    **Additional Fees**.  The Debtors will pay the fees set forth in the Fee Letter.

(j)    **Expense Reimbursements**.  The Administrative Agent shall also be entitled to reimbursement of all reasonable documents costs and expenses, including external counsel and collateral valuation fees.

A00166

A0166

(k)   **DIP Liens**. As security for the DIP Obligations, effective and perfected upon the date of the proposed Interim Order and without the necessity of the execution or recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens will be granted to the Administrative Agent for its own behalf and the benefit of the Secured DIP Creditors (all property identified in clauses (i), (ii) and (iii) below being collectively referred to as the "Collateral"), subject, only in the event of the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Agreement), to the payment of the Carve-Out (all such liens and security interests granted to the Administrative Agent, for its benefit and for the benefit of the Secured DIP Creditors, pursuant to the proposed Interim Order and the DIP Loan Documents, the "DIP Liens"):

(i)   First Lien on Cash Balances and Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors that is not Excluded Property,[3] whether existing on the Petition Date or thereafter acquired, to the extent not subject to valid, perfected non-avoidable and enforceable liens in existence as of the Petition Date or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code, including without limitation, all cash and cash collateral of the Debtors and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment (whether arising before or after the Petition Date), contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries and the proceeds of all the foregoing.

---

[3]   "Excluded Property" means (i) the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code, (ii) property constituting withholdings required under any law (including, but not limited to, federal, state and local income, payroll and trust fund taxes and insurance payments of any nature, whether imposed on the employer or employee, or otherwise) from any amounts due to any employee of any of the Debtors, and any withholdings from an employee considered a "plan asset" under Title I of ERISA (as defined in the DIP Loan Agreement), (iii) 34% of the equity interests in certain Foreign Subsidiaries (as defined in the DIP Loan Agreement) in accordance with, and subject to the provisions of, Section 9.01(e)(iii) of the DIP Loan Agreement and (iv) trademarks consisting of United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law.

A00167

A0167

(ii)  Liens Priming Pre-Petition Secured Creditors' Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors (not including Excluded Property, but including, without limitation, cash collateral, inventory, machinery, accounts receivable, other rights to payment (whether arising before or after the Petition Date) and the equity interests of DAF), whether now existing or hereafter acquired, that is subject to the existing liens presently securing the Pre-Petition Secured Indebtedness (including in respect of issued but undrawn letters of credit).  Such security interests and liens shall be senior in all respects to the interests in such property of the Pre-Petition Secured Creditors arising from current and future liens of the Pre-Petition Secured Creditors (including, without limitation, adequate protection liens granted hereunder), and shall be subject and subordinate to (A) the Carve-Out, to the extent specifically provided for in the Interim or Final Order and (B) any valid, perfected and unavoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date, or to any valid, perfected and unavoidable interests in such property arising out of liens to which the liens of the Pre-Petition Secured Creditors become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(iii)  Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected security interests in and liens upon the all prepetition and postpetition property of the Debtors (other than Excluded Property and the property described in clauses (i) and (ii) above, as to which liens and security interests in favor of the Administrative Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the Administrative Agent and the Secured DIP Creditors are immediately junior to such valid, perfected and unavoidable liens.

(iv)  Liens Senior to Certain Other Liens.  The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after

A00168

A0168

the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, other than with respect to any liens or security interests arising after the Petition Date and permitted under the DIP Loan Agreement to be senior to the DIP Liens.

(l)     **Superpriority Claim**.  In addition, the Lenders will be granted in each of the Interim Order and the Final Order a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the DIP Facility with priority above all other administrative claims.

(m)     **Carve-Out**.  The term "Carve-Out" in the DIP Loan Documents means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code and (iii) an amount not exceeding $20,000,000 in the aggregate, which amount may be used after the occurrence and during the continuance of an Event of Default, to pay fees or expenses incurred by the Debtors and any Creditors' Committee in respect of (A) allowances of compensation for services rendered or reimbursement or expenses awarded by the Bankruptcy Court to the Debtors' or any Creditors' Committee's professionals, any chapter 11 trustee or examiners appointed in these chapter 11 cases and (B) the reimbursement of expenses incurred by members of the Creditors' Committee in the performance of their duties that are allowed by the Bankruptcy Court; provided, however, that the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code and the Carve-Out shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed by the Bankruptcy Court) prior to the occurrence of an Event of Default in respect of which the Carve-Out is invoked or any fees, expenses, indemnities or other amounts paid to the Administrative Agent, the Lenders and their respective attorneys and agents under the DIP Loan Documents or otherwise; and provided, further, that (x) nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above and (y) following the Termination Date, cash or other amounts on deposit in the L/C Cash Collateral Account (as defined in the DIP Loan Agreement) shall not be subject to the Carve-Out.

(n)     **Adequate Protection**.  As adequate protection for the interests of the Pre-Petition Secured Creditors for their interest in the Pre-Petition Collateral, including the Cash Collateral, the Pre-Petition Agent and the Pre-Petition Secured Creditors are hereby granted the following:

A00169

A0169

(i)  Adequate Protection Liens.  The Pre-Petition Agent (on behalf of itself and for the benefit of the Pre-Petition Secured Creditors) will be granted adequate protection liens (the "Adequate Protection Liens") in all of the Collateral, subject and subordinate only to (A) the security interests and liens granted to the Administrative Agent for the benefit of the Secured DIP Creditors and any liens on the collateral to which the liens granted to the Administrative Agent are junior and (B) the Carve-Out.

(ii)  Section 507(b) Claim.  To the extent that the Adequate Protection Liens are not adequate to protect against the diminution in value of the Pre-Petition Collateral, that part of the Adequate Protection Obligations (as defined in the proposed Interim Order) that are not satisfied in full from the proceeds of property subject to the Adequate Protection Liens shall be an allowed administrative expense claim with priority under sections 503(b) and 507(b) of the Bankruptcy Code over all administrative expenses of the kind specified in section 503(b) or 507(a) of the Bankruptcy Code, subordinate only to (A) the Carve-Out and (B) the DIP Obligations (without the requirement to file any motion or pleading or to make any demand); provided, however, that the Pre-Petition Agent and the Pre-Petition Secured Creditors shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under sections 503(b) and 507(b) of the Bankruptcy Code granted hereunder or under the Pre-Petition Security Agreement (as such term is defined in the proposed Interim Order) unless and until the DIP Obligations have indefeasibly been paid in cash in full.

(iii)  Interest, Fees and Expenses.  The Pre-Petition Secured Creditors shall receive from the Debtors (A) immediate cash payment of all accrued and unpaid interest on the Pre-Petition Secured Indebtedness and letter of credit fees at the applicable rates provided for in the Pre-Petition Documents, and all other accrued and unpaid fees and disbursements payable to or for the benefit of the Pre-Petition Secured Creditors under the Pre-Petition Documents and incurred prior to the Petition Date, including, but not limited to, fees owed and amounts to be paid or reimbursed for counsel, financial and other consultants to the Pre-Petition Agent pursuant to Section 8.04 of the Pre-Petition Credit Agreement (as defined in the proposed Interim Order); (B) the monthly payment of current interest and letter of credit fees at the applicable non-default rates pursuant to the applicable Pre-Petition Document (including interest calculated at the Base Rate (as defined in the Pre-Petition Credit Agreement pursuant to Section 2.09(e) of the Pre-Petition Credit Agreement), and all other accrued and unpaid fees and disbursements (including, but not limited to, reasonable

A00170

A0170

fees owed to the Pre-Petition Agent and the Pre-Petition Credit Agreement Agent (as defined in the proposed Interim Order)), provided that the Pre-Petition Secured Creditors reserve their rights to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), and for the payment of any other amounts provided for in the Pre-Petition Documents, and the proposed Interim Order is without prejudice to the rights of the Debtors or any other party to contest such assertion; and (C) current cash payments of all reasonable fees and disbursements of professionals (including, but not limited to, the reasonable fees and disbursements of counsel and internal and third-party consultants, including financial consultants and auditors) for the Pre-Petition Agent and the Pre-Petition Credit Agreement Agent.

(iv)    Monitoring of Collateral.  The Pre-Petition Agent (for the benefit of the Pre-Petition Secured Creditors) shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the Collateral.

(v)     Information.  The Debtors shall provide the Pre-Petition Agent with any written financial information or periodic reporting that is provided to, or required to be provided to, the Administrative Agent or the Lenders.

(o)     **Letters of Credit**.  No Letter of Credit shall have an expiration date after the date that is five days prior to the Maturity Date, or such later date as the issuing bank may, in its sole discretion, specify.  Letters of Credit may be issued for the account of a non-Debtor subsidiary which is one of the Dana Companies.

(p)     **Representations and Warranties**.  The DIP Loan Agreement contains usual representations and warranties, including, but not limited to, valid organization and existence, governmental approvals, no conflicts, compliance with laws and material agreements, accuracy of financial statements, absence of Material Adverse Change, disclosure of litigation, compliance with Federal Reserve Regulations and the Investment Company Act, reliability of information provided to Lenders, subsidiaries, absence of default, maintenance of insurance, payment of taxes, compliance with ERISA, environmental matters, real properties, intellectual property and ownership of properties.

(q)     **Covenants**.  The DIP Loan Agreement contains (i) usual covenants, including affirmative covenants regarding the preservation of corporate existence, compliance with laws, maintenance of insurance, payment of

A00171

A0171

postpetition obligations and taxes, access to books and records, limitations on the use of proceeds, maintenance of an acceptable cash management system and the maintenance of properties and (ii) usual negative covenants, subject to customary exceptions, on liens, other indebtedness, issuance of guaranties, permitting other superpriority claims in these chapter 11 cases, payment of dividends or other distributions, transactions with affiliates which are not also obligors under the DIP Loan Agreement, investments, disposition of assets, capital expenditures, certain mergers, changing the Debtors' accounting policies or engaging in certain sale-leaseback transactions. In addition to the usual customary exceptions, the covenant on investments is subject to exceptions to permit the Borrower and its Subsidiaries to make permitted acquisitions not to exceed $10,000,000 during any Fiscal Year, make investments in Spicer S.A. or its subsidiaries ("Spicer") in an aggregate amount not to exceed $45,000,000 plus the value of certain of the Debtors' equipment to be transferred to Spicer, make investments in connection with tooling programs of Dana suppliers not to exceed $135,000,000 and to permit investments in foreign subsidiaries in an amount not to exceed $50,000,000 and the issuance of letters of credit for the benefit of foreign subsidiaries in an aggregate face amount not in excess of $200,000,000.

(r)     **Selected Financial Covenants**.  The DIP Loan Agreement contains a minimum consolidated EBITDAR covenant that is applicable to Dana and its Subsidiaries and a minimum availability covenant.

(s)     **Financial Reporting**.  Financial reporting will include (i) monthly consolidated balance sheets and cash flow statements of the Debtors, (ii) quarterly consolidated balance sheets and consolidated cash flow statements prepared in accordance with GAAP, (iii) annual audited financials, (iv) annual forecasts of results on a monthly basis and (v) weekly cash flow statements together with a 13 rolling week forecast of cash receipts and disbursements.

(t)     **Events of Default**.  The DIP Loan Agreement contains usual Events of Default, including: (i) failure to pay principal when due or failure to pay interest within three business days of it becoming due; (ii) representations or warranties being incorrect in a material respect; (iii) failure of the Debtors to comply with certain of the covenants under the DIP Loan Agreement; (iv) failure to pay any postpetition debt with an aggregate principal or notional amount of at least $35,000,000; (v) failure to satisfy or stay execution of judgments or administrative claims in excess of $35,000,000; (vi) entry of any nonmonetary judgment that is reasonably likely to have a Material Adverse Effect and such judgment is not stayed for at least 10 consecutive days; (vii) certain ERISA-related defaults; (viii) dismissal or conversion of the Debtors' bankruptcy cases or if the Debtors request such action or support any such request; (ix) appointment of a chapter 7 or chapter 11 trustee or an examiner with powers enlarged

A00172

A0172

beyond those of section 1106(a)(3) and (a)(4) of the Bankruptcy Code; (x) entry of orders granting relief from the automatic stay to foreclose on assets of the Debtors with a value in excess of $10,000,000, other than the exercise of valid setoff rights under section 553 of the Bankruptcy Code; (xi) entry of an order reversing, amending, supplementing, staying for a period in excess of 10 days, vacating or otherwise materially modifying in a manner adverse to the Lenders without their consent the Interim Order or the Final Order; (xii) the Debtors filing a motion under section 364(d) of the Bankruptcy Code to obtain financing which does not provide for the payoff of the DIP Facility; (xiii) the Debtors filing a motion to use Cash Collateral of the Administrative Agent or the Lenders without their prior written consent, except to pay the Carve-Out; (xiv) filing a motion to recover from the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or (xv) failure to obtain entry of a final financing order within 45 days of the entry of the Interim Order.

### Extraordinary Provisions Under the Guidelines

13.    In accordance with the Guidelines, the Debtors have identified the following provisions of the DIP Loan Agreement and the proposed Interim Order as potentially being Extraordinary Provisions under the Guidelines:

a.    **Repayment of Pre-Petition Secured Indebtedness**.  The Debtors seek to obtain credit under the DIP Facility to (i) repurchase, pursuant to the proposed Interim Order, the Receivables Portfolio receivables sold, transferred and/or pledged pursuant to the Existing Receivables Facility and (ii) repay the approximately $10 million in Existing Corporate Credit Card Obligations.  Under the Final Order, the Debtors are seeking to repay the remaining Pre-Petition Secured Indebtedness, which includes both amounts outstanding under their prepetition revolving credit facility and other bilateral obligations, such as hedging agreements.  The Debtors believe that these Extraordinary Provisions should be granted.  First, the DIP Facility would enable the Debtors to acquire substantial additional liquidity as the Lenders were willing to effectively lend approximately 68% of the book value of receivables to the Debtors, which is substantially greater than the approximately 30% effective rate the Debtors were able to obtain under the Existing Receivables Facility.  Thus, repurchasing the Debtors' outstanding receivables which are included in the Receivables Portfolio will provide the Debtors with significantly more liquidity if they are allowed to be repurchased so that they can be pledged to the Lenders under the DIP Facility.  Second, the Debtors similarly believe that they should be authorized to pay off the Existing Corporate Credit Card Obligations. The Corporate Credit Card Program would be costly and time-consuming to replace and is relied upon daily by the Debtors to obtain necessary goods and services and to pay for necessary expenses throughout their business organizations.  Importantly, Citibank, the issuing bank under the Corporate Credit Card Program, has assured the Debtors that the

A00173

A0173

commencement of these chapter 11 cases will not be cause for termination if authority to payoff the Existing Corporate Credit Card Obligations is granted in the proposed Interim Order.

        b.    **Section 506(c) Waiver**. Subject to the entry of a Final Order, the Debtors will be prohibited from attempting to surcharge the Collateral under section 506(c) of the Bankruptcy Code.

        c.    **Events of Default**. The DIP Loan Documents provide that it will be an Event of Default for the Debtors to file a motion to: (i) obtain working capital from any person other than the Lenders under section 364(d) of the Bankruptcy Code; (ii) obtain financing from any persons other than the Lenders under section 364(c) of the Bankruptcy Code; (iii) obtain authority to use Cash Collateral of the Administrative Agent without its written consent (other than to pay the Carve-Out); and (iv) to recover costs under section 506(c) of the Bankruptcy Code from the Collateral.

        d.    **Remedies**. The DIP Loan Documents contain the extraordinary remedy that cash collateral usage will cease immediately if the Debtors' seek a modification or extension of the Interim Order without the consent of the Lenders.

Significantly, and as explained in more detail below, the Lenders would not provide postpetition financing without these Extraordinary Provisions.

### Request for Approval of the DIP Facility and Related Actions

    14.    As described above, it is essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain access to sufficient postpetition financing. The preservation of estate assets, the Debtors' continuing viability and their ability to reorganize successfully, thus, depend heavily upon the expeditious approval of the DIP Facility and the related actions requested herein.

    15.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to

A00174

A0174

section 364(c) of the Bankruptcy Code,[4] a court may authorize the obtaining of credit or the

incurring of debt, repayment of which is entitled to superpriority administrative expense status or

is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or

a combination of the foregoing.

16.    Because the Debtors propose to obtain financing under the DIP Facility

that is secured by first, second and/or third priority liens with respect to the Collateral (subject

only to the Carve-Out and the Excluded Property) and to prime the liens securing the Pre-

Petition Secured Indebtedness, the approval of the DIP Facility is governed by both

sections 364(c) and 364(d) of the Bankruptcy Code.

***Approval Under Section 364 of the Bankruptcy Code***

17.    The statutory requirement for obtaining postpetition credit under

section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor

in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of [the

Bankruptcy Code] as an administrative expense."  See In re Ames Dep't Stores, Inc., 115 B.R.

34, 37-39 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to

seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re

---

[4]       Section 364(c) of the Bankruptcy Code provides as follows:

    (c)       If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of
this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of
credit or the incurring of debt

        (1)  with priority over any or all administrative expenses of the kind specified in
section 503(b) or 507(b) of this title;

        (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

        (3)  secured by a junior lien on property of the estate that is subject to a lien.

    11 U.S.C. § 364(c).

A00175
A0175

Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit

under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured

credit pursuant to section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R.

553 (Bankr. E.D. Pa. 1987).

        18.      Courts have articulated a three-part test to determine whether a debtor may

obtain financing under section 364(c) of the Bankruptcy Code:

> (a)      the debtor is unable to obtain unsecured credit under section 364(b) (i.e.,
> by granting a lender administrative expense priority);
>
> (b)      the credit transaction is necessary to preserve the assets of the estate; and
>
> (c)      the terms of the transaction are fair, reasonable and adequate, given the
> circumstances of the debtor-borrower and the proposed lender.

In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and

holding that "[o]btaining credit should be permitted not only because it is not available

elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated

by credit, but also because the credit acquired is of significant benefit to the debtor's estate and

the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the

debtor to obtain comparable credit elsewhere"); In re Ames Dep't Stores, 115 B.R. at 37-39.  The

Declaration of Henry S. Miller, a copy of which is attached hereto as Exhibit C (the "Miller

Declaration"), presents evidence that these three elements are satisfied.  See Miller Declaration at

¶¶ 7-9.

        19.      The Debtors also seek approval of the DIP Facility under

section 364(d)(1) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition

credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and

hearing, that the debtors in possession are "unable to obtain such credit otherwise."  See Shaw

Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.), 300 B.R. 861, 863, 865 (Bankr.

A00176

A0176

W.D. Pa. 2003) (where debtor made efforts by "contacting numerous lenders" and was unable to obtain credit without a priming lien, it had met its burden under section 364(d)); In re Dunes Casino Hotel, 69 B.R. 784, 796 (Bankr. D. N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien).  In addition, the secured creditors whose liens are being "primed" by a new postpetition lender under section 364(d) of the Bankruptcy Code must be provided with adequate protection of their interests in collateral.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (noting that adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy); Dunes Casino, 69 B.R. at 793 (holding that "[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").

   20. To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Id. at 1088; see also Ames, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).  Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for

A00177

A0177

financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom.

Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

      21.     To obtain postpetition financing, the Debtors and their advisors

approached, or were approached by, several sophisticated commercial entities active in the

debtor in possession financing market, including traditional banks, asset-based lenders,

investment banks, hedge funds and institutional lenders (collectively, the "Potential Lenders").

No less than six Potential Lenders executed confidentiality agreements and were provided due

diligence packages by the Debtors' advisors. See Miller Declaration at ¶ 12. Four different

financing proposals were received from teams involving the Potential Lenders and other parties.

See id. at ¶ 13.

      22.     None of the Potential Lenders were willing to make a postpetition loan on

an unsecured basis in an amount necessary for the Debtors' business operations and other

financing needs or without the existing financing being paid off by the proceeds of such a facility

or having the Pre-Petition Secured Indebtedness primed. See id. The Miller Declaration shows,

and the evidence at the Final Hearing will show, that the Debtors could not have obtained a

postpetition financing facility of the type and magnitude required in these chapter 11 cases on an

unsecured basis or without granting the priming proposed in the DIP Loan Documents. See id.

Moreover, the cost of the DIP Facility is comparable to the pricing of similar DIP financing

transactions in the current market. See id. at ¶ 18. Further, the DIP Facility provided the most

liquidity and had a more favorable covenant package than the package with the lowest

combination of interest rates and fees. See id. at ¶ 14. As such, when considering all of the

factors, the Debtors concluded that the DIP Facility was their best financing alternative. See id.

The Debtors' efforts to seek necessary postpetition financing from these large, sophisticated

A00178

A0178

entities satisfy the statutory requirements of section 364 of the Bankruptcy Code. See, e.g., In re

495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor seeking financing

under section 364(c) of the Bankruptcy Code made acceptable attempt to obtain less onerous

financing by speaking to several lenders that denied the loan request); Ames, 115 B.R. at 40.

***The DIP Facility is Necessary to Preserve Assets of the Debtors' Estates***

        23.     It is essential that the Debtors immediately obtain financing necessary to

continue, among other things, the orderly operation of the Debtors' businesses and to make

certain capital expenditures and satisfy certain working capital requirements of the Debtors'

businesses. See Burns Affidavit at ¶ 98. The DIP Facility also is essential to provide the

Debtors' various stakeholders, including customers, employees, vendors, service providers and

other key constituencies, with confidence in the Debtors' ability to reorganize. See id.

        24.     The success of these chapter 11 cases depends on, among other things,

(a) the Debtors' ability to meet their day-to-day working capital requirements without

interruption or delay and (b) the confidence of the Debtors' stakeholders. See id. at ¶ 97. If entry

of the Interim Order or the Final Order is denied or delayed, the Debtors will likely experience

business disruptions in the short term, stakeholder confidence may be destroyed and the Debtors'

ability to reorganize may be damaged irreparably. See id. Further, pursuant to the Pre-Petition

Security Agreement and the Receivables Program, the Debtors have pledged virtually all their

cash and the proceeds of existing accounts receivable and inventory as collateral or sold their

interests in these items. See id. As a result, without immediate access to Cash Collateral and

new borrowing relief, the Debtors' business operations would grind to an almost immediate halt,

which would seriously jeopardize, and may destroy, the going-concern value of the Debtors'

businesses. See id. Immediate access to postpetition financing will enable the Debtors to

repurchase the receivables subject to the Receivables Program and use collections on these

A00179

A0179

receivables to finance operations during these chapter 11 cases until the Debtors can start to collect on their postpetition receivables. See id. In addition, the substantial new liquidity under the proposed interim portion of the DIP Facility will ensure that the Debtors can make the payments requested by the First Day Pleadings and to pay the administrative claims incurred in the ordinary course of these chapter 11 cases. See id. at ¶ 98.

25.    The requested interim availability under the DIP Credit Facility will help provide assurances to the Debtors' suppliers, vendors and employees that they will be paid for postpetition services. See id. These assurances will be essential to the Debtors' efforts to persuade their vendors to continue shipping goods and providing services to the Debtors on customary trade credit. See id. The liquidity provided by the DIP Facility will provide assurances to the Debtors' customers that they will be able to deliver products during these chapter 11 cases. See id. Approval of interim borrowing under the DIP Facility thus is crucial to maximizing the value of the Debtors' estates. See id.

**The Terms of the DIP Facility Are Fair, Reasonable and Appropriate**

26.    The proposed DIP Facility provide generally that the security interests and superpriority administrative expense claims granted to the Lenders are subject to the Carve-Out described above. The DIP Loan Agreement also provides for payment of fees and expenses of professionals without any cap as long as, essentially, no Event of Default has occurred and is continuing. In Ames Department Stores, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that official committees and debtors' estates are adequately assisted by counsel and other professionals. Ames, 115 B.R. at 40.

27.    Likewise, the fees and charges required by the Lenders under the DIP Facility are reasonable and appropriate under the circumstances. The Debtors submit that the proposed fees under the DIP Facility are well within the parameters of market fee structures for

NYI-2248844v1                                    -24-

A00180

A0180

similar postpetition financing. See Miller Declaration at ¶ 18. Indeed, courts routinely authorize

similar lender incentives beyond the explicit liens and other rights specified in section 364 of the

Bankruptcy Code. See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (B.A.P. 9th Cir.

1992) (approving a financing facility under section 364 of the Bankruptcy Code that included a

lender "enhancement fee").

### Application of the Business Judgment Standard

        28.     As described above, after appropriate investigation and analysis, the

Debtors' management has concluded that the DIP Facility provide the best alternative available

in the circumstances of these chapter 11 cases. Bankruptcy courts routinely defer to a debtor's

business judgment on most business decisions, including the decision to borrow money, unless

such decision is arbitrary and capricious. See In re Trans World Airlines, Inc., 163 B.R. 964,

974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based

facility were approved because they "reflect[ed] sound and prudent business judgment on the

part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and

its creditors"); cf. Group of Inst. Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550

(1943) (holding that decisions regarding the rejection or assumption of a lease is left to the

business judgment of the debtor). In fact, "[m]ore exacting scrutiny would slow the

administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's

provision for private control of administration of the estate, and threaten the court's ability to

control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311

(5th Cir. 1985).

        29.     The Debtors have exercised sound business judgment in determining that a

postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt

under the DIP Facility. The terms of the DIP Facility are fair and reasonable, and are in the best

A00181

A0181

interests of the Debtors' estates.  Accordingly, the Court should grant the Debtors authority to enter into the DIP Facility and obtain funds from the Lenders on the secured and administrative "superpriority" basis described above, pursuant to section 364(c) of the Bankruptcy Code.

### Request for Consensual Use of Cash Collateral

30.     By this Motion, the Debtors also request authority to use Cash Collateral on the terms set forth in the proposed Interim Order.  The Debtors' use of Cash Collateral, including the Debtors' proposal to provide replacement liens as adequate protection in connection with such use, is authorized pursuant to section 363(c) of the Bankruptcy Code. Section 363(c) of the Bankruptcy Code provides as follows:

> (1)     If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

> (2)     The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless —

>> (a)     each entity that has an interest in such cash collateral consents; or

>> (b)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code further provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest . . . ."

31.     The Debtors require access to their cash and the proceeds of existing accounts receivable and inventory to operate their businesses and preserve their value as going

NYI-2248844v1                              -26-

A00182
A0182

concerns. These essential items, however, constitute part of the collateral under the Pre-Petition Security Agreement and the Receivables Portfolio sold under the Existing Receivables Facility, as well as part of the intended collateral under the DIP Facility and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with section 363 of the Bankruptcy Code. <u>See</u> Miller Declaration at ¶ 8.

32.     The proposed Interim Order, if approved, will provide the Debtors with the ability to use the Cash Collateral while providing the Pre-Petition Secured Creditors with adequate protection, as contemplated by sections 363(c)(2)(A) and 363(e) of the Bankruptcy Code. Under section 361 of the Bankruptcy Code, adequate protection may be provided by granting a lienholder an additional or replacement lien to the extent that the usage of the cash collateral results in a decrease in the value of such entity's interest in such property. As discussed above, the proposed Interim Order provides for replacement liens to protect the Pre-Petition Secured Creditors against any diminution in value of their interests in the Cash Collateral. In addition, in accordance with sections 503(b) and 507(b) of the Bankruptcy Code, the proposed Interim Order provides for a superpriority administrative expense claim to protect the Pre-Petition Secured Creditors if the replacement liens granted by the proposed Interim Order prove inadequate to secure against any diminution in the value of the their interests in the Cash Collateral.

**Request for Authority to Make<br>Interim Borrowings Under the DIP Facility**

33.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to

NYI-2248844v1                                    -27-

A00183<br>A0183

the extent necessary to avoid immediate and irreparable harm to a debtor's estate. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., Simasko, 47 B.R. at 449; see also Ames, 115 B.R. at 38. After the 15-day period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., Simasko, 47 B.R. at 449; Ames, 115 B.R. at 36.

34.    Pursuant to Bankruptcy Rule 4001(c), the Debtors request that the Court conduct an interim hearing and authorize the Debtors to borrow, on an interim basis, $800 million in cash under the DIP Facility in order to (a) maintain and finance the ongoing operations of the Debtors, (b) repurchase the Receivables Portfolio under the Existing Receivables Facility and to refinance the Existing Corporate Credit Card Obligations and (c) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest.

35.    The Debtors have an urgent and immediate need for cash to continue to operate. As described above, the Debtors do not have sufficient funds with which to operate their businesses through only the use of cash collateral. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide the necessary assurance to vendors, employees and customers of the Debtors' ability to meet their near-term obligations.

A00184
A0184

## Good Faith

36.    The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  Therefore, the Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## Request for Modification of the Automatic Stay

37.    The proposed DIP Facility contemplate a modification of the automatic stay imposed by operation of section 362 of the Bankruptcy Code to permit (a) the Debtors to grant the DIP Liens and to perform the Debtors' liabilities and obligations to the Agents and the Lenders under the DIP Facility, and (b) the delivery by the Administrative Agent of an Enforcement Notice (as defined below) and the exercise of remedies by the Administrative Agent following an Event of Default in accordance with Paragraph 15 of the proposed Interim Order.  Upon the occurrence of an Event of Default and during the continuance thereof, with five business days' prior written notice to the Debtors, Debtors' counsel, counsel to any Creditors' Committee and the U.S. Trustee, the Administrative Agent shall be entitled to exercise the Administrative Agent's rights and remedies as set forth in the DIP Loan Documents.  Such Enforcement Notice also will be filed with the Court.  In any hearing after the giving of the Enforcement Notice, the only issues that may be raised by any party in opposition to the giving of the Enforcement Notice thereto shall be whether, in fact, (a) an event of Default has occurred and is continuing or (b) such Event of Default is primarily due to, or primarily arises from, the gross negligence or willful misconduct of the Agents or the Lenders.

A00185

A0185

38.     Such stay modification provisions are customary features of postpetition

financing facilities and, in the Debtors' business judgment, are reasonable under the

circumstances.  Accordingly, the Debtors respectfully request that this Court modify the

automatic stay to the extent contemplated by the DIP Loan Agreement and the proposed Interim

Order.

## Request for Final Hearing

39.     Finally, pursuant to Bankruptcy Rule 4001(c)(2), the Debtors respectfully

request that this Court set a date for the Final Hearing that is no later than 30 days from the

Petition Date and approve the provisions for notice of such Final Hearing that are set forth in the

proposed Interim Order.

## Memorandum of Law

40.     This Motion includes citations to the applicable authorities and does not

raise any novel issues of law.  Accordingly, the Debtors respectfully request that the Court waive

the requirement contained in Bankruptcy Rule 9013-1(b) that a separate memorandum of law be

submitted.

## Notice

41.     No trustee or examiner has been appointed in these chapter 11 cases.

Notice of this Motion has been provided to:  (a) the U.S. Trustee; (b) counsel to the

administrative agent for the Debtors' prepetition secured bank lenders and the DIP Lenders;

(c) the creditors holding the 50 largest unsecured claims against the Debtors' estates, as identified

in the Debtors' chapter 11 petitions; (d) Wilmington Trust Company, as the indenture trustee for

the Debtors' noteholders; (e) counsel for the program agent for the Debtors' prepetition accounts

NYI-2248844v1                              -30-

A00186

A0186

receivable securitization facility; and (f) known holders of prepetition liens against the Debtors'

property.  The Debtors submit that no other or further notice need be provided.

### No Prior Request

42.     No prior request for the relief sought in this Motion has been made to this

or any other court in connection with these chapter 11 cases.

A00187

A0187

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Interim Order, granting the interim relief requested herein that is substantially in the form annexed hereto as Exhibit A; (b) the Final Order; and (c) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: March 3, 2006
      New York, New York

Respectfully submitted,

   s/Corinne Ball
Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

  - and -

Heather Lennox (HL 3046)
Jeffrey B. Ellman (JE 5638)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

A00188

A0188