# **EXHIBIT B**

## **DIP LOAN AGREEMENT**

NYI-2248844v1

A00229

A0229

**$1,450,000,000**

**SENIOR SECURED SUPERPRIORITY**
**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of March 3, 2006

Among

DANA CORPORATION, as Debtor and
Debtor-in-Possession

as <u>Borrower</u>

and

THE GUARANTORS PARTY HERETO,
as Debtors and Debtors in Possession under
Chapter 11 of the Bankruptcy Code

and

CITICORP NORTH AMERICA, INC.

as <u>Administrative Agent</u>

and

BANK OF AMERICA, N.A.

and

JPMORGAN CHASE BANK, N.A.

as <u>Co-Syndication Agents</u>

and

CITICORP NORTH AMERICA, INC.

as <u>Initial Swing Line Lender</u>

and

BANK OF AMERICA, N.A.,

CITICORP NORTH AMERICA, INC.

and

JPMORGAN CHASE BANK, N.A.

as <u>Initial Issuing Banks</u>

THE INITIAL LENDERS AND THE OTHER LENDERS PARTY HERETO

CITIGROUP CAPITAL MARKETS INC., J.P. MORGAN SECURITIES INC.

and

BANC OF AMERICA SECURITIES LLC

as <u>Joint Lead Arrangers and Joint Bookrunners</u>

A00230

A0230

# TABLE OF CONTENTS

**Page**

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01 Certain Defined Terms.................................................................................... 2
Section 1.02 Computation of Time Periods........................................................................ 26
Section 1.03 Accounting Terms........................................................................................... 27

## ARTICLE II

## AMOUNTS AND TERMS OF THE ADVANCES
## AND THE LETTERS OF CREDIT

Section 2.01 The Advances................................................................................................. 27
Section 2.02 Making the Advances .................................................................................... 28
Section 2.03 Issuance of and Drawings and Reimbursement Under Letters of Credit................ 30
Section 2.04 Repayment of Advances ................................................................................ 35
Section 2.05 Termination or Reduction of Commitments .................................................. 35
Section 2.06 Prepayments................................................................................................... 36
Section 2.07 Interest............................................................................................................ 37
Section 2.08 Fees  38
Section 2.09 Conversion of Advances ................................................................................ 39
Section 2.10 Increased Costs, Etc ...................................................................................... 39
Section 2.11 Payments and Computations ......................................................................... 41
Section 2.12 Taxes.............................................................................................................. 42
Section 2.13 Sharing of Payments, Etc .............................................................................. 44
Section 2.14 Use of Proceeds............................................................................................. 44
Section 2.15 Defaulting Lenders........................................................................................ 45
Section 2.16 Evidence of Debt........................................................................................... 47
Section 2.17 Priority and Liens.......................................................................................... 47
Section 2.18 Payment of Obligations................................................................................. 48
Section 2.19 No Discharge: Survival of Claims ................................................................ 48

## ARTICLE III

## CONDITIONS TO EFFECTIVENESS

Section 3.01 Conditions Precedent to Effectiveness.......................................................... 49
Section 3.02 Conditions Precedent to Each Borrowing and Each Issuance of a Letter of Credit 51
Section 3.03 Conditions Precedent to the Term Borrowing .............................................. 52
Section 3.04 Determinations Under Sections 3.01 and 3.03.............................................. 52

A00231
A0231

ii

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

Section 4.01 Representations and Warranties of the Loan Parties ................................................. 52

## ARTICLE V

### COVENANTS OF THE LOAN PARTIES

Section 5.01 Affirmative Covenants.................................................................................... 56
Section 5.02 Negative Covenants ...................................................................................... 59
Section 5.03 Reporting Requirements. ............................................................................... 64
Section 5.04 Financial Covenants...................................................................................... 67

## ARTICLE VI

### EVENTS OF DEFAULT

Section 6.01 Events of Default ......................................................................................... 68
Section 6.02 Actions in Respect of the Letters of Credit upon Default......................................... 71

## ARTICLE VII

### THE AGENTS

Section 7.01 Appointment and Authorization of the Agents........................................................ 71
Section 7.02 Delegation of Duties ..................................................................................... 72
Section 7.03 Liability of Agents ........................................................................................ 72
Section 7.04 Reliance by Agents ....................................................................................... 72
Section 7.05 Notice of Default........................................................................................... 73
Section 7.06 Credit Decision; Disclosure of Information by Agents ............................................ 73
Section 7.07 Indemnification of Agents .............................................................................. 73
Section 7.08 Agents in Their Individual Capacity.................................................................. 74
Section 7.09 Successor Agent........................................................................................... 74
Section 7.10 Administrative Agent May File Proofs of Claim.................................................... 74
Section 7.11 Collateral and Guaranty Matters....................................................................... 75
Section 7.12 Other Agents; Arrangers and Managers .............................................................. 76

## ARTICLE VIII

### SUBSIDIARY GUARANTY

Section 8.01 Subsidiary Guaranty...................................................................................... 76
Section 8.02 Guaranty Absolute ........................................................................................ 76
Section 8.03 Waivers and Acknowledgments ....................................................................... 77
Section 8.04 Subrogation................................................................................................. 78
Section 8.05 Additional Guarantors.................................................................................... 79

A00232

A0232

iii

Section 8.06 Continuing Guarantee; Assignments ........................................................ 79
Section 8.07 No Reliance............................................................................................... 79

## ARTICLE IX

## SECURITY

Section 9.01 Grant of Security ...................................................................................... 79
Section 9.02 Further Assurances................................................................................... 83
Section 9.03 Rights of Lender; Limitations on Lenders' Obligations .......................... 84
Section 9.04 Covenants of the Loan Parties with Respect to Collateral...................... 85
Section 9.05 Performance by Agent of the Loan Parties' Obligations ......................... 88
Section 9.06 The Administrative Agent's Duties ......................................................... 88
Section 9.07 Remedies................................................................................................... 89
Section 9.08 Modifications ............................................................................................ 91
Section 9.09 Release; Termination ............................................................................... 92

## ARTICLE X

## MISCELLANEOUS

Section 10.01 Amendments, Etc..................................................................................... 92
Section 10.02 Notices, Etc.............................................................................................. 93
Section 10.03 No Waiver; Remedies.............................................................................. 95
Section 10.04 Costs, Fees and Expenses ....................................................................... 95
Section 10.05 Right of Set-off ....................................................................................... 97
Section 10.06 Binding Effect ......................................................................................... 97
Section 10.07 Successors and Assigns........................................................................... 97
Section 10.08 Execution in Counterparts..................................................................... 100
Section 10.09 Confidentiality; Press Releases and Related Matters........................... 100
Section 10.10 Patriot Act Notice. ................................................................................. 101
Section 10.11 Jurisdiction, Etc..................................................................................... 101
Section 10.12 Governing Law ...................................................................................... 101
Section 10.13 Waiver of Jury Trial.............................................................................. 102

iv

## SCHEDULES

| | | |
|---|---|---|
| Schedule I | - | Commitments and Applicable Lending Offices |
| Schedule II | - | Intellectual Property |
| Schedule III | - | Material IP Agreements |
| Schedule IV | - | Initial Pledged Equity |
| Schedule V | - | Initial Pledged Debt |
| Schedule 1.01(a) | - | Material Guarantors |
| Schedule 1.01(b) | - | Material Intellectual Property |
| Schedule 3.01 | - | Disclosures |
| Schedule 4.01 | - | Equity Investors; Subsidiaries |
| Schedule 4.01(c) | - | Violations |
| Schedule 4.01(m) | - | Environmental Matters |
| Schedule 5.01(k) | - | Unblocked Accounts |
| Schedule 5.01(n)(iii) | - | Post-Closing Matters |
| Schedule 5.01(q) | - | Excluded Accounts |
| Schedule 5.02(c)(viii) | - | Insurance Premium and Surety Bond Financings |
| Schedule 5.02(g) | - | Existing Investments |
| Schedule 5.02(h) | - | Permitted Asset Sales |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A-1 | - | Form of Term Note |
| Exhibit A-2 | - | Form of Revolving Credit Note |
| Exhibit B | - | Form of Notice of Borrowing |
| Exhibit C | - | Form of Assignment and Acceptance |
| Exhibit D-1 | - | Form of Opinion of Jones Day |
| Exhibit D-2 | - | Form of Opinion of Hunton & Williams LLP |
| Exhibit D-3 | - | Form of Opinion of Shumaker, Loop & Kendrick, LLP |
| Exhibit E | - | Interim Order |
| Exhibit F | - | Final Order |
| Exhibit G | - | Form of IP Security Agreement Supplement |
| Exhibit H | - | Form of Guaranty Supplement |

NYDOCS02/757095.6          Dana – DIP Credit Agreement

A00234
A0234

## SENIOR SECURED SUPERPRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") dated as of March 3, 2006 among DANA CORPORATION, a Virginia corporation and a debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code (as hereinafter defined) (the "Borrower"), and each of the direct and indirect subsidiaries of the Borrower signatory hereto (each, a "Guarantor", and, collectively, together with any person that becomes a Guarantor hereunder pursuant to Section 8.05, the "Guarantors"), each of which is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, the Initial Lenders (as hereinafter defined) and the other banks, financial institutions and other institutional lenders party hereto (each, a "Lender", and collectively with the Initial Lenders and any other person that becomes a Lender hereunder pursuant to Section 10.07, the "Lenders"), BANK OF AMERICA, N.A. ("BofA"), CITICORP NORTH AMERICA, INC. ("CNAI") and JPMORGAN CHASE BANK, N.A. ("JPM"), as the initial Issuing Banks (in such capacity, the "Initial Issuing Banks"), CNAI, as the initial Swing Line Lender (in such capacity, the "Initial Swing Line Lender"), CNAI, as administrative agent (or any successor appointed pursuant to Article VII, the "Administrative Agent") for the Lender Parties and the other Secured Parties (each as hereinafter defined), JPMORGAN CHASE BANK, N.A. and BANK OF AMERICA, N.A., as co-syndication agents (the "Syndication Agents") and CITIGROUP CAPITAL MARKETS INC., J.P. MORGAN SECURITIES INC. and BANC OF AMERICA SECURITIES LLC, as Joint Lead Arrangers and Joint Bookrunners (the "Lead Arrangers").

### PRELIMINARY STATEMENTS

(1)     On March 3, 2006 (the "Petition Date"), the Borrower and the Guarantors filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for relief, and commenced proceedings (the "Cases") under Chapter 11 of the U.S. Bankruptcy Code (11 U.S.C. §§ 101 et seq.; the "Bankruptcy Code") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(2)     The Borrower has requested that the Agents (as hereafter defined) and the Lender Parties (as hereinafter defined) enter into term, revolving credit, swing line and letter of credit facilities (collectively, the "Facilities") in an aggregate principal amount not to exceed $1,450,000,000.

(3)     To provide guarantees and security for the repayment of the advances under the Facilities, the reimbursement of any drawing under a letter of credit and the payment of the other obligations of the Borrower hereunder and under the other Loan Documents (as hereinafter defined), the Borrower and the Guarantors, as the case may be, will provide to the Administrative Agent and the Lender Parties (a) a guaranty from each of the Guarantors of the due and punctual payment of the obligations of the Borrower hereunder, and (b) the claims and liens described in Section 2.17 of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

A00235

A0235

2

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01 <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>Account Collateral</u>" has the meaning specified in Section 9.01(f).

"<u>Accounts</u>" has the meaning set forth in the UCC.

"<u>Acquisition</u>" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (i) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (ii) the acquisition or ownership of in excess of 50% of the Equity Interests in any Person, or (iii) the acquisition of another Person by a merger, consolidation, amalgamation or any other combination with such Person.

"<u>Administrative Agent</u>" has the meaning specified in the recital of parties to this Agreement.

"<u>Administrative Agent's Account</u>" means the account of the Administrative Agent maintained by the Administrative Agent with Citibank, N.A. and identified to the Borrower and the Lender Parties from time to time.

"<u>Advance</u>" means a Term Advance, a Revolving Credit Advance, a Swing Line Advance or a Letter of Credit Advance.

"<u>Affiliate</u>" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"<u>After-Acquired Intellectual Property</u>" has the meaning specified in Section 9.04(h)(v).

"<u>Agent-Related Persons</u>" means, the Agents, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Agents and Affiliates.

"<u>Agents</u>" means the Administrative Agent, the Syndication Agent and the Lead Arrangers.

"<u>Agreement Value</u>" means, for each Hedge Agreement, on any date of determination, an amount equal to:  (a) in the case of a Hedge Agreement documented pursuant to the Master Agreement (Multicurrency-Cross Border) published by the International Swap and Derivatives Association, Inc. (the "Master Agreement"), the amount, if any, that would be payable by any Loan Party or any of its Subsidiaries to its counterparty to such Hedge Agreement, as if (i) such Hedge Agreement was being terminated early on such date of determination, (ii) such Loan Party or Subsidiary was the sole "Affected Party," and (iii) the Administrative Agent was the sole party determining such payment amount (with the Administrative Agent making such determination

A00236
A0236

3

pursuant to the provisions of the form of Master Agreement); (b) in the case of a Hedge Agreement traded on an exchange, the mark-to-market value of such Hedge Agreement, which will be the unrealized loss or gain on such Hedge Agreement to the Loan Party or Subsidiary of a Loan Party to such Hedge Agreement based on the settlement price of such Hedge Agreement on such date of determination; or (c) in all other cases, the mark-to-market value of such Hedge Agreement, which will be the unrealized loss or gain on such Hedge Agreement to the Loan Party or Subsidiary of a Loan Party to such Hedge Agreement determined as the amount, if any, by which (i) the present value of the future cash flows to be paid by such Loan Party or Subsidiary exceeds (ii) the present value of the future cash flows to be received by such Loan Party or Subsidiary pursuant to such Hedge Agreement; capitalized terms used and not otherwise defined in this definition shall have the respective meanings set forth in the above described Master Agreement

"Applicable Lending Office" means, with respect to each Lender Party, such Lender Party's Domestic Lending Office in the case of a Base Rate Advance and such Lender Party's Eurodollar Lending Office in the case of a Eurodollar Rate Advance.

"Applicable Margin" means (a) in respect of the Term Facility, 3.25% per annum, in the case of Eurodollar Rate Advances, and 2.25% per annum, in the case of Base Rate Advances, (b) in respect of the Swing Line Facility, as set forth in clause (c) below for Base Rate Advances, and (c) in respect of the Revolving Credit Facility, 2.25% per annum, in the case of Eurodollar Rate Advances, and 1.25% per annum, in the case of Base Rate Advances.

"Appropriate Lender" means, at any time, with respect to (a) the Term Facility or the Revolving Credit Facility, a Lender that has a Commitment or Advances outstanding, in each case with respect to or under such Facility at such time, (b) the Letter of Credit Sublimit, (i) any Issuing Bank and (ii) if the Revolving Credit Lenders have made Letter of Credit Advances pursuant to Section 2.03(c) that are outstanding at such time, each such Revolving Credit Lender and (c) the Swing Line Facility, (i) the Swing Line Lender and (ii) if the Revolving Credit Lenders have made Swing Line Advances pursuant to Section 2.02(b) that are outstanding at such time, each Revolving Credit Lender.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender Party and an Eligible Assignee, and accepted by the Administrative Agent, in accordance with Section 10.07 and in substantially the form of Exhibit C hereto.

"Available Amount" of any Letter of Credit means, at any time, the maximum amount available to be drawn under such Letter of Credit at such time (assuming compliance at such time with all conditions to drawing).

"Availability" means at any time the excess of (a) the Revolving Credit Availability Amount at such time over (b) the sum of (i) the Revolving Credit Advances, Swing Line Advances and Letter of Credit Advances outstanding at such time plus (ii) the aggregate Available Amount of all Letters of Credit outstanding at such time.

"Bankruptcy Code" has the meaning specified in the Preliminary Statements.

A00237

A0237

4

"Bankruptcy Court" has the meaning specified in the Preliminary Statements and means the United States District Court for the Southern District of New York when such court is exercising direct jurisdiction over the Cases.

"Base Rate" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the higher of:

  (a) the rate of interest announced publicly by Citibank, N.A. in New York, New York, from time to time, as Citibank N.A.'s base rate; and

  (b) ½ of 1% per annum above the Federal Funds Rate.

"Borrower" has the meaning specified in the recital of parties to this Agreement.

"Borrower's Account" means the account of the Borrower maintained by the Borrower and specified in writing to the Administrative Agent from time to time.

"Borrowing" means a borrowing consisting of simultaneous Advances of the same Type made by the Appropriate Lenders.

"Borrowing Base" means (a) the sum of the Loan Values *less* (b) Reserves.

"Borrowing Base Amendment" means an amendment to this Agreement reasonably satisfactory to the Initial Lenders to be executed and delivered prior to entry of the Final Order pursuant to which aggregate availability under the Revolving Credit Facility will not be permitted to exceed the Borrowing Base.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in New York City and, if the applicable Business Day relates to any Eurodollar Rate Advances, on which dealings are carried on in the London interbank market.

"Budget Variance Report" means a report calculated in accordance with the most recent Thirteen Week Forecast, in each case certified by a Responsible Officer of the Borrower, in form and substance reasonably satisfactory to the Initial Lenders, to be delivered concurrently with each Thirteen Week Forecast showing cash usage and borrowing variance for the period since the delivery of the last Thirteen Week Forecast.

"Canadian Revolving Facility" means the senior secured revolving credit facility in an aggregate principal amount up to $100,000,000 entered into by Dana Canada Holding Company and its Subsidiaries on or prior to the date of the entry of the Final Order, on terms reasonably acceptable to the Initial Lenders.

"Capital Expenditures" means, for any Person for any period, the sum (without duplication) of all expenditures made, directly or indirectly, by such Person or any of its Subsidiaries during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a Consolidated balance sheet of such Person. For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such

A00238

A0238

5

purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Carve-Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under Section 1930(a) of title 28 of the United States Code and (ii) an amount not exceeding $20,000,000 in the aggregate, which amount may be used after the occurrence and during the continuance of an Event of Default, to pay fees or expenses incurred by the Borrower and any Committee in respect of (A) allowances of compensation for services rendered or reimbursement or expenses awarded by the Bankruptcy Court to the Borrower's or any Committee's professionals, any chapter 11 or chapter 7 trustees or examiners appointed in these cases and (B) the reimbursement of expenses incurred by Committee members in the performance of their duties that are allowed by the Bankruptcy Court; provided, however, that the Borrower and each Guarantor shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code, such dollar limitation on fees and disbursements shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed by the Bankruptcy Court) prior to the occurrence of an Event of Default in respect of which the Carve-Out is invoked or any fees, expenses, indemnities or other amounts paid to the Administration Agent or the Lenders and their respective attorneys and agents under this Agreement or otherwise; and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above.

"Cases" has the meaning specified in the Preliminary Statements.

"Cash Concentration Account" has the meaning specified in Section 5.01(m).

"Cash Equivalents" means any of the following, to the extent owned by any Loan Party free and clear of all Liens other than Liens created under the Collateral Documents or claims or Liens permitted pursuant to this Agreement and having a maturity of not greater than 12 months from the date of issuance thereof:  (a) readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States, (b) certificates of deposit of or time deposits with any commercial bank that is a Lender Party or a member of the Federal Reserve System that issues (or the parent of which issues) commercial paper rated as described in clause (c), is organized under the laws of the United States or any state thereof and has combined capital and surplus of at least $500,000,000, (c) commercial paper in an aggregate amount of no more than $10,000,000 per issuer outstanding at any time, issued by any corporation organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P or (d) Investments, classified in accordance with GAAP, as current assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P and which are approved by the Bankruptcy Court, or (e) offshore overnight interest bearing deposits in foreign branches of Citibank, N.A., JP Morgan Chase Bank, N.A. or Bank of America, N.A.

A00239
A0239

6

"Cash Flow" means for any period, (a) EBITDAR for such period less (b) the sum of (i) Professional Fees accrued in connection with the Cases during such period and (ii) Capital Expenditures made during such period.

"Cash Management Obligations" means all Obligations of any Loan Party owing to a Lender Party (or a banking Affiliate of a Lender Party) in respect of any overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house transfers of funds.

"Change of Control" means and shall be deemed to have occurred upon the occurrence of any of the following events: (i) any Person or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, and regulations promulgated thereunder) shall have acquired beneficial ownership of more than 40% of the outstanding Equity Interests in the Borrower and (ii) after the Effective Date, the occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (A) nominated by the board of directors of the Borrower nor (B) appointed by the directors so nominated.

"CNAI" has the meaning specified in the recital of parties to this Agreement.

"Collateral" means all "Collateral" referred to in the Collateral Documents and all other property that is or is intended to be subject to any Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"Collateral Documents" means, collectively, the provisions of Article IX of this Agreement, the Intellectual Property Security Agreement and any other agreement that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"Commitment" means a Term Commitment, a Revolving Credit Commitment, a Swing Line Commitment or a Letter of Credit Commitment.

"Committee" means any statutory committee appointed in the Cases.

"Company" means, collectively, the Borrower and its Subsidiaries.

"Computer Software" has the meaning specified in Section 9.01(g)(iv).

"Confidential Information" means any and all material non-public information delivered or made available by any Loan Party or any Subsidiary relating to any Loan Party or any Subsidiary or their respective businesses, other than any such information that is or has been made available publicly by a Loan Party or any Subsidiary.

"Confidential Information Memorandum" means the confidential information memorandum that will be used by the Lead Arrangers in connection with the syndication of the Commitments.

"Consolidated" refers to the consolidation of accounts in accordance with GAAP which, for purposes of this Agreement, shall result in the treatment of DCC and its Subsidiaries on an equity basis.

A00240

A0240

7

"Conversion", "Convert" and "Converted" each refers to the conversion of Advances from one Type to Advances of the other Type.

"Copyrights" has the meaning specified in Section 9.01(g)(iii).

"Credit Card Program" means the (i) Citibank Business Card Purchasing Card Agreement, dated August 31, 1994, between Citibank (South Dakota), N.A. and Dana Corporation, (ii) Citibank Purchasing Card Agreement, dated Januray 18, 2005, between Citibank International plc and Dana Corporation, and (iii) Citibank Corporate Card Agreement, dated January 24, 2005, between Citibank International plc and Dana Corporation, each as amended, restated, or otherwise modified from time to time, or replacement of any of the foregoing for the same or substantially similar purposes.

"DCC" means Dana Credit Corporation, a Delaware corporation.

"DCC Entity" means DCC or any of its Subsidiaries.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under Capitalized Leases, (f) all obligations of such Person under acceptance, letter of credit or similar facilities, (g) all mandatory obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in cash in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (h) all obligations of such Person in respect of Hedge Agreements, valued at the Agreement Value thereof, (i) all Guarantee Obligations and Synthetic Debt of such Person and (j) all indebtedness and other payment Obligations referred to in clauses (a) through (i) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any Event of Default or any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Defaulted Advance" means, with respect to any Lender at any time, the portion of any Advance required to be made by such Lender to the Borrower pursuant to Section 2.01 or 2.02 at or prior to such time which has not been made by such Lender or by the Administrative Agent for the account of such Lender pursuant to Section 2.02(d) as of such time. In the event that a

A00241
A0241

8

portion of a Defaulted Advance shall be deemed made pursuant to Section 2.15(a), the remaining portion of such Defaulted Advance shall be considered a Defaulted Advance originally required to be made pursuant to Section 2.01 on the same date as the Defaulted Advance so deemed made in part.

"Defaulted Amount" means, with respect to any Lender Party at any time, any amount required to be paid by such Lender Party to the Administrative Agent or any other Lender Party hereunder or under any other Loan Document at or prior to such time which has not been so paid as of such time, including, without limitation, any amount required to be paid by such Lender Party to (a) the Swing Line Lender pursuant to Section 2.02(b) to purchase a portion of the Swing Line Advance made by the Swing Line Lender, (b) any Issuing Bank pursuant to Section 2.03(d) to purchase a portion of an Letter of Credit Advance made by such Issuing Bank, (c) the Administrative Agent pursuant to Section 2.02(e) to reimburse the Administrative Agent for the amount of any Advance made by the Administrative Agent for the account of such Lender Party, (d) any other Lender Party pursuant to Section 2.13 to purchase any participation in Advances owing to such other Lender Party and (e) the Administrative Agent or any Issuing Bank pursuant to Section 7.07 to reimburse the Administrative Agent or such Issuing Bank for such Lender Party's ratable share of any amount required to be paid by the Lender Parties to the Administrative Agent or such Issuing Bank as provided therein.  In the event that a portion of a Defaulted Amount shall be deemed paid pursuant to Section 2.15(b), the remaining portion of such Defaulted Amount shall be considered a Defaulted Amount originally required to be paid hereunder or under any other Loan Document on the same date as the Defaulted Amount so deemed paid in part.

"Defaulting Lender" means, at any time, any Lender Party that, at such time, (a) owes a Defaulted Advance or a Defaulted Amount or (b) shall take any action or be the subject of any action or proceeding under any Debtor Relief Law.

"DIP Budget" means a forecast heretofore delivered to the Initial Lenders, as supplemented as provided in Section 5.03(g), detailing the Borrower's anticipated income statement, balance sheet and cash flow statement, each on a Consolidated basis for the Borrower and its Subsidiaries, together with a written set of assumptions supporting such statements, for 2006 and 2007 and setting forth the anticipated uses of the Commitments on a monthly basis.

"DIP Financing Orders" means the Interim Order and the Final Order.

"Domestic Lending Office" means, with respect to any Lender Party, the office of such Lender Party specified as its "Domestic Lending Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender Party, as the case may be, or such other office of such Lender Party as such Lender Party may from time to time specify to the Borrower and the Administrative Agent.

"EBITDAR" means, for any period, without duplication (a) the sum, determined on a Consolidated basis, of (i) net income (or net loss), (ii) interest expense and facility fees, unused commitment fees, letter of credit fees and similar fees, (iii) income tax expense, (iv) depreciation expense, (v) amortization expense, (vi) non-recurring, transactional or unusual losses deducted in calculating net income less non-recurring, transactional or unusual gains added in calculating net income, (vii) in each case without duplication, cash Restructuring Charges to the extent deducted in computing net income for such period and settled or to be settled in cash during such period in an aggregate amount not to exceed $75,000,000 in any twelve-month period, in each case of the Borrower and its Subsidiaries, determined in accordance with GAAP for such period, (viii) non-

A00242

A0242

9

cash Restructuring Charges and related non-cash losses or other non-cash charges resulting from the writedown in the valuation of any assets in each case of the Borrower and its Subsidiaries, determined in accordance with GAAP for such period, (ix) without duplication, net losses from discontinued operations, (x) Professional Fees and (xi) minority interest expense, minus (b) (i) net income from discontinued operations, (ii) equity earnings of Affiliates and (iii) interest income.

"Effective Date" means the date on which this Agreement shall become effective pursuant to Section 3.01.

"Eligible Assignee" means with respect to any Facility (other than the Letter of Credit Facility), (i) a Lender Party; (ii) an Affiliate of a Lender Party; (iii) an Approved Fund; and (iv) any other Person (other than an individual) approved by (x) the Administrative Agent, (y) in the case of an assignment of a Revolving Credit Commitment, each Issuing Bank and (z) solely in the case of the Revolving Credit Facility, unless an Event of Default has occurred and is continuing, and except in the case of an assignment by an Initial Lender during the primary syndication of the Revolving Credit Facility, the Borrower (each such approval not to be unreasonably withheld or delayed); provided, however, that neither any Loan Party nor any Affiliate of a Loan Party shall qualify as an Eligible Assignee under this definition.

"Eligible Inventory" shall have the meaning ascribed to such term in the Borrowing Base Amendment.

"Eligible Receivables" shall have the meaning ascribed to such term in the Borrowing Base Amendment.

"Environmental Action" means any action, suit, written demand, demand letter, written claim, written notice of noncompliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit, any Hazardous Material, or arising from alleged injury or threat to public or employee health or safety, as such relates to exposure to Hazardous Material, or to the environment, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Law" means any applicable federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction or decree, or judicial or agency interpretation, relating to pollution or protection of the environment, public or employee health or safety, as such relates to exposure to Hazardous Material, or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equipment" has the meaning specified in the UCC.

"Equity Interests" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of

A00243

A0243

10

(or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Loan Party (other than a DCC Entity), or under common control with any Loan Party (other than a DCC Entity), within the meaning of Section 414(b), (c), (m) or (o) of the Internal Revenue Code.

"ERISA Event" means (a) (i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any ERISA Plan unless the 30-day notice requirement with respect to such event has been waived by the PBGC or (ii) the requirements of subsection (1) of Section 4043(b) of ERISA (without regard to subsection (2) of such Section) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of an ERISA Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such ERISA Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to an ERISA Plan; (c) the provision by the administrator of any ERISA Plan of a notice of intent to terminate such ERISA Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Loan Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Loan Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for imposition of a lien under Section 302(f) of ERISA shall have been met with respect to any ERISA Plan; (g) the adoption of an amendment to an ERISA Plan requiring the provision of security to such ERISA Plan pursuant to Section 307 of ERISA; or (h) the institution by the PBGC of proceedings to terminate an ERISA Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such ERISA Plan.

"ERISA Plan" means a Single Employer Plan or a Multiple Employer Plan.

"Eurodollar Lending Office" means, with respect to any Lender Party, the office of such Lender Party specified as its "Eurodollar Lending Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender Party, as the case may be, or such other office of such Lender Party as such Lender Party may from time to time specify to the Borrower and the Administrative Agent.

"Eurodollar Rate" means, for any Interest Period for all Eurodollar Rate Advances comprising part of the same Borrowing, an interest rate per annum equal to the rate per annum obtained by dividing (a) the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in U.S. dollars at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period for a period equal to such Interest Period (*provided* that, if for any reason such rate is not available, the term "Eurodollar Rate" shall mean, for any Interest Period

A00244

A0244

11

for all Eurodollar Rate Advances comprising part of the same Borrowing, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on Reuters Screen LIBO Page as the London interbank offered rate for deposits in Dollars at approximately 11:00 A.M. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period); *provided, however,* if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates) by (b) a percentage equal to 100% minus the Eurodollar Rate Reserve Percentage for such Interest Period.

"Eurodollar Rate Advance" means an Advance that bears interest as provided in Section 2.07(a)(ii).

"Eurodollar Rate Reserve Percentage" for any Interest Period for all Eurodollar Rate Advances comprising part of the same Borrowing means the reserve percentage applicable two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Advances is determined) having a term equal to such Interest Period.

"Events of Default" has the meaning specified in Section 6.01.

"Excluded Property" means property constituting withholdings required under any law (including but not limited to federal, state and local income, payroll and trust fund taxes and insurance payments of any nature, whether imposed on the employer or employee or otherwise) from any amounts due to any employee of a Loan Party, and any withholdings from an employee considered a "plan asset" under Title I of ERISA.

"Existing Credit Agreement" means the Five-Year Credit Agreement, dated as March 4, 2005, among the Borrower, Citicorp USA, Inc., as administrative agent and the other lenders signatory thereto from time to time, as amended, modified or supplemented prior to the date hereof.

"Existing Receivables Facility" means the sale and securitization of certain Accounts of the Borrower and certain of its Subsidiaries pursuant to the (a) Amended and Restated Purchase and Contribution Agreement, dated as of April 15, 2005, between Dana Corporation and Dana Asset Funding LLC, and (b) Amended and Restated Purchase and Contribution Agreement, dated as April 15, 2005, among Dana Asset Funding LLC, Dana Corporation, as collection agent, Falcon Asset Securitization Corporation and Blue Ridge Asset Funding Corp., as conduit purchasers, Wachovia Bank, N.A., as a committed purchaser, Blue Ridge Agent and JPMorgan Chase Bank, N.A., each as a committed purchaser and as agents in the capacities set forth therein, each agreement as amended, restated, or otherwise modified from time to time.

"Facility" means the Term Facility, the Revolving Credit Facility, the Swing Line Facility or the Letter of Credit Sublimit.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight federal funds

A00245
A0245

12

transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter" means the fee letter dated March 2, 2006 among the Borrower, the Initial Lenders and the Lead Arrangers, as amended.

"Final Order" has the meaning specified in Section 3.02(i)(C).

"First Day Orders" means all orders entered by the Bankruptcy Court on the Petition Date or within five Business Days of the Petition Date or based on motions filed on the Petition Date.

"Fiscal Year" means a fiscal year of the Borrower and its Subsidiaries ending on December 31.

"Foreign Subsidiary" means, at any time, any of the direct or indirect Subsidiaries of the Borrower that are organized outside of the laws of the United States, any state thereof or the District of Columbia at such time.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" has the meaning specified in Section 1.03.

"General Intangibles" has the meaning specified in the UCC.

"Granting Lender" has the meaning specified in Section 10.07(k).

"Guarantee Obligation" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the primary obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of

A00246
A0246

13

the instrument evidencing such Guarantee Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Guaranteed Obligations" has the meaning specified in Section 8.01.

"Guarantor" has the meaning specified in the recital of parties to this Agreement, but shall exclude the Non-Filing Domestic Subsidiaries.

"Guaranty" has the meaning specified in Section 8.01.

"Hazardous Materials" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls, mold and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous, toxic or words of similar import under any Environmental Law.

"Hedge Agreements" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other hedging agreements.

"Hedge Bank" means any Lender Party or an Affiliate of a Lender Party in its capacity as a party to a Secured Hedge Agreement.

"Honor Date" has the meaning specified in Section 2.03(c).

"Indemnified Liabilities" has the meaning specified in Section 10.04(b).

"Indemnitees" has the meaning specified in Section 10.04(b).

"Initial Extension of Credit" means the earlier to occur of the initial Borrowing and the initial issuance of a Letter of Credit hereunder.

"Initial Issuing Banks" has the meaning specified in the recital of parties to this Agreement.

"Initial Lenders" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders; provided that any such bank, financial institution or other institutional lender shall cease to be an Initial Lender on any date on which it ceases to have a Commitment.

"Initial Pledged Debt" means Debt in existence on the Petition Date which is evidenced by a promissory note payable to a Loan Party by a third party with a principal face amount in excess of $2,500,000 as listed opposite such Loan Party's name on and as otherwise described in Schedule V hereto.

"Initial Pledged Equity" means the shares of stock and other Equity Interests in any Subsidiary of a Loan Party as set forth opposite each Loan Party's name on and as otherwise described in Schedule IV hereto; provided that no Loan Party shall be required to pledge any shares of stock in any Foreign Subsidiary owned or otherwise held by such Loan Party which, when aggregated with all of the other shares of stock in such Foreign Subsidiary pledged by any

A00247
A0247

14

Loan Party, would result in more than 66% of the shares of stock in such Foreign Subsidiary entitled to vote (within the meaning of Treasury Regulation Section 1.956(d)(2) promulgated under the Internal Revenue Code) (the "Voting Foreign Stock") (on a fully diluted basis) being pledged to the Administrative Agent, on behalf of the Secured Parties, under this Agreement (although all of the shares of stock in such Foreign Subsidiary not entitled to vote (within the meaning of Treasury Regulation Section 1.956-2(c)(2) promulgated under the Internal Revenue Code) (the "Non-Voting Foreign Stock") shall be pledged by each of the Loan Parties that owns or otherwise holds any such Non-Voting Foreign Stock therein).

"Initial Swing Line Lender" has the meaning specified in the recital of parties to this Agreement.

"Insufficiency" means, with respect to any ERISA Plan, the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"Intellectual Property" has the meaning specified in Section 9.01(g).

"Intellectual Property Collateral" shall mean all Material Intellectual Property.

"Intellectual Property Security Agreement" has the meaning specified in Section 3.01(a)(vii).

"Interest Period" means, for each Eurodollar Rate Advance comprising part of the same Borrowing, the period commencing on the date of such Eurodollar Rate Advance or the date of the Conversion of any Base Rate Advance into such Eurodollar Rate Advance, and ending on the last day of the period selected by the Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one, two, three or six months, as the Borrower may, upon notice received by the Administrative Agent not later than 11:00 A.M. (New York City time) on the third Business Day prior to the first day of such Interest Period, select; provided, however, that:

(a) the Borrower may not select any Interest Period with respect to any Eurodollar Rate Advance under a Facility that ends after any principal repayment installment date for such Facility unless, after giving effect to such selection, the aggregate principal amount of Base Rate Advances and of Eurodollar Rate Advances having Interest Periods that end on or prior to such principal repayment installment date for such Facility shall be at least equal to the aggregate principal amount of Advances under such Facility due and payable on or prior to such date;

(b) Interest Periods commencing on the same date for Eurodollar Rate Advances comprising part of the same Borrowing shall be of the same duration;

(c) whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, however, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

A00248
A0248

15

(d)    whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

"Interim Order" means a certified copy of an order entered by the Bankruptcy Court in substantially the form of Exhibit E.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Inventory" has the meaning specified in the UCC.

"Investment" means, with respect to any Person, (a) any direct or indirect purchase or other acquisition (whether for cash, securities, property, services or otherwise) by such Person of, or of a beneficial interest in, any Equity Interests or Debt of any other Person, (b) any direct or indirect purchase or other acquisition (whether for cash, securities, property, services or otherwise) by such Person of all or substantially all of the property and assets of any other Person or of any division, branch or other unit of operation of any other Person, (c) any direct or indirect loan, advance, other extension of credit or capital contribution by such Person to, or any other investment by such Person in, any other Person (including, without limitation, any arrangement pursuant to which the investor incurs indebtedness of the types referred to in clause (i) or (j) of the definition of "Debt" set forth in this Section 1.01 in respect of such other Person) and (d) any written agreement to make any Investment.

"Issuing Bank" means each Initial Issuing Bank and any other Revolving Credit Lender approved as an Issuing Bank by the Administrative Agent and any Eligible Assignee to which a Letter of Credit Commitment hereunder has been assigned pursuant to Section 7.09 or 10.07.

"L/C Cash Collateral Account" means the account established by the Borrower in the name of the Administrative Agent and under the sole and exclusive control of the Administrative Agent that shall be used solely for the purposes set forth herein.

"L/C Obligations" means, as at any date of determination, the aggregate Available Amount of all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts, including all Letter of Credit Borrowings.

"Lead Arrangers" has the meaning specified in the recital of parties to this Agreement.

"Lender Party" means any Lender, any Issuing Bank or the Swing Line Lender.

"Lenders" has the meaning specified in the recital of parties to this Agreement.

"Letter of Credit" means any letter of credit issued hereunder.

"Letter of Credit Advance" means an advance made by any Issuing Bank or Revolving Credit Lender pursuant to Section 2.03(c).

A00249

A0249

16

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the applicable Issuing Bank.

"Letter of Credit Commitment" means with respect to any Issuing Bank, the amount set forth opposite such Issuing Bank's name on Schedule I hereto under the caption "Letter of Credit Commitment" or if such Issuing Bank has entered into one or more Assignment and Acceptances, set forth (for such Issuing Bank in the Register maintained by the Administrative Agent pursuant to Section 10.07(d) as such Issuing Bank's Letter of Credit Commitment," as such amount may be reduced at or prior to such time pursuant to Section 2.05.

"Letter of Credit Expiration Date" means the day that is five days prior to the Maturity Date, or such later date as the applicable Issuing Bank may, in its sole discretion, specify.

"Letter of Credit Sublimit" means an amount equal to the lesser of (a) the aggregate amount of the Issuing Banks' Letter of Credit Commitments at such time and (b) $400,000,000 as such amount may be reduced from time to time pursuant to Section 2.05. The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"Lien" means any lien, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"Loan Documents" means (i) this Agreement, (ii) the Notes, if any, (iii) the DIP Financing Orders, (iv) the Collateral Documents, (v) the Fee Letter, (vi) solely for purposes of the Collateral Documents, each Secured Hedge Agreement and (vii) any other document, agreement or instrument executed and delivered by a Loan Party in connection with the Facilities, in each case as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Loan Parties" means, collectively, the Borrower and the Guarantors.

"Loan Value" means (a) with respect to Eligible Receivables, up to 85% of the value of Eligible Receivables and (b) with respect to Eligible Inventory, the lesser of (i) 65% of the value of Eligible Inventory and (ii) 85% of the Net Recovery Rate of Eligible Inventory (based on the then most recent independent inventory appraisal) on any date of determination.

"Margin Stock" has the meaning specified in Regulation U.

"Material Adverse Change" means any event or occurrence which has resulted in or would reasonably be expected to result in any material adverse change in the business, financial or other condition, operations or properties of the Borrower and its Subsidiaries, taken as a whole (other than events publicly disclosed prior to the commencement of the Cases and the commencement and continuation of the Cases and the consequences that would normally result therefrom); provided that events, developments and circumstances disclosed in public filings and press releases of the Borrower and any other events of information made available in writing to the Lead Arrangers, in each case at least three days prior to the Effective Date, shall not be considered in determining whether a Material Adverse Change has occurred, although subsequent events, developments and circumstances relating thereto may be considered in determining whether or not a Material Adverse Change has occurred.

A00250

A0250

17

"Material Adverse Effect" means a material adverse effect on (a) the business, financial or other condition, operations or properties of the Borrower and its Subsidiaries, taken as a whole (other than events publicly disclosed prior to the commencement of the Cases and the commencement and continuation of the Cases and the consequences that would normally result therefrom), (b) the rights and remedies of the Administrative Agent or any Lender Party under any Loan Document or (c) the ability of any Loan Party to perform its Obligations under any Loan Document to which it is or is to be a party; provided that events, developments and circumstances disclosed in public filings and press releases of the Borrower and any other events of information made available in writing to the Lead Arrangers, in each case at least three days prior to the Effective Date, shall not be considered in determining whether a Material Adverse Effect has occurred, although subsequent events, developments and circumstances relating thereto may be considered in determining whether or not a Material Adverse Effect has occurred.

"Material Guarantors" means, on any date of determination, (a) those Guarantors set forth on Schedule 1.01(a) and (b) any other Guarantor that is a Material Subsidiary, on such date, has (i) assets with a book value equal to or in excess of $1,000,000, (ii) annual net income in excess of $1,000,000 or (iii) liabilities in an aggregate amount equal to or in excess of $1,000,000; provided, however, that in no event shall Guarantors that are not Material Guarantors have (i) assets with an aggregate book value in excess of $5,000,000, (ii) aggregate annual net income in excess of $5,000,000 or (iii) liabilities in an aggregate amount in excess of $5,000,000.

"Material Intellectual Property" means the Intellectual Property set forth on Schedule 1.01(b).

"Material Subsidiary" means, on any date of determination, any Subsidiary of the Borrower that, on such date, has (i) assets with a book value equal to or in excess of $1,000,000, (ii) annual net income in excess of $1,000,000 or (iii) liabilities in an aggregate amount equal to or in excess of $1,000,000; provided, however, that in no event shall all Subsidiaries of the borrower that are not Material Subsidiaries have (i) assets with an aggregate book value in excess of $5,000,000, (ii) aggregate annual net income in excess of $5,000,000 or (iii) liabilities in an aggregate amount in excess of $5,000,000.

"Maturity Date" means the earlier of (i) the date that is eighteen months following the Effective Date and (ii) the effective date of a Reorganization Plan in respect of the Cases.

"Moody's" means Moody's Investor Services, Inc.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Multiple Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and at least one Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"Net Cash Proceeds" means, with respect to any sale, lease, transfer or other disposition of any asset of the Borrower or any of its Subsidiaries (other than any sale, lease, transfer or other

A00251

A0251