44

(g)    If any Lender Party determines, in its sole discretion, that it has actually and finally realized by reason of the refund of any Taxes paid or reimbursed by any Loan Party pursuant to subsection (a) or (c) above in respect of payments under the Loan Documents, a current monetary benefit that it would otherwise not have obtained, and that would result in the total payments under this section 2.12 exceeding the amount needed to make such Lender Party whole, such Lender Party shall pay to the Borrower or other Loan Party, as the case may be, with reasonable promptness following the date on which it actually realizes such benefit, an amount equal to the lesser of the amount of such benefit or the amount of such excess, net of all out-of-pocket expenses in securing such refund.

Section 2.13  Sharing of Payments, Etc.  If any Lender Party shall obtain at any time any payment, whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise (other than pursuant to Section 2.10, 2.12, 10.04 or 10.07), (a) on account of Obligations due and payable to such Lender Party hereunder and under the Notes at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender Party at such time (other than pursuant to Section 2.10, 2.12, 10.04 or 10.07) to (ii) the aggregate amount of the Obligations due and payable to all Lender Parties hereunder and under the Notes at such time) of payments on account of the Obligations due and payable to all Lender Parties hereunder and under the Notes at such time obtained by all the Lender Parties at such time or (b) on account of Obligations owing (but not due and payable) to such Lender Party hereunder and under the Notes at such time (other than pursuant to Section 2.10, 2.12, 10.04 or 10.07) in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender Party at such time (other than pursuant to Section 2.10, 2.12, 10.04 or 10.07) to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the Notes at such time) of payments on account of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the Notes at such time obtained by all of the Lender Parties at such time, such Lender Party shall forthwith purchase from the other Lender Parties such participations in the Obligations due and payable or owing to them, as the case may be, as shall be necessary to cause such purchasing Lender Party to share the excess payment ratably with each of them; provided, however, that, if all or any portion of such excess payment is thereafter recovered from such purchasing Lender Party, such purchase from each other Lender Party shall be rescinded and such other Lender Party shall repay to the purchasing Lender Party the purchase price to the extent of such Lender Party's ratable share (according to the proportion of (i) the purchase price paid to such Lender Party to (ii) the aggregate purchase price paid to all Lender Parties) of such recovery together with an amount equal to such Lender Party's ratable share (according to the proportion of (i) the amount of such other Lender Party's required repayment to (ii) the total amount so recovered from the purchasing Lender Party) of any interest or other amount paid or payable by the purchasing Lender Party in respect of the total amount so recovered.  The Borrower agrees that any Lender Party so purchasing a participation from another Lender Party pursuant to this Section 2.13 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender Party were the direct creditor of the Borrower in the amount of such participation.

Section 2.14  Use of Proceeds.  The proceeds of (a) the Revolving Credit Advances, the Swing Line Advances and the Letters of Credit shall only be utilized (i)(A) to refinance the Existing Receivables Facility and (B) to satisfy the obligations under the Credit Card Program as of the Petition Date in the ordinary course of  business, (ii) to pay costs and expenses in connection with such refinancing and the Cases, and (iii) to provide financing for working capital, letters of credit, capital expenditures and other general corporate purposes of the Borrower and the Guarantors, provided that not more than $200,000,000 in Available Amount of Letters of Credit may be issued to provide credit support for Foreign Subsidiaries of the Borrower and (b) the Term Advances shall only be utilized (i) to refinance Pre-Petition Secured Indebtedness and to repay Revolving Credit Advances on the date of the Term Advance, (ii) to pay costs and expenses in connection such refinancing and (iii) for other general

A00278
A0278

45

corporate purposes of the Loan Parties, provided, however, that no amounts shall be paid pursuant to this Section 2.14 for fees and disbursements incurred by any Loan Party in connection with any assertion or prosecution of claims or causes of action against the Agents or any Lender Party, including, without limitation, (x) any objection to, the contesting in any manner of, or the raising of any defenses to, the validity, perfection, priority or enforceability of the Obligations under this Agreement or the Administrative Agent's Liens upon the Collateral, or (y) any other rights or interest of the Agents or the Lender Parties under the Loan Documents but not including assertions or prosecutions of claims and causes of action arising from an Agent's or a Lender's failure to perform hereunder; provided, further, that, the proceeds of the Advances shall be available, and the Borrower agrees that it shall use all such proceeds in a manner consistent with the most recent Thirteen Week Forecast.

Section 2.15  Defaulting Lenders.  (a)  In the event that, at any time, (i) any Lender Party shall be a Defaulting Lender, (ii) such Defaulting Lender shall owe a Defaulted Advance to the Borrower and (iii) the Borrower shall be required to make any payment hereunder or under any other Loan Document to or for the account of such Defaulting Lender, then the Borrower may, to the fullest extent permitted by applicable law, set off and otherwise apply the Obligation of the Borrower to make such payment to or for the account of such Defaulting Lender against the obligation of such Defaulting Lender to make such Defaulted Advance.  In the event that, on any date, the Borrower shall so set off and otherwise apply its obligation to make any such payment against the obligation of such Defaulting Lender to make any such Defaulted Advance on or prior to such date, the amount so set off and otherwise applied by the Borrower shall constitute for all purposes of this Agreement and the other Loan Documents an Advance by such Defaulting Lender made on the date under the Facility pursuant to which such Defaulted Advance was originally required to have been made pursuant to Section 2.01.  Such Advance shall be considered, for all purposes of this Agreement, to comprise part of the Borrowing in connection with which such Defaulted Advance was originally required to have been made pursuant to Section 2.01, even if the other Advances comprising such Borrowing shall be Eurodollar Rate Advances on the date such Advance is deemed to be made pursuant to this subsection (a).  The Borrower shall notify the Administrative Agent at any time the Borrower exercises its right of set-off pursuant to this subsection (a) and shall set forth in such notice (A) the name of the Defaulting Lender and the Defaulted Advance required to be made by such Defaulting Lender and (B) the amount set off and otherwise applied in respect of such Defaulted Advance pursuant to this subsection (a).  Any portion of such payment otherwise required to be made by the Borrower to or for the account of such Defaulting Lender which is paid by the Borrower, after giving effect to the amount set off and otherwise applied by the Borrower pursuant to this subsection (a), shall be applied by the Administrative Agent as specified in subsection (b) or (c) of this Section 2.15.

(b)    In the event that, at any time, (i) any Lender Party shall be a Defaulting Lender, (ii) such Defaulting Lender shall owe a Defaulted Amount to the Administrative Agent or any of the other Lender Parties and (iii) the Borrower shall make any payment hereunder or under any other Loan Document to the Administrative Agent for the account of such Defaulting Lender, then the Administrative Agent may, on its behalf or on behalf of such other Lender Parties and to the fullest extent permitted by applicable law, apply at such time the amount so paid by the Borrower to or for the account of such Defaulting Lender to the payment of each such Defaulted Amount to the extent required to pay such Defaulted Amount.  In the event that the Administrative Agent shall so apply any such amount to the payment of any such Defaulted Amount on any date, the amount so applied by the Administrative Agent shall constitute for all purposes of this Agreement and the other Loan Documents payment, to such extent, of such Defaulted Amount on such date.  Any such amount so applied by the Administrative Agent shall be retained by the Administrative Agent or distributed by the Administrative Agent to such other Lender Parties, ratably in accordance with the respective portions of such Defaulted Amounts payable at such time to the Administrative Agent and such other Lender Parties and, if the amount of such payment made

A00279

A0279

46

by the Borrower shall at such time be insufficient to pay all Defaulted Amounts owing at such time to the Administrative Agent and the other Lender Parties, in the following order of priority:

(i)  first, to the Administrative Agent for any Defaulted Amount then owing to the Administrative Agent in its capacity as Administrative Agent; and

(ii)  second, to the Issuing Banks and the Swing Line Lender for any Defaulted Amounts then owing to them, in their capacities as such, ratably in accordance with such respective Defaulted Amounts then owing to the Issuing Banks and the Swing Line Lender; and

(iii)  third, to any other Lender Parties for any Defaulted Amounts then owing to such other Lender Parties, ratably in accordance with such respective Defaulted Amounts then owing to such other Lender Parties.

Any portion of such amount paid by the Borrower for the account of such Defaulting Lender remaining, after giving effect to the amount applied by the Administrative Agent pursuant to this subsection (b), shall be applied by the Administrative Agent as specified in subsection (c) of this Section 2.15.

(c)  In the event that, at any time, (i) any Lender Party shall be a Defaulting Lender, (ii) such Defaulting Lender shall not owe a Defaulted Advance or a Defaulted Amount and (iii) the Borrower, the Administrative Agent or any other Lender Party shall be required to pay or distribute any amount hereunder or under any other Loan Document to or for the account of such Defaulting Lender, then the Borrower or such other Lender Party shall pay such amount to the Administrative Agent to be held by the Administrative Agent, to the fullest extent permitted by applicable law, in escrow or the Administrative Agent shall, to the fullest extent permitted by applicable law, hold in escrow such amount otherwise held by it. Any funds held by the Administrative Agent in escrow under this subsection (c) shall be deposited by the Administrative Agent in an account with Citibank, N.A., in the name and under the control of the Administrative Agent, but subject to the provisions of this subsection (c). The terms applicable to such account, including the rate of interest payable with respect to the credit balance of such account from time to time, shall be Citibank, N.A.'s standard terms applicable to escrow accounts maintained with it. Any interest credited to such account from time to time shall be held by the Administrative Agent in escrow under, and applied by the Administrative Agent from time to time in accordance with the provisions of, this subsection (c). The Administrative Agent shall, to the fullest extent permitted by applicable law, apply all funds so held in escrow from time to time to the extent necessary to make any Advances required to be made by such Defaulting Lender and to pay any amount payable by such Defaulting Lender hereunder and under the other Loan Documents to the Administrative Agent or any other Lender Party, as and when such Advances or amounts are required to be made or paid and, if the amount so held in escrow shall at any time be insufficient to make and pay all such Advances and amounts required to be made or paid at such time, in the following order of priority:

(i)  first, to the Administrative Agent for any amount then due and payable by such Defaulting Lender to the Administrative Agent hereunder in its capacity as Administrative Agent;

(ii)  second, to the Issuing Banks and the Swing Line Lender for any amounts then due and payable to them hereunder, in their capacities as such, by such Defaulting Lender, ratably in accordance with such respective amounts then due and payable to the Issuing Banks and the Swing Line Lender;

(iii)  third, to any other Lender Parties for any amount then due and payable by such Defaulting Lender to such other Lender Parties hereunder, ratably in accordance with such respective amounts then due and payable to such other Lender Parties; and

A00280

A0280

47

(iv)    fourth, to the Borrower for any Advance then required to be made by such Defaulting Lender pursuant to a Commitment of such Defaulting Lender.

In the event that any Lender Party that is a Defaulting Lender shall, at any time, cease to be a Defaulting Lender, any funds held by the Administrative Agent in escrow at such time with respect to such Lender Party shall be distributed by the Administrative Agent to such Lender Party and applied by such Lender Party to the Obligations owing to such Lender Party at such time under this Agreement and the other Loan Documents ratably in accordance with the respective amounts of such Obligations outstanding at such time.

(d)    The rights and remedies against a Defaulting Lender under this Section 2.15 are in addition to other rights and remedies that the Borrower may have against such Defaulting Lender with respect to any Defaulted Advance and that the Administrative Agent or any Lender Party may have against such Defaulting Lender with respect to any Defaulted Amount.

Section 2.16 Evidence of Debt.  (a)  The Advances made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Advances made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Advances in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Advances and payments with respect thereto.

(b)    In addition to the accounts and records referred to in subsection (a), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

Section 2.17 Priority and Liens. Subject to the limitations and exclusions set forth in Section 9.01(e)(iii) hereof, each of the Borrower and each Guarantor hereby covenants, represents and warrants that, upon entry of the Interim Order, the Obligations of the Borrower and such Guarantor hereunder and under the Loan Documents:  (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all unencumbered tangible and intangible property of the Borrower and such Guarantor and on all cash maintained in the L/C Cash Collateral Account and any investments of the funds contained therein, including any such property that is subject to valid and perfected Liens in existence on the Petition Date, which Liens are thereafter released or otherwise extinguished in connection with the satisfaction of the obligations secured by such Liens (excluding any avoidance actions under the Bankruptcy Code (but including the proceeds therefrom)); (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all real, personal and mixed property of the Borrower and such Guarantor that is subject to valid and perfected liens in existence on the Petition Date, junior to such valid and perfected Liens; and

A00281

A0281

(iv) pursuant to Section 364(d)(1), shall be secured by a perfected priming Lien upon all tangible and intangible property of the Borrower and such Guarantor that presently secure the Pre-Petition Secured Indebtedness, subject and subordinated in each case with respect to clauses (i) through (iv) above, only to the Carve-Out. Except for the Carve-Out having priority over the Obligations, the Superpriority Claims shall at all times be senior to the rights of the Borrower, each Guarantor, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases if any of the Borrower's or the Guarantor's cases are converted to cases under chapter 7 of the Bankruptcy Code.

Section 2.18 <u>Payment of Obligations</u>. Subject to the provisions of Section 6.01 and the DIP Financing Orders, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents of the Borrower and the Guarantors, the Lender Parties shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

Section 2.19 <u>No Discharge; Survival of Claims</u>. Each of the Borrower and each Guarantor agree that (i) its obligations hereunder shall not be discharged by the entry of an order confirming any Reorganization Plan (and each of the Borrower and each Guarantor, pursuant to Section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge), (ii) the Superpriority Claim granted to the Administrative Agent and the Lender Parties pursuant to the Order and described in Section 2.17 and the Liens granted to the Administrative Agent and the Lender Parties pursuant to the Order and described in Section 2.17 shall not be affected in any manner by the entry of any order by the Bankruptcy Court, including an order confirming any Reorganization Plan, and (iii) notwithstanding the terms of any Reorganization Plan, its Obligations hereunder and under each other Loan Document shall be repaid in full in accordance with the terms hereof and the terms of each other Loan Document, the Interim Order, and the Final Order.

Section 2.20    <u>Replacement of Certain Lenders</u>.

In the event a Lender ("<u>Affected Lender</u>") shall have (i) become Defaulting Lender under Section 2.15, (ii) requested compensation from the Borrowers under Section 2.12 with respect to Taxes or Other Taxes or with respect to increased costs or capital or under Section 2.10 or other additional costs incurred by such Lender which, in any case, are not being incurred generally by the other Lenders, or (iii) delivered a notice pursuant to Section 2.10(d) claiming that such Lender is unable to extend Eurodollar Rate Advances to the Borrower for reasons not generally applicable to the other Lenders, then, in any case, the Borrower or the Administrative Agent may make written demand on such Affected Lender (with a copy to the Administrative Agent in the case of a demand by the Borrower and a copy to the Borrower in the case of a demand by the Administrative Agent) for the Affected Lender to assign, and such Affected Lender shall use commercially reasonable efforts to assign pursuant to one or more duly executed Assignments and Acceptances 5 Business Days after the date of such demand, to one or more financial institutions that comply with the provisions of Section 10.07 which the Borrower or the Administrative Agent, as the case may be, shall have engaged for such purpose ("<u>Replacement Lender</u>"), all of such Affected Lender's rights and obligations under this Agreement and the other Loan Documents (including, without limitation, its Commitment, all Advances owing to it, all of its participation interests in existing Letters of Credit, and its obligation to participate in additional Letters of Credit hereunder) in accordance with Section 10.07. The Administrative Agent is authorized to execute one or more of such Assignments and Acceptances as attorney-in-fact for any Affected Lender failing to execute and deliver the same within 5 Business Days after the date of such demand. Further, with respect to such assignment, the Affected Lender shall have concurrently received, in cash, all amounts due and owing to the Affected

A00282

A0282

49

Lender hereunder or under any other Loan Document; *provided* that upon such Affected Lender's replacement, such Affected Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10 and 10.04, as well as to any fees accrued for its account hereunder and not yet paid, and shall continue to be obligated under Section 7.07 with respect to losses, obligations, liabilities, damages, penalties, actions, judgments, costs, expenses or disbursements for matters which occurred prior to the date the Affected Lender is replaced.

### ARTICLE III

### CONDITIONS TO EFFECTIVENESS

Section 3.01 <u>Conditions Precedent to Effectiveness</u>. The effectiveness of this agreement, the obligation of the Revolving Credit Lenders to make Revolving Credit Advance up to the Revolving Credit Availability Amount then in effect, the obligation of the Initial Swing Line Lender to make the initial Swing Line Advance and obligation of the Initial Issuing Banks to issue the initial Letter of Credit are, in each case, subject to the satisfaction of the following conditions precedent (other than those conditions specified in Schedule 5.01(n)(iii)):

(a)    The Administrative Agent shall have received on or before the Effective Date the following, each dated such day (unless otherwise specified), in form and substance reasonably satisfactory to the Initial Lenders (unless otherwise specified) and (except for the Notes) in sufficient copies for each Initial Lender:

(i)    The Notes payable to the order of the Lenders to the extent requested in accordance with Section 2.16(a).

(ii)    Certified copies of the resolutions of the Boards of Directors of each of the Borrower and each Guarantor approving the execution and delivery of this Agreement, and of all documents evidencing other necessary constitutive action and, if any, governmental and other third party approvals and consents, if any, with respect to this Agreement and each other Loan Document other than any approval required and granted pursuant to the Interim Order.

(iii)    A copy of the charter or other constitutive document of each Guarantor and each amendment thereto, certified (as of a date on or after November 15, 2005) by the Secretary of State of the jurisdiction of its incorporation or organization, as the case may be, thereof as being a true and correct copy thereof.

(iv)    A certificate of each of the Borrower and each Material Guarantor signed on behalf of the Borrower and such Guarantor, respectively, by its President or a Vice President and its Secretary or any Assistant Secretary, dated the Effective Date (the statements made in which certificate shall be true on and as of the Effective Date), certifying as to (A) the accuracy and completeness of the charter of the Borrower or such Guarantor and the absence of any changes thereto; (B) the accuracy and completeness of the bylaws of the Borrower or such Guarantor as in effect on the date on which the resolutions of the board of directors (or persons performing similar functions) of such Person referred to in Section 3.01(a)(ii) were adopted and the absence of any changes thereto (a copy of which shall be attached to such certificate); (C) the absence of any proceeding known to be pending for the dissolution, liquidation or other termination of the existence of the Borrower or any Guarantor; (D) the accuracy in all material respects

A00283

A0283

50

of the representations and warranties made by the Borrower or such Guarantor in the Loan Documents to which it is or is to be a party as though made on and as of the Effective Date, before and after giving effect to all of the Borrowings and the issuance of all of the Letters of Credit to be made on such date and to the application of proceeds, if any, therefrom; and (E) the absence of any event occurring and continuing, or resulting from any of the Borrowings or the issuance of any of the Letters of Credit to be made on the Effective Date or the application of proceeds, if any, therefrom, that would constitute a Default.

(v)     A certificate of the Secretary or an Assistant Secretary of each of the Borrower and each Material Guarantor certifying the names and true signatures of the officers of the Borrower and such Guarantor, respectively, authorized to sign this Agreement and the other documents to be delivered hereunder.

(vi)     The following: (A) such certificates representing the Initial Pledged Equity of domestic entities referred to on Schedule V hereto, accompanied by undated stock powers, duly executed in blank, and such instruments evidencing the Initial Pledged Debt referred to on Schedule V hereto, duly indorsed in blank, as the Loan Parties may be able to deliver using their reasonable best efforts, (B) proper financing statements (Form UCC-1 or a comparable form) under the UCC of all jurisdictions that the Initial Lenders may deem necessary or desirable in order to perfect and protect the liens and security interest created or purported to be created under Article IX hereof, covering the Collateral described in Article IX hereof, in each case completed in a manner reasonably satisfactory to the Lender Parties, and (C) evidence of insurance as reasonably requested by the Initial Lenders.

(vii)     An intellectual property security agreement (as amended, supplemented or otherwise modified from time to time in accordance with its terms, the "Intellectual Property Security Agreement"), duly executed by each Loan Party, together with evidence that all actions that the Initial Lenders may deem reasonably necessary or desirable in order to perfect and protect the first priority liens and security interests created under the Intellectual Property Security Agreement have been taken or will be taken in accordance with the terms of the Loan Documents.

(viii)     A Thirteen Week Forecast detailing the Borrower's anticipated cash receipts and disbursements reasonably satisfactory in form and substance to the Initial Lenders.

(ix)     A Notice of Borrowing for any Borrowing to be made, and/or one or more Letter of Credit Applications for each Letter of Credit to be issued, on the Effective Date.

(x)     A favorable opinion of (A) Jones Day, counsel to the Loan Parties, in substantially the form of Exhibit D-1 hereto, and addressing such other matters as the Initial Lenders may reasonably request, (B) Hunton & Williams LLP, Virginia and Delaware counsel to the Loan Parties, in substantially the form of Exhibit D-2 hereto, and addressing such other matters as the Initial Lenders may reasonably request and (C) Shumaker, Loop & Kendrick, LLP, Michigan counsel to the Loan Parties, in substantially the form of Exhibit D-3 hereto and addressing such other matters as the Initial Lenders may reasonably request .

A00284

A0284

51

(b)    Interim Order.  At the time of the Initial Extension of Credit, the Bankruptcy Court shall have entered an order in substantially the form of Exhibit E (the "Interim Order") approving the Loan Documents and granting the Superpriority Claim status and the Liens described in Section 2.17.

(c)    First Day Orders.  All of the First Day Orders entered by the Bankruptcy Court at the time of commencement of the Cases shall be in form and substance reasonably satisfactory to the Initial Lenders.

(d)    Payment of Fees.  The Borrower shall have paid all accrued fees and expenses of the Lead Arrangers, the Administrative Agent and the Initial Lenders.

Section 3.02  Conditions Precedent to Each Borrowing and Each Issuance of a Letter of Credit.  Each of (a) the obligation of each Appropriate Lender to make an Advance (other than an Letter of Credit Advance to be made by the Issuing Banks or a Lender pursuant to Section 2.03(c) and as set forth in Section 2.06(b) with respect to the Swing Line Advances made by a Lender) on the occasion of each Borrowing, and (b) the obligation of the Issuing Banks to issue a Letter of Credit (including the initial issuance of a Letter of Credit hereunder) or to renew a Letter of Credit and the right of the Borrower to request a Swing Line Borrowing, shall be subject to the further conditions precedent that on the date of such Borrowing, issuance or renewal:

(i)    the following statements shall be true (and each of the giving of the applicable Notice of Borrowing or Letter of Credit Application and the acceptance by the Borrower of the proceeds of such Borrowing or the issuance or renewal of such Letter of Credit, as the case may be, shall constitute a representation and warranty by the Borrower that both on the date of such notice and on the date of such Borrowing, issuance or renewal such statements are true):

(A)    the representations and warranties contained in each Loan Document, are correct in all material respects on and as of such date, before and after giving effect to such Borrowing, issuance or renewal and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such Borrowing, issuance or renewal, in which case as of such specific date;

(B)    no event has occurred and is continuing, or would result from such Borrowing, issuance or renewal or from the application of the proceeds, if any, therefrom, that constitutes a Default; and

(C)    the Interim Order is in full force and effect and has not been stayed, reversed, modified or amended in any respect without the prior written consent of the Initial Lenders, provided that at the time of the making of any Advance or the issuance of any Letter of Credit the amount of either of which, when added to the sum of the aggregate Advances outstanding and the aggregate Available Amount of all Letters of Credit then outstanding, would exceed the amount authorized by the Interim Order (collectively, the "Additional Credit"), the Administrative Agent and each of the Lenders shall have received a copy of an order of the Bankruptcy Court in substantially the form of Exhibit F hereto (the "Final Order"), which, in any event, shall have been entered by the Bankruptcy Court no later than 45 days after entry of the Interim Order and at the time of the extension of any Additional Credit the Final Order shall be in full force and effect, shall authorize extensions of credit in respect of the Revolving Credit Facility and the Swing Line Facility in the aggregate amount up to the Revolving Credit Availability

A00285
A0285

52

Amount and in respect of the Term Facility in the amount up to $700,000,000, and shall not have been stayed, reversed, modified or amended in any respect that is adverse to the Lender Parties without the prior written consent of the Initial Lenders; and if either the Interim Order or the Final Order is the subject of a pending appeal in any respect, neither the making of Advances nor the issuance of any Letter of Credit nor the performance by the Borrower or the Guarantor of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal; and

Section 3.03 <u>Conditions Precedent to the Term Borrowing</u>. The obligation of each Term Lender to make its Term Loan is subject to the satisfaction of the following conditions precedent:

(a)     The Administrative Agent shall have received a Notice of Borrowing with respect to such Borrowing as required by Section 2.02.

(b)     The Final Order shall have been entered by the Bankruptcy Court.

(c)     The Borrower shall have furnished to the Administrative Agent (i) the DIP Budget, which shall be reasonably satisfactory to the Administrative Agent and the Initial Lenders and (ii) the unaudited Consolidated balance sheet of the Borrower and its Subsidiaries as at December 31, 2005, and the related unaudited Consolidated statements of income and cash flows of the Borrower and its Subsidiaries for the Fiscal Year then ended, each in form and substance reasonably satisfactory to the Initial Lenders.

(d)     The Loan Parties and the Lenders shall have entered into the Borrowing Base Amendment.

(e)     The Borrower shall have used commercially reasonable efforts to obtain debt ratings for the Facilities from each of Moody's and S&P.

(f)     The Borrower shall have paid to the Administrative Agent and the Lead Arrangers the then unpaid balance of all accrued and unpaid fees of the Administrative Agent and the Lead Arrangers, and the reasonable fees and out-of-pocket expenses of counsel to the Administrative Agent and the Lead Arrangers as to which invoices have been issued.

(g)     The conditions set forth in Sections 3.01 and 3.02 shall have been satisfied.

Section 3.04 <u>Determinations Under Sections 3.01 and 3.03</u>. For purposes of determining compliance with the conditions specified in Sections 3.01 and 3.03, each Lender Party shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lender Parties unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender Party prior to the Effective Date specifying its objection thereto, and if a Borrowing occurs on the Effective Date, such Lender Party shall not have made available to the Administrative Agent such Lender Party's ratable portion of such Borrowing.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES**

Section 4.01 <u>Representations and Warranties of the Loan Parties</u>Each Loan Party represents and warrants as follows:

NYDOCS02/757095.6                    Dana – DIP Credit Agreement

A00286

A0286

53

(a)     Each of the Borrower and its Material Subsidiaries (i) is a corporation, partnership, limited liability company or other organization duly organized, validly existing and in good standing (or to the extent such concept is applicable to a non-U.S. entity, the functional equivalent thereof) under the laws of the jurisdiction of its incorporation or formation except where the failure to be in good standing (or the functional equivalent), individually or in the aggregate, would not have a Material Adverse Effect, (ii) is duly qualified as a foreign corporation (or other entity) and in good standing (or the functional equivalent thereof, if applicable) in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed, except where the failure to so qualify or be licensed and in good standing (or the functional equivalent thereof, if applicable), individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, and (iii) subject to the entry of the Interim Order by the Bankruptcy Court, has all requisite power and authority (including, without limitation, all governmental licenses, permits and other approvals) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted, except where the failure to have such power or authority, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. As of the Effective Date, all of the outstanding capital stock of each Loan Party (other than the Borrower) has been validly issued, is fully paid and non-assessable and is owned by the Persons listed on Schedule 4.01 hereto in the percentages specified on Schedule 4.01 hereto free and clear of all Liens, except those created under the Collateral Documents or otherwise permitted under Section 5.02(a) hereof.

(b)     Set forth on Schedule 4.01 hereto is a complete and accurate list of all Subsidiaries of the Borrower (other than DCC and its Subsidiaries as of the Effective Date), showing as of the Effective Date (as to each such Subsidiary) the jurisdiction of its incorporation or organization, as the case may be, and the percentage of the Equity Interests owned (directly or indirectly) by the Borrower or its Subsidiaries.

(c)     The execution, delivery and performance by each Loan Party of this Agreement, the Notes and each other Loan Document to which it is or is to be a party, and the consummation of each aspect of the transactions contemplated hereby, are within such Loan Party's constitutive powers, have been duly authorized by all necessary constitutive action, and do not (i) contravene such Loan Party's constitutive documents, (ii) subject to the entry of the Interim Order by the Bankruptcy Court, violate any applicable law (including, without limitation, the Securities Exchange Act of 1934), rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award, (iii) conflict with or result in the breach of, or constitute a default under, any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting any Loan Party, or any of their properties entered into by such Loan Party after the Petition Date except, in each case, other than any conflict, breach or violation which, individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect or (iv) except for the Liens created under the Loan Documents, the Interim Order and the Final Order, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of any Loan Party or any of its Subsidiaries.

(d)     Except for the entry of the DIP Financing Orders, filings or recordings already made or to be made pursuant to any federal law, rule or regulation or filings or recordings to be made in any jurisdiction outside of the United States, no authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by any Loan Party of this Agreement, the Notes or any other Loan Document to which it is or is to

A00287
A0287

54

be a party, or for the consummation of each aspect of the transactions contemplated hereby, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the requisite priority set forth in the DIP Financing Orders) or (iv) subject to the DIP Financing Orders, the exercise by the Administrative Agent or any Lender Party of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents.

(e)    This Agreement has been, and each of the Notes, if any, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Loan Party thereto. This Agreement is, and each of the Notes and each other Loan Document when delivered hereunder will be, subject to the entry of the Interim Order by the Bankruptcy Court, the legal, valid and binding obligation of each Loan Party thereto, enforceable against such Loan Party in accordance with its terms.

(f)    The Consolidated balance sheet of the Borrower and its Subsidiaries as at December 31, 2004, and the related Consolidated statements of income and cash flows of the Borrower and its Subsidiaries for the Fiscal Year then ended, and the interim Consolidated balance sheets of the Borrower and its Subsidiaries as at March 31, 2005, June 30, 2005, and September 30, 2005 and the related Consolidated statements of income and cash flows of the Borrower and its Subsidiaries for the respective periods then ended, in each case as restated, which have been furnished to each Lender Party present fairly the financial condition and results of operations of the Borrower and its Subsidiaries as of such dates and for such periods all in accordance with GAAP consistently applied (subject to year-end adjustments and in the case of unaudited financial statements, except for the absence of footnote disclosure). Since December 31, 2004, there has not occurred a Material Adverse Change.

(g)    The DIP Budget and all projected Consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries delivered to the Lender Parties pursuant to Section 5.03(f) were prepared and will be prepared, as applicable, in good faith on the basis of the assumptions stated therein, which assumptions were fair and will be fair in the light of conditions existing at the time of delivery of such DIP Budget or projections, as the case may be, and represented and will represent, at the time of delivery, the Borrower's best estimate of its future financial performance.

(h)    Neither the Confidential Information Memorandum nor any other written information, exhibits and reports furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender Party on or after February 4, 2006 in connection with any Loan Document (other than to the extent that any such information, exhibits and reports constitute projections described in Section 4.01(g) above and any historical financial information delivered prior to the restatement thereof by the Borrower and its auditors) taken as a whole and in light of the circumstances in which made, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements made therein, in light of the circumstances in which any such statements were made, not misleading.

(i)    Except as set forth on Schedule 3.01 or as disclosed in any SEC filings, there is no action, suit, or proceeding affecting the Borrower or any of its Material Subsidiaries pending or, to the best knowledge of the Loan Parties, threatened before any court, governmental agency or arbitrator that (i) is reasonably expected to be determined adversely to the Loan Party and, if so adversely determined, would reasonably be expected to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of this Agreement, any Note or any other Loan Document.

A00288

A0288

55

(j)     The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Advance or any drawing under any Letter of Credit will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(k)     Other than the filing of the Cases and events related to such filing, no ERISA Event has occurred or is reasonably expected to occur with respect to any Plan that has resulted in or is reasonably expected to result in a Material Adverse Effect.

(l)     The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  The present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount which could reasonably be expected to have a Material Adverse Effect.  Neither the Borrower, its Material Subsidiaries, nor any ERISA Affiliates has incurred or is reasonably expected to incur any material withdrawal liability (as defined in Part I of Subtitle E of Title IV of ERISA) under any multiemployer plan.

(m)     Except as set forth in Schedule 4.01(m) hereto, the operations and properties of each Loan Party and each of its Material Subsidiaries comply with all applicable Environmental Laws and Environmental Permits except for non-compliance that could not be reasonably likely to have a Material Adverse Effect, all past non compliance with such Environmental Laws and Environmental Permits has been resolved in a manner that could not be reasonably likely to have a Material Adverse Effect, and, to the knowledge of the Loan Parties after reasonable inquiry, no circumstances exist that would be reasonably likely to (i) form the basis of an Environmental Action against any Loan Party or any of its Material Subsidiaries or any of their properties that could be reasonably likely to have a Material Adverse Effect or (ii) cause any such property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law that could be reasonably likely to have a Material Adverse Effect.

(n)     The DIP Financing Orders and the Collateral Documents create a valid and perfected security interest in the Collateral having the priority set forth therein securing the payment of the Secured Obligations, and all filings and other actions necessary or desirable, as determined in the reasonable discretion of the Initial Lenders, to perfect and protect such security interest have been duly taken, except that the execution and delivery of local law governed pledge or analogous documentation with respect to Equity Interests in Subsidiaries of the Borrower organized in jurisdictions outside the United States, and the filing, notarization, registration or other publication thereof, and the taking of other actions, if any, required under local law of the relevant jurisdictions of organization for the effective grant and perfection of a Lien on such Equity Interests under laws of such jurisdictions of organization outside the United States, may be required in order to fully grant, perfect and protect such security interest under such local laws. The Loan Parties are the legal and beneficial owners of the Collateral free and clear of any Lien, except for the liens and security interests created or permitted under the Loan Documents.

(o)     Neither the making of any Advances, nor the issuance of any Letters of Credit, nor the application of the proceeds or repayment thereof by the Borrowers, nor the consummation of the other transactions contemplated by the Loan Documents, will violate any provision of the

A00289

A0289

56

Investment Company Act of 1940, as amended, or any rule, regulation or order of the Securities and Exchange Commission thereunder.

(p)    Each Loan Party and each of its Subsidiaries has filed or caused to be filed all tax returns and reports (federal, state, local and foreign) which are required to have been filed and has paid or caused to be paid all taxes required to have been paid by it, together with applicable interest and penalties, except (a) taxes that are being contested in good faith by appropriate proceedings and for which such Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

## ARTICLE V

### COVENANTS OF THE LOAN PARTIES

Section 5.01 <u>Affirmative Covenants</u>. So long as any Advance shall remain unpaid, any Letter of Credit shall be outstanding or any Lender Party shall have any Commitment hereunder, each Loan Party will:

(a)    <u>Corporate Existence</u>.    Preserve and maintain in full force and effect all governmental rights, privileges, qualifications, permits, licenses and franchises necessary or desirable in the normal conduct of its business except (i)(A) if in the reasonable business judgment of the Borrower or such Guarantor, as the case may be, it is in its best economic interest not to preserve and maintain such rights, privileges, qualifications, permits, licenses and franchises and the loss thereof is not materially disadvantageous to the Loan Parties, taken as a whole, and (B) such failure to preserve the same could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, and (ii) as otherwise permitted by Section 5.02(h).

(b)    <u>Compliance with Laws</u>.    Comply with all laws, rules, regulations and orders of any governmental authority applicable to it or its property, such compliance to include without limitation, ERISA, Environmental Laws and The Racketeer Influenced and Corrupt Organizations Chapter of The Organized Crime Control Act of 1970, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)    <u>Insurance</u>.    Keep its insurable properties insured at all times, against such risks, including fire and other risks insured against by extended coverage, as is customary with companies of the same or similar size in the same or similar businesses (subject to deductibles and including provisions for self-insurance); and maintain in full force and effect public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by the Borrower or any Guarantor, as the case may be, in such amounts and with such deductibles as are customary with companies of the same or similar size in the same or similar businesses and in the same geographic area and in each case with financially sound and reputable insurance companies (subject to provisions for self-insurance).

(d)    <u>Obligations and Taxes</u>.    Pay all its obligations arising after the Petition Date promptly and in accordance with their terms and pay and discharge and cause each of its Subsidiaries to pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property arising, or attributed to the period, after the Petition Date, before the same shall become in default, as well as

Dana – DIP Credit Agreement

A00290

A0290

57

all lawful claims for labor, materials and supplies or otherwise arising after the Petition Date which, if unpaid, would become a Lien or charge upon such properties or any part thereof; provided, however, that the Borrower and each Guarantor shall not be required to pay and discharge or to cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the (i) payment or discharge thereof shall be stayed by Section 362(a)(8) of the Bankruptcy Code, or (ii) the validity or amount thereof shall be contested in good faith by appropriate proceedings, in each case, if the Borrower and the Guarantors shall have set aside on their books adequate reserves therefor in conformity with GAAP.

(e)    Access to Books and Records.

(i)    Maintain or cause to be maintained at all times true and complete books and records in accordance with GAAP of the financial operations of the Borrower and the Guarantors; and provide the Lender Parties and their representatives access to all such books and records during regular business hours upon reasonable advance notice, in order that the Lender Parties may examine and make abstracts from such books, accounts, records and other papers for the purpose of verifying the accuracy of the various reports delivered by the Borrower or the Guarantors to any Agent or the Lenders pursuant to this Agreement or for otherwise ascertaining compliance with this Agreement and to discuss the affairs, finances and condition of the Borrower and the Guarantors with the officers and independent accountants of the Borrower; provided that the Borrower shall have the right to be present at any such visit or inspection.

(ii)    Grant the Lender Parties access to and the right to inspect all reports, audits and other internal information of the Borrower and the Guarantors relating to environmental matters upon reasonable advance notice, but subject to appropriate limitations so as to preserve attorney-client privilege.

(iii)    At any reasonable time and from time to time during regular business hours, upon reasonable notice, permit the Initial Lenders and/or any representatives designated by the Initial Lenders (including any consultants, accountants, lawyers and appraisers retained by the Initial Lenders) to visit the properties of the Borrower and the Guarantors to conduct evaluations, appraisals, environmental assessments and ongoing maintenance and monitoring in connection with the Borrower's computation of the Borrowing Base and the assets included in the Borrowing Base and such other assets and properties of the Borrower or its Subsidiaries as the Initial Lenders may require, and to monitor the Collateral and all related systems; provided that the Borrower shall have the right to be present at any such visit and, unless an Event of Default has occurred and is continuing, such visits permitted under this clause (iii) shall be coordinated through the Administrative Agent and shall be made no more frequently than once in any fiscal quarter.

(f)    Use of Proceeds.  Use the proceeds of the Advances solely for the purposes, and subject to the restrictions, set forth in Section 2.14.

(g)    Restructuring Advisor; Financial Advisor.  Retain at all times (i) a restructuring advisor and (ii) a financial advisor that, in each case, has substantial experience and expertise advising Chapter 11 debtors-in-possession in large and complex bankruptcy cases; provided that the Loan Parties shall be permitted to replace any such advisor with any another advisor satisfying the requirements of this subsection (g) and shall be permitted a period a time (not to exceed 10 Business Days) to file an application with the Bankruptcy Court to employ such replacement advisor.

A00291

A0291

58

(h)    Priority.  Acknowledge pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations of the Loan Parties hereunder and under the other Loan Documents constitute allowed Superpriority Claims.

(i)    Validity of Loan Documents.  Use its best efforts to object to any application made on behalf of any Loan Party or by any Person to the validity of any Loan Document or the applicability or enforceability of any Loan Document or which seeks to void, avoid, limit, or otherwise adversely affect the security interest created by or in any Loan Document or any payment made pursuant thereto.

(j)    Maintenance of Cash Management System.  Maintain a cash management system on terms reasonably acceptable to the Initial Lenders, it being acknowledged that the Cash Management System of the Borrower as in effect on the Effective Date is reasonably acceptable to the Initial Lenders.

(k)    Account Control Agreements.  (i) Maintain, with respect to lockbox or other blocked accounts maintained in connection with the Existing Receivables Facility immediately prior to the termination thereof, and (ii) obtain and deliver to the Administrative Agent no later than 30 days following the Effective Date (or such later date as the Initial Lenders may reasonably determine), with respect to all other lockbox and deposit accounts (other than disbursement accounts maintained in the ordinary course of business consistent with past practices), account control agreements with respect to all such lockboxes and other deposit accounts of the Borrower and each Guarantor in form and substance reasonably satisfactory to the Administrative Agent; provided, however, that this Section 5.01(k) shall not apply to (i) cash collateral accounts for Hedge Agreements, letters of credit, surety bonds and existing equipment leases (solely for purposes of collateralizing such letters of credit, surety bonds and existing equipment leases and solely to the extent permitted by Section 5.02(a)), (ii) payroll accounts maintained in the ordinary course of business, (iii) disbursement accounts maintained in the ordinary course of business for the prompt disbursement of amounts payable in the ordinary course of business, and (iv) deposit accounts to the extent the aggregate amount on deposit in each such deposit account does not exceed $1,000,000 at any time and the aggregate amount on deposit in all deposit accounts under this clause (iv) does not exceed $5,000,000 at any time (the accounts described in the foregoing clauses (i) through (iv) being, collectively, the "Excluded Deposit Accounts").

(l)    Additional Guarantors.  Cause each Material Subsidiary that hereafter becomes party to a Case to execute a Guaranty Supplement within 10 days of becoming party thereto; provided, however, that notwithstanding the foregoing, no subsidiary will be required to become or remain a Guarantor or provide or maintain a lien on any of its assets as security for any of the Obligations (A) if such Subsidiary is not a wholly-owned Subsidiary; or (B) to the extent doing so would (1) result in any adverse tax consequences or (2) be prohibited by any applicable law.

(m)    DIP Budget; Financial Statements.  Furnish to the Administrative Agent (i) a DIP Budget which shall be reasonably satisfactory to the Administrative Agent and the Initial Lenders and (ii) the unaudited Consolidated balance sheet of the Borrower and its Subsidiaries as at December 31, 2005, and the related unaudited Consolidated statements of income and cash flows of the Borrower and its Subsidiaries for the Fiscal Year then ended, in each case not later than March 22, 2006.

A00292

A0292

59

(n)    Further Assurances.

(i)    Promptly upon reasonable request by any Agent, or any Lender Party through the Administrative Agent, correct, and cause each of its Subsidiaries promptly to correct, any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof

(ii)    Promptly upon reasonable request by any Agent, or any Lender Party through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as any Agent, or any Lender Party through the Administrative Agent, may reasonably require from time to time in order to (A) carry out more effectively the purposes of the Loan Documents, (B) to the fullest extent permitted by applicable law, subject any Loan Party's properties, assets, rights or interests to the Liens now or hereafter required to be covered by any of the Collateral Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens required to be created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

(iii)    Promptly take, or cause to be taken, each action set forth in Schedule 5.01(n)(iii) to be taken by such Loan Party within the time period specified for such action to be taken on such schedule.

(o)    Maintenance of Properties, Etc.  Maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted, and will from time to time make or cause to be made all appropriate repairs, renewals and replacements thereof except where failure to do so would not have a Material Adverse Effect; provided that, this subsection (q) shall not prohibit the sale, transfer or other disposition of any such property consummated in accordance with the other terms of this Agreement.

(p)    Transfer of Receivables.  Use commercially reasonable efforts to cause the Accounts subject to the Existing Receivables Facility to be transferred to the originator Loan Parties as promptly as practicable following payment in full of the Existing Receivables Facility.

Section 5.02 Negative Covenants.  So long as any Advance shall remain unpaid, any Letter of Credit shall be outstanding or any Lender Party shall have any Commitment hereunder, no Loan Party will, at any time:

(a)    Liens.  Incur, create, assume or suffer to exist any Lien on any asset of the Borrower or any of its Material Subsidiaries now owned or hereafter acquired by any of the Borrower or the Guarantors, other than: (i) Liens existing on the Petition Date, (ii) Permitted Liens, (iii) Liens on assets of Foreign Subsidiaries to secure Debt permitted by Section 5.02(b)(vi), (iv) Liens in favor of the Administrative Agent and the Secured Parties, (v) Liens in connection with Debt permitted to be incurred pursuant to Section 5.02(b)(vii) so long as such

A00293
A0293

60

Liens extend solely to the property (and improvements and proceeds of such property) acquired with the proceeds of such Debt or subject to the applicable Capitalized Lease, (vi) Liens in the form of cash collateral deposited to secure Obligations under Hedge Agreements provided and such cash is not in excess of $75,000,000, and (vii) Liens arising pursuant to the Tooling Program.

(b)    Debt.  Contract, create, incur, assume or suffer to exist any Debt, or permit any of its Material Subsidiaries to contract, create, incur, assume or suffer to exist any Debt, except for (i) Debt under this Agreement and the other Loan Documents, (ii) Debt incurred prior to the Petition Date (including any capital lease obligations assumed after the Petition Date), (iii) Debt arising from Investments among the Borrower and its Subsidiaries that are permitted hereunder, (iv) Debt in respect of any overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house transfers of funds; (v) Debt consisting of guaranties permitted by Section 5.02(c); (vi) Debt of Foreign Subsidiaries owing to third parties in an aggregate outstanding principal amount (together with the aggregate outstanding principal amount of all other Debt of Foreign Subsidiaries permitted under this subsection (b)) not in excess of $400,000,000 at any time outstanding and Debt of Canadian Subsidiaries of the Borrower under the Canadian Revolving Facility, (vii) Debt constituting purchase money debt and Capitalized Lease obligations (not otherwise included in subclause (ii) above) in an aggregate outstanding amount not in excess of $75,000,000, (viii)(x) Debt in respect of Hedge Agreements entered into in the ordinary course of business to protect against fluctuations in interest rates, foreign exchange rates and commodity prices and (y) Debt arising on and after the Petition Date under the Credit Card Program, provided that the aggregate amount of Debt in respect of (A) Secured Hedge Agreements and Secured Credit Card Obligations shall not exceed $50,000,000 at any time outstanding and (B) Hedge Agreements subject to Liens permitted under Section 5.02(a)(vi) shall not exceed $75,000,000 at any time outstanding, (ix) indebtedness which may be deemed to exist pursuant to any surety bonds, appeal bonds or similar obligations incurred in connection with any judgment not constituting an Event of Default, (x) indebtedness in respect of netting services, customary overdraft protections and otherwise in connection with deposit accounts in the ordinary course of business, and (xi) Debt not otherwise permitted hereunder in an aggregate outstanding principal amount of $20,000,000.

(c)    Guarantees and Other Liabilities.  Contract, create, incur, assume or permit to exist, or permit any Material Subsidiary to contract, create, assume or permit to exist, any Guarantee Obligations, except (i) for any guaranty of Debt or other obligations of the Borrower or any Guarantor if the Borrower or such Guarantor could have incurred such Debt or obligations under this Agreement, (ii) by endorsement of negotiable instruments for deposit or collection in the ordinary course of business and (iii) Guarantee Obligations constituting Investments of the Borrower and its Subsidiaries permitted hereunder.

(d)    Chapter 11 Claims.  Incur, create, assume, suffer to exist or permit any other Superpriority Claim that is pari passu with or senior to the claims of the Agents and the Secured Parties against the Borrower and the Guarantors except with respect to the Carve-Out.

(e)    Dividends; Capital Stock.  Declare or pay, directly or indirectly, any dividends or make any other distribution, or payment, whether in cash, property, securities or a combination thereof, with respect to (whether by reduction of capital or otherwise) any shares of capital stock (or any options, warrants, rights or other equity securities or agreements relating to any capital stock) of the Borrower, or set apart any sum for the aforesaid purposes.

A00294

A0294

61

(f)    Transactions with Affiliates. Enter into or permit any of its Material Subsidiaries to enter into any transaction with any Affiliate, other than on terms and conditions at least as favorable to the Borrower or such Subsidiary as would reasonably be obtained at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except for the following: (i) any transaction between any Loan Party and any other Loan Party or between any Non-Loan Party and any other Non-Loan Party; (ii) any transaction between any Loan Party and any Non-Loan Party that is at least as favorable to such Loan Party as would reasonably be obtained at that time in a comparable arm's-length transaction with a Person other than an Affiliate; (iii) any transaction individually or of a type expressly permitted pursuant to the terms of the Loan Documents; (iv) reasonable and customary director, officer and employee compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements, in each case approved by the relevant Board of Directors; or (v) transactions in existence, or of a type in existence, on the Petition Date.

(g)    Investments. Make or hold, or permit any of its Material Subsidiaries to make, any Investment in any Person, except for (i) ownership by the Borrower or the Guarantors of the capital stock of each of the Subsidiaries listed on Schedule 4.01; (ii) Investments in Cash Equivalents and Investments by Foreign Subsidiaries in securities and deposits similar in nature to Cash Equivalents and customary in the applicable jurisdiction; (iii) advances and loans existing on the Petition Date among the Borrower and the Subsidiaries (including any refinancings or extensions thereof but excluding any increases thereof or any further advances of any kind in connection therewith); (iv) Investments or intercompany loans or advances made on or after the Petition Date (A) by any Loan Party to or in any other Loan Party, (B) by any Non-Loan Party to or in any Loan Party or (C) by any Non-Loan Party to or in any other Non-Loan Party; (v) investments (A) received in satisfaction or partial satisfaction thereof from financially troubled account debtors or in connection with the settlement of delinquent accounts and disputes with customers and suppliers, or (B) received in settlement of debts created in the ordinary course of business and owing to the Borrower or any Subsidiary or in satisfaction of judgments; (vi) Investments (A) in the form of deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with current market practices, (B) in the form of extensions of trade credit in the ordinary course of business, or (C) in the form of prepaid expenses and deposits to other Persons in the ordinary course of business; (vii) Investments made in any Person to the extent such investment represents the non-cash portion of consideration received for an asset sale permitted under the terms of the Loan Documents; (viii) loans or advance to directors, officers and employees for bona fide business purposes and in the ordinary course of business in an aggregate principal amount not to exceed $10,000,000 at any time outstanding; (ix) investments constituting guaranties permitted pursuant to Section 5.02(c)(i) or (ii) above; (x) Permitted Acquisitions in an amount not to exceed $75,000,000 in the case of the Borrower and its Subsidiaries during any Fiscal Year (provided that the Loan Parties may only make Permitted Acquisitions in an amount not to exceed $10,000,000 during any Fiscal Year); (xi) Investments in Spicer S.A. in an aggregate amount not in excess of the sum of $45,000,000 plus the aggregate amount of any transfers made to Spicer S.A. or any of its Subsidiaries in accordance with Section 5.02(v) below, (xii) Investments in connection with the Tooling Program in an amount not in excess of $135,000,000; (xiii) Investments by Loan Parties in Foreign Subsidiaries (A) in an aggregate amount not to exceed $50,000,000 at any time outstanding and (B) to the extent that Letters of Credit are permitted to be issued hereunder to provide credit support for third-party Debt of Foreign Subsidiaries; (xiv) Investments by Foreign Subsidiaries in other Foreign Subsidiaries and in the Loan Parties; and (xv) other Investments to the extent not permitted pursuant to any other subpart of this Section in an amount not to exceed $15,000,000 in any Fiscal Year.

A00295

A0295

62

(h)    <u>Disposition of Assets</u>.  Sell or otherwise dispose of, or permit any of its Material Subsidiaries to sell or otherwise dispose of, any assets (including, without limitation, the capital stock of any Subsidiary) except for (i) proposed divestitures publicly disclosed as of the Effective Date or otherwise disclosed to the Administrative Agent and the Lenders prior to the Effective Date; (ii) (x) sales of inventory or obsolete or worn-out property by the Borrower or any of its Subsidiaries in the ordinary course of business, (y) sales, leases or transfers of property by the Borrower or any of its Subsidiaries to the Borrower or a Subsidiary or to a third party in connection with the asset value recovery program to be established with GOIndustries, or (z) sales by Non-Loan Parties of property no longer used or useful; (iii) the sale, lease, transfer or other disposition of any assets (A) by any Loan Party to any other Loan Party, (B) by any Non-Loan Party to any Loan Party, (c) by any Non-Loan Party to any other Non-Loan Party, or (E) constituting Permitted Non-Loan Party Investments; (iv) sales, transfers or other dispositions of assets in connection with the Tooling Program; (v) the transfer by any US Loan Party of certain machinery, equipment and inventory to Spicer S.A. or any of its Subsidiaries so long as the aggregate value of all such assets transferred does not exceed $50,000,000; (vi) any sale, lease, transfer or other disposition made in connection with any Investment permitted under Sections 5.02(g)(ii), (v), (vi) or (ix) hereof; (vii) licenses, sublicenses or similar transactions of intellectual property in the ordinary course of business and the abandonment of intellectual property deemed no longer useful; (viii) equity issuances by any subsidiary to the Borrower or any other subsidiary to the extent such equity issuance constitutes an Investment permitted pursuant to Section 5.02(g)(iv); (ix) transfers of receivables and receivables related assets  or any interest therein by any Foreign Subsidiary in connection with any factoring or similar arrangement, subject to compliance with Section 5.02(b)(vi); (x) other sales, leases, transfers or dispositions of assets for fair value at the time of such sale (as reasonably determined by Borrower) so long as (A) in the case of any sale or other disposition, not less than 75% of the consideration is cash, (B) no Default or Event of Default exists immediately before or after giving effect to any such sale, lease, transfer or other disposition, and (C) in the case of any sale, lease transfer or other disposition by any Loan Party, the fair value of all such assets sold, leased, transferred or otherwise disposed of in any fiscal year does not exceed an amount equal to $25,000,000.

(i)    <u>Nature of Business</u>.  Modify or alter, or permit any of its Material Subsidiaries to modify or alter, in any material manner the nature and type of its business as conducted at or prior to the Petition Date or the manner in which such business is currently conducted (except as required by the Bankruptcy Code), it being understood that sales permitted by Section 5.02(h) and discontinuing operations expressly identified as operations to be discontinued in the DIP Budget shall not constitute such a material modification or alteration.

(j)    <u>Limitation on Prepayments and Pre-Petition Obligations</u>.  Except as otherwise allowed pursuant to the Interim Order or the Final Order, (i) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) of any Pre-Petition Debt or other pre-Petition Date obligations of the Borrower or Guarantor, (ii) pay any interest on any Pre-Petition Debt of the Borrower or Guarantor (whether in cash, in kind securities or otherwise), or (iii) except as provided in the Interim Order, the Final Order or any order of the Bankruptcy Court and approved by the Required Lenders, make any payment or create or permit any Lien pursuant to Section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection), or apply to the Court for the authority to do any of the foregoing; <u>provided</u> that (x) the Borrower may make payments for administrative expenses that are allowed and payable under Sections 330 and 331 of the Bankruptcy Code, (y) the Borrower may prepay the obligations under the Loan Documents and make payments permitted by the First Day Orders, and (z) the Borrower may make payments to

A00296

A0296

63

such other claimants and in such amounts as may be consented to by the Lenders and approved by the Court. In addition, no Loan Party shall permit any of its Subsidiaries to make any payment, redemption or acquisition on behalf of such Loan Party which such Loan Party is prohibited from making under the provisions of this subsection (j).

    (k)    <u>Capital Expenditures</u>. Make, or permit any of its Subsidiaries to make, any Capital Expenditures that would cause the aggregate of all such Capital Expenditures made by the Borrower and its Subsidiaries during any fiscal year to exceed $325,000,000; <u>provided, however,</u> that if, for any year, the aggregate amount of capital expenditures made by the Borrower and its Subsidiaries is less than $325,000,000 (the difference between $325,000,000 and the amount of Capital Expenditures in such year (the "<u>Excess Amount</u>"), the Borrower shall be entitled to make additional Capital Expenditures in the immediately succeeding year in an amount equal to the Excess Amount, it being understood that the Excess Amount for any Fiscal Year shall be deemed the first amount used in any succeeding Fiscal Year.

    (l)    <u>Mergers</u>. Merge into or consolidate with any Person or permit any Person to merge into it, except (i) for mergers or consolidation constituting permitted Investments under Section 5.02(g) or asset dispositions permitted pursuant to Section 5.02(h), (ii) mergers, consolidations, liquidations or dissolutions (A) by any Loan Party (other than the Borrower) with or into any other Loan Party, (B) by any Non-Loan Party (other than a DCC Entity) with or into any Loan Party, (C) by any Non-Loan Party (other than a DCC Entity) with or into any other Non-Loan Party (other than a DCC Entity), or (D) by any Subsidiary of the Borrower in connection with or constituting Permitted Non-Loan Party Investments; *provided* that, in the case of any such merger or consolidation, the person formed by such merger or consolidation shall be a wholly owned Subsidiary of the Borrower, and *provided* further that in the case of any such merger or consolidation (x) to which the Borrower is a party, the Person formed by such merger or consolidation shall be the Borrower and (y) to which a Loan Party (other than the Borrower) is a party (other than a merger or consolidation made in accordance with subclause (D) above), the Person formed by such merger or consolidation shall be a Loan Party on the same terms; and (iii) the dissolution, liquidation or winding up of any subsidiary of the Borrower, *provided* that such dissolution, liquidation or winding up would not reasonably be expected to have a Material Adverse Effect and the assets of the Person so dissolved, liquidated or wound-up are distributed to its Borrower or to a Loan Party.

    (m)    <u>Amendments of Constitutive Documents</u>. Amend its constitutive documents, except for amendments that would not reasonably be expected to materially affect the interests of the Lenders.

    (n)    <u>Accounting Changes</u>. Make or permit any changes in (i) accounting policies or reporting practices, except as permitted or required by generally accepted accounting principles, or (ii) its Fiscal Year.

    (o)    <u>Payment Restrictions Affecting Subsidiaries</u>. Enter into or allow to exist, or allow any Material Subsidiary to enter into or allow to exist, any agreement prohibiting or conditioning the ability of the Borrower or any such Subsidiary to (i) create any lien upon any of its property or assets, (ii) make dividends to, or pay any indebtedness owed to, any Loan Party, (iii) make loans or advances to, or other investments in, any Loan Party, or (iv) transfer any of its assets to any Loan Party other than (A) any such agreement with or in favor of the Administrative Agent or the Lenders; (B) in connection with (1) any agreement evidencing any Liens permitted pursuant to Section 5.02(a)(iii), (v) or (vii) (so long as (x) in the case of agreements evidencing Liens permitted under Section (a)(iii), such prohibitions or conditions are customary for such

A00297

A0297

64

Liens and the obligations they secure and (y) in the case of agreements evidencing Liens permitted under Section (a)(v) or (vii), such prohibitions or conditions relate solely to the assets that are the subject of such Liens) or (2) any Indebtedness permitted to be incurred under Sections 5.02(b)(vi), (vii), or (viii) above (so long as (x) in the case of agreements evidencing Indebtedness permitted under Section 5.02(b)(vi), such prohibitions or conditions are customary for such Indebtedness and (y) in the case of agreements evidencing Indebtedness permitted under Section 5.02(b)(vii) or (viii), such prohibitions or conditions are limited to the assets securing such Indebtedness; (C) any agreement setting forth customary restrictions on the subletting, assignment or transfer of any property or asset that is a lease, license, conveyance or contract of similar property or assets; (D) any restriction or encumbrance imposed pursuant to an agreement that has been entered into by the Borrower or any Subsidiary for the disposition of any of its property or assets so long as such disposition is otherwise permitted under the Loan Documents; (E) any such agreement imposed in connection with consignment agreements entered into in the ordinary course of business; (F) customary anti-assignment provisions contained in any agreement entered into in the ordinary course of business; (G) any agreement in existence on the Petition Date and any assumption of any such agreement permitted hereunder so long as the terms or provisions in connection with any such assumption relating to liens are no more restrictive than the agreement in effect on the Petition Date; (H) any agreement in existence at the time a Subsidiary is acquired so long as such agreement was not entered into in contemplation of such acquisition; or (I) such encumbrances or restrictions required by applicable law.

(p)    Sales and Lease Backs.  Except as set forth on Schedule 5.02(o), become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property, whether now owned or hereafter acquired (i) which such Loan Party has sold or transferred or is to sell or transfer to any other Person (other than another Loan Party) or (ii) which such Loan Party intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by a Loan Party to any Person (other than another Loan Party) in connection with such lease.

Section 5.03 Reporting Requirements. So long as any Advance shall remain unpaid, any Letter of Credit shall be outstanding or any Lender Party shall have any Commitment hereunder, the Borrower will furnish to the Administrative Agent:

(a)    Default Notice.  As soon as possible and in any event within three Business Days after any Responsible Officer of the Borrower has knowledge of the occurrence of each Default or within five Business Days after any Responsible Officer of the Borrower has knowledge of the occurrence of any event, development or occurrence reasonably likely to have a Material Adverse Effect continuing on the date of such statement, a statement of a Responsible Officer (or person performing similar functions) of the Borrower setting forth details of such Default or other event and the action that the Borrower has taken and proposes to take with respect thereto.

(b)    Monthly Financials.  For each month, as soon as available and in any event on the later of (i) 30 days after the end of such month and (ii) the date on which the Bankruptcy Court shall require the delivery thereof (but in no event later than the 60th days after the end of such month), in each case, the financial information required to be delivered to the Bankruptcy Court for such month, which information shall be in form and detail satisfactory to the Required Lenders, and, without duplication, a comparison of such financial information with the projections for such month in the DIP Budget and a schedule in form reasonably satisfactory to the Initial Lenders of the computations used in determining compliance with the covenants contained in Section 5.04, all in reasonable detail and duly certified by a Responsible Officer of the Borrower.

A00298
A0298

65

(c)    Quarterly Financials.   Commencing with the fiscal quarter ending March 31, 2006, as soon as available and in any event within 45 days after the end of each of the first three quarters of each Fiscal Year (or such earlier date as the Borrower may be required by the SEC to deliver its Form 10-Q or such later date as the SEC may permit for the delivery of the Borrower's Form 10-Q up to 60 days), a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such quarter, and Consolidated statements of income and cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous quarter and ending with the end of such quarter, and Consolidated statements of income cash flows of the Borrower and its Subsidiaries for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth, in each case in comparative form the corresponding figures for the corresponding period of the immediately preceding Fiscal Year, all in reasonable detail and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Borrower as having been prepared in accordance with GAAP, together with a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto.

(d)    Annual Financials.   As soon as available and in any event no later than 90 days (or 120 days in the case of the Fiscal Year ending December 31, 2005) following the end of the Fiscal Year ending December 31, 2005, a copy of the annual audit report for such Fiscal Year, including therein a Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Year and Consolidated statements of income and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, in each case accompanied by (A) an opinion acceptable to the Initial Lenders of independent public accountants of recognized national standing acceptable to the Initial Lenders and (B) a certificate of a Responsible Officer of the Borrower stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto, together with a schedule in form reasonably satisfactory to the Initial Lenders of the computations used in determining, as of the end of such Fiscal Year, compliance with the covenants contained in Sections 5.02(k) and 5.04; provided that, in the event of any change in GAAP used in the preparation of such financial statements, the Borrower shall also provide, if necessary for the determination of compliance with Section 5.02(k) and 5.04, a statement of reconciliation conforming such financial statements to GAAP.

(e)    Annual Forecasts.   No later than 30 days after the end of each fiscal year (commencing with the fiscal year ending December 31, 2006) annual forecasts of the Borrower and its Consolidated Subsidiaries on a monthly basis.

(f)    Cash Flows.   No later than the last Business Day of each month, commencing March 31, 2006, (i) a cash flow forecast detailing cash receipts and cash disbursements on a weekly basis for the next 13 weeks (a "Thirteen Week Forecast"), the information and calculations contained in which shall be reasonably satisfactory to the Initial Lenders and (ii) a Budget Variance Report for the month then ended.

(g)    DIP Budget Supplement.   No later than December 31, 2006, and on any other date on which the Borrower may deliver the same to the Bankruptcy Court, a supplement to the DIP Budget setting forth on a monthly basis for the remainder of the term of the Facilities an updated forecast of the information contained in the DIP Budget for such period and a written set of supporting assumptions, all in form reasonably satisfactory to the Initial Lenders.

A00299

A0299

(h)    ERISA Events and ERISA Reports.  Promptly and in any event within 10 Business Days after any Loan Party or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred with respect to an ERISA Plan, a statement of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, that such Loan Party or such ERISA Affiliate has taken and proposes to take with respect thereto, on the date any records, documents or other information must be furnished to the PBGC with respect to any ERISA Plan pursuant to Section 4010 of ERISA, a copy of such records, documents and information.

(i)    Plan Terminations.  Promptly and in any event within two Business Days after receipt thereof by any Loan Party or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any ERISA Plan or to have a trustee appointed to administer any ERISA Plan.

(j)    Actuarial Reports.  Promptly upon receipt thereof by any Loan Party or any ERISA Affiliate, a copy of the annual actuarial valuation report for each Plan the funded current liability percentage (as defined in Section 302(d)(8) of ERISA) of which is less than 90% or the unfunded current liability of which exceeds $5,000,000.

(k)    Multiemployer Plan Notices.  Promptly and in any event within five Business Days after receipt thereof by any Loan Party or any ERISA Affiliate from the sponsor of a Multiemployer Plan, copies of each notice concerning (i) the imposition of Withdrawal Liability by any such Multiemployer Plan, (ii) the reorganization or termination, within the meaning of Title IV of ERISA, of any such Multiemployer Plan or (iii) the amount of liability incurred, or that may be incurred, by such Loan Party or any ERISA Affiliate in connection with any event described in clause (i) or (ii) above.

(l)    Litigation.  Promptly after the commencement thereof, notice of each unstayed action, suit, investigation, litigation and proceeding before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting any Loan Party or any of its Subsidiaries that (i) is reasonably likely to be determined adversely and if so determined adversely would be reasonably likely to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of this Agreement, any Note, any other Loan Document or the consummation of the transactions contemplated hereby.

(m)    Securities Reports.  Promptly after the sending or filing thereof, copies of all proxy statements, financial statements and reports that the Borrower sends to its public stockholders, copies of all regular, periodic and special reports, and all registration statements, that the Borrower files with the Securities and Exchange Commission or any governmental authority that may be substituted therefor, or with any national securities exchange; provided that such documents may be made available by posting on the Borrower's website.

(n)    Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any non-compliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that would reasonably be expected to (i) have a Material Adverse Effect or (ii) cause any real property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law that could reasonably be expected to have a Material Adverse Effect.

(o)    Bankruptcy Pleadings, Etc.  Promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of any of the Loan Parties with the Bankruptcy Court in the cases, or

67

distributed by or on behalf of any of the Loan Parties to any Official Committee appointed in the cases, providing copies of same to the Initial Lenders and counsel for Administrative Agent; provided that such documents may be made available by posting on a website maintained by the Borrower, and identified to the Lenders, in connection with the Cases.

(p)    Other Information.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries as any Lender Party (through the Administrative Agent), the Administrative Agent or any of their advisors may from time to time reasonably request.

Section 5.04  Financial Covenants.  So long as any Advance shall remain unpaid, any Letter of Credit shall be outstanding or any Lender Party shall have any Commitment hereunder, the Borrower will:

(a)    Minimum Global EBITDAR.  Maintain Consolidated EBITDAR of the Borrower and its Subsidiaries as at the last day of each calendar month not less than the amount set forth below for each period set forth below, as determined for such period then ended:

| Month | Period then Ended | EBITDAR |
|---|---|---|
| May 2006 | 3 months | $20,000,000 |
| June 2006 | 4 months | $40,000,000 |
| July 2006 | 5 months | $45,000,000 |
| August 2006 | 6 months | $70,000,000 |
| September 2006 | 7 months | $100,000,000 |
| October 2006 | 8 months | $145,000,000 |
| November 2006 | 9 months | $190,000,000 |
| December 2006 | 10 months | $215,000,000 |
| January 2007 | 11 months | $240,000,000 |
| February 2007 | 12 months | $260,000,000 |
| March 2007 | 12 months | $270,000,000 |
| April 2007 | 12 months | $280,000,000 |
| May 2007 | 12 months | $280,000,000 |
| June 2007 | 12 months | $280,000,000 |
| July 2007 | 12 months | $280,000,000 |

A00301

A0301

68

| August 2007 | 12 months | $280,000,000 |
|---|---|---|

(b)    Minimum Availability. Not permit Availability to be less than $100,000,000 on any Business Day if Availability on the immediately preceding Business Day was less than $100,000,000.

## ARTICLE VI

## EVENTS OF DEFAULT

Section 6.01  Events of Default. If any of the following events ("Events of Default") shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal of any Advance or any unreimbursed drawing with respect to any Letter of Credit when the same shall become due and payable or any Loan Party shall fail to make any payment of interest on any Advance or any other payment under any Loan Document within three business days after the same becomes due and payable; or

(b)    any representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made; or

(c)    any Loan Party shall fail to perform or observe (i) any term, covenant or agreement contained in Sections 2.14, 5.01(f), 5.02, 5.03 or 5.04 or (ii) any term, covenant or agreement (other than those listed in clause (i) above) contained in Article V hereof, if such failure shall remain unremedied for 5 Business Days; or

(d)    any Loan Party shall fail to perform any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for 10 days; or

(e)    (i) any Loan Party or any of its Subsidiaries shall fail to pay any principal of, premium or interest on or any other amount payable in respect of one or more items of Debt arising after the Petition Date of the Loan Parties and their Subsidiaries (excluding Debt outstanding hereunder) that is outstanding in an aggregate principal or notional amount (or, in the case of any Hedge Agreement, an Agreement Value) of at least $35,000,000 when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreements or instruments relating to all such Debt; or (ii) any other event shall occur or condition shall exist under the agreements or instruments relating to one or more items of Debt arising after the Petition Date of the Loan Parties and their Subsidiaries (excluding Debt outstanding hereunder) that is outstanding in an aggregate principal or notional amount of at least $35,000,000, and such other event or condition shall continue after the applicable grace period, if any, specified in all such agreements or instruments, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature; or (iii) one or more items of Debt arising after the Petition Date of the Loan Parties and their Subsidiaries (excluding Debt outstanding hereunder) that is outstanding in an aggregate principal or notional amount (or, in the case of any Hedge Agreement, an Agreement Value) of at least $35,000,000 shall be declared to be due and

A00302

A0302

69

payable or required to be prepaid or redeemed (other than by a regularly scheduled or required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof; or ʼ

(f)    one or more final, non-appealable judgments or orders for the payment of money in excess of $35,000,000 (exclusive of any judgment or order the amounts of which are fully covered by insurance (less any applicable deductible) which is not in dispute) in the aggregate at any time, as an administrative expense of the kind specified in Section 503(b) of the Bankruptcy Code shall be rendered against any Loan Party or any of its Subsidiaries and enforcement proceedings shall have been commenced by any creditor upon such judgment or order; or

(g)    one or more nonmonetary judgments or orders shall be rendered against any Loan Party or any of its Subsidiaries that is reasonably likely to have a Material Adverse Effect, and there shall be any period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(h)    any provision of any Loan Document after delivery thereof pursuant to Section 3.01 or Section 3.03 shall for any reason cease to be valid and binding on or enforceable against any Loan Party intended to be a party to it, or any such Loan Party shall so state in writing; or

(i)    any Collateral Document after delivery thereof pursuant to Section 3.01 shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected lien on and security interest in the Collateral purported to be covered thereby; or

(j)    any ERISA Event shall have occurred with respect to a Plan and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then exist (or the liability of the Loan Parties and the ERISA Affiliates related to such ERISA Event) is reasonably likely to have a Material Adverse Effect; or

(k)    any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Loan Parties and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), exceeds $5,000,000 or requires payments exceeding $2,500,000 per annum; or

(l)    any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount exceeding $2,000,000; or

(m)    any of the Cases concerning the Borrower or Guarantors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person seeking the

A00303
A0303

70

dismissal of any of the Cases concerning the Borrower or Material Guarantors under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the entry thereof; or an application shall be filed by the Borrower or any Guarantor for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases which is *pari passu* with or senior to the claims of the Administrative Agent and the Lenders against the Borrower or any Guarantor hereunder, or there shall arise or be granted any such *pari passu* or senior Superpriority Claim; or

(n)     the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Borrower or the Guarantors that have a value in excess of $10,000,000 in the aggregate, provided that this subsection (n) shall not apply to any order granting relief from the automatic stay pursuant to which a creditor exercises valid setoff rights pursuant to Section 553 of the Bankruptcy Code; or

(o)     an order of the Bankruptcy Court shall be entered (i) reversing, amending, staying for a period in excess of 10 days or vacating either of the DIP Financing Orders, (ii) without the written consent of the Administrative Agent and the requisite Lenders (in accordance with the provisions of Section 10.01), otherwise amending, supplementing or modifying either of the DIP Financing Orders in a manner that is reasonably determined by the Administrative Agent to be adverse to the Agents and the Lenders or (iii) terminating the use of cash collateral by the Borrower or the Guarantors pursuant to the DIP Financing Orders; or

(p)     default in any material respect shall be made by the Borrower or any Guarantor in the due observance or performance of any term or condition contained in any DIP Financing Order; or

(q)     any Loan Party shall bring a motion in the Cases: (i) to obtain working capital financing from any Person other than Lenders under Section 364(d) of the Bankruptcy Code; or (ii) to obtain financing for such Loan Party from any Person other than the Lenders under Section 364(c) of the Bankruptcy Code (other than with respect to a financing used, in whole or part, to repay in full the Obligations); or (iii) to grant any Lien other than those permitted under Section 5.02(a) upon or affecting any Collateral; or (iv) to use Cash Collateral of the Administrative Agent or Lenders under Section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders (as provided in Section 10.01); except to pay the Carve-Out or (v) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (vi) to effect any other action or actions adverse to the Administrative Agent or Lenders or their rights and remedies hereunder or their interest in the Collateral that would, individually or in the aggregate, have a Material Adverse Effect; or

(r)     the entry of the Final Order shall not have occurred within 45 days of the entry of the Interim Order; or

(s)     any challenge by any Loan Party to the validity of any Loan Document or the applicability or enforceability of any Loan Document or which seeks to void, avoid, limit, or

A00304

A0304