90

sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)    Any cash held by or on behalf of the Administrative Agent and all cash proceeds received by or on behalf of the Administrative Agent in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Administrative Agent, be held by the Administrative Agent as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Administrative Agent pursuant to Section 9.08) in whole or in part by the Administrative Agent for the ratable benefit of the Secured Parties against, all or any part of the Secured Obligations, in the following manner:

(i)    first, paid ratably to each Agent for any amounts then owing to such Agent pursuant to Section 10.04 or otherwise under the Loan Documents; and

(ii)    second, ratably (A) paid to the Secured Parties for any amounts then owing to them, in their capacities as such, in respect of the Secured Obligations ratably in accordance with such respective amounts then owing to such Secured Parties, (B) paid to each Lender Party (or its applicable Affiliate) for any amounts then owing to such Lender Party (or such Affiliate) in respect of Cash Management Obligations, Secured Hedge Agreements and Secured Credit Card Obligations and (C) deposited as Collateral in the L/C Cash Collateral Account up to an amount equal to 105% of the aggregate Available Amount of all outstanding Letters of Credit, provided that in the event that any such Letter of Credit is drawn, the Administrative Agent shall pay to the Issuing Bank that issued such Letter of Credit the amount held in the L/C Cash Collateral Account in respect of such Letter of Credit, provided further that, to the extent that any such Letter of Credit shall expire or terminate undrawn and as a result thereof the amount of the Collateral in the L/C Cash Collateral Account shall exceed 105% of the aggregate Available Amount of all then outstanding Letters of Credit, such excess amount of such Collateral shall be applied in accordance with the remaining order of priority set out in this Section 9.07(b).

(c)    All payments received by any Loan Party under or in connection with the Collateral shall be received in trust for the benefit of the Administrative Agent, and after the occurrence, continuance and declaration of an Event of Default, shall be segregated from other funds of such Loan Party and shall be forthwith paid over to the Administrative Agent in the same form as so received (with any necessary endorsement).

(d)    The Administrative Agent may, without notice to any Loan Party except as required by law or by the DIP Financing Orders and at any time or from time to time, charge, set off and otherwise apply all or any part of the Secured Obligations against any funds held with respect to the Account Collateral or in any other deposit account.

(e)    In the event of any sale or other disposition of any of the Intellectual Property Collateral of any Loan Party, the goodwill symbolized by any Trademarks subject to such sale or other disposition shall be included therein, and such Loan Party shall supply to the Administrative Agent or its designee such Loan Party's know-how and expertise, and documents and things relating to any Intellectual Property Collateral subject to such sale or other disposition, and such Loan Party's customer lists and other records and documents relating to such Intellectual Property Collateral and to the manufacture, distribution, advertising and sale of products and services of such Loan Party.

A00324

A0324

91

(f)    The Administrative Agent is authorized, in connection with any sale of the Pledged Collateral pursuant to this Section 9.07, to deliver or otherwise disclose to any prospective purchaser of the Pledged Collateral any information in its possession relating to such Pledged Collateral.

(g)    To the extent that any rights and remedies under this Section 9.07 would otherwise be in violation of the automatic stay of section 362 of the Bankruptcy Code, such stay shall be deemed modified, as set forth in the Interim Order or Final Order, as applicable, to the extent necessary to permit the Administrative Agent to exercise such rights and remedies.

Section 9.08 Modifications.    (a) Except as specifically contemplated in the Interim Order in respect of collateral arrangements between the Revolving Credit Facility and the Term Facility upon and following entry of the Final Order, the Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent for the benefit of the Lenders pursuant to this Agreement and the DIP Financing Orders (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Debt by any of the Loan Parties (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Cases, or by any other act or omission whatsoever (other than in connection with any disposition permitted hereunder).  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    except for the Carve-Out having priority over the Secured Obligations, no costs or expenses of administration which have been or may be incurred in any of the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Administrative Agent or the Lenders against the Loan Parties in respect of any Obligation;

(ii)    the liens and security interests granted herein and in the DIP Financing Orders shall constitute valid and perfected first priority liens and security interests (subject only to (A) the Carve-Out, (B) valid and perfected liens, (C) Permitted Liens in existence on the Petition Date and junior to such valid and perfected Liens and Liens permitted pursuant to Section 5.02(a), and (D) only to the extent such post-petition perfection is expressly permitted by the Bankruptcy Code, valid, nonavoidable and enforceable Liens existing as of the Petition Date, but perfected after the Petition Date, in accordance with subsections 364(c)(2) and (3) and 364(d) of the Bankruptcy Code, and shall be prior to all other Liens and security interests (other than those set forth in sub-clauses (A) through (D) herein), now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever (except that the execution and delivery of local law governed pledge or analogous documentation with respect to Equity Interests in Subsidiaries of the Borrower organized in jurisdictions outside the United States, and the filing, notarization, registration or other publication thereof, and the taking of other actions, if any, required under local law of the relevant jurisdictions of organization for the effective grant and perfection of a Lien on such Equity Interests under laws of such jurisdictions or organization outside the United States, may be required in order to fully grant, perfect and protect such security interests under such local laws); and

(iii)    the liens and security interests granted hereunder shall continue valid and perfected without the necessity that financing statements be filed or that any other action be taken under applicable nonbankruptcy law.

Dana – DIP Credit Agreement

A00325

A0325

92

(b)    Notwithstanding any failure on the part of any Loan Party or the Administrative Agent or the Lenders to perfect, maintain, protect or enforce the liens and security interests in the Collateral granted hereunder, the Interim Order and the Final Order (when entered) shall automatically, and without further action by any Person, perfect such liens and security interests against the Collateral.

Section 9.09 Release; Termination.    (a) Upon any sale, lease, transfer or other disposition of any item of Collateral of any Loan Party in accordance with the terms of the Loan Documents (other than sales of Inventory in the ordinary course of business), the Administrative Agent will, at such Loan Party's expense, execute and deliver to such Loan Party such documents as such Loan Party shall reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted hereby; provided, however, that (i) at the time of such request and such release no Default shall have occurred and be continuing, (ii) such Loan Party shall have delivered to the Administrative Agent, at least 5 Business Days prior to the date of the proposed release, a written request for release describing the item of Collateral and the terms of the sale, lease, transfer or other disposition in reasonable detail, including, without limitation, the price thereof and any expenses in connection therewith, together with a form of release for execution by the Administrative Agent and a certificate of such Loan Party to the effect that the transaction is in compliance with the Loan Documents and as to such other matters as the Administrative Agent may request, and (iii) the proceeds of any such sale, lease, transfer or other disposition required to be applied, or any payment to be made in connection therewith, in accordance with Section 2.06 shall, to the extent so required, be paid or made to, or in accordance with the instructions of, the Administrative Agent when and as required under Section 2.06, and (iv) in the case of Collateral sold or disposed of, the release of a Lien created hereby will not be effective until the receipt by the Administrative Agent of the Net Cash Proceeds arising from the sale or disposition of such Collateral.

(b)    Upon the latest of (i) the payment in full in cash of the Secured Obligations (other than contingent indemnification obligations which are not then due and payable), (ii) the Termination Date and (iii) the termination or expiration of all Letters of Credit, the pledge and security interest granted hereby shall terminate and all rights to the Collateral shall revert to the applicable Loan Party. Upon any such termination, the Administrative Agent will, at the applicable Loan Party's expense, execute and deliver to such Loan Party such documents as such Loan Party shall reasonably request to evidence such termination.

## ARTICLE X

## MISCELLANEOUS

Section 10.01 Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or the Initial Lenders, as applicable) and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    waive any condition set forth in Section 3.01(a) without the written consent of each Initial Lender;

(b)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 2.05 or Section 6.01) without the written consent of such Lender;

A00326

A0326

93

(c)     postpone any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby;

(d)     reduce the principal of, or the rate of interest specified herein on, any Advance, or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby;

(e)     change (i) Section 2.02(a) in a manner that would alter the pro rata nature of Borrowings required thereby, (ii) Section 2.13 in a manner that would alter the pro rata sharing of payments required thereby or (iii) Section 9.07(h) in a manner that would alter the pro rata sharing of cash and cash proceeds required thereby, in each case with respect to clauses (i), (ii) and (iii) of this Section 10.01(f), without the written consent of each Lender;

(f)     change the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or grant any consent hereunder, without the written consent of each Lender;

(g)     amend, restate, supplement or otherwise modify any provision of this Agreement or the DIP Financing Orders in any manner that would impair the interests of the Lenders in Priority Collateral under either the Revolving Credit Facility or the Term Facility, in each case without the consent of Lenders holding a majority in interest of the Obligations under such Facility;

(h)     except in connection with a transaction permitted under this Agreement, release all or substantially all of the Guarantors from the Guaranty or release all or a material portion of the Collateral or release the superpriority claim without the written consent of each Lender; and

(i)     change the definition of any of "Borrowing Base Availability", "Eligible Inventory", "Eligible Receivables", "Initial Lenders", "Loan Value" or "Reserves", in each case, without the written consent of the Initial Lenders; provided that any change in the definition of "Loan Value" or "Borrowing Base Availability that would result in an increase in either the Borrowing Base Availability shall require the written consent of each Lender;

and provided further that (i) no amendment, waiver or consent shall, unless in writing and signed by the Swing Line Lender or the Issuing Banks, as the case may be, in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender or of the Issuing Banks, as the case may be, under this Agreement or any Letter of Credit Application relating to any Letter of Credit issued or to be issued by it; and (ii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

Section 10.02 Notices, Etc.  (a) All notices and other communications provided for hereunder shall be in writing (including telegraphic or telecopy communication) and mailed, telegraphed, telecopied or delivered, if to the Borrower or any Guarantor, at the Borrower's address at 4500 Dorr Street, Toledo, Ohio 43615, Attention: Treasurer, as well as to (i) the attention of the general counsel of the Borrower at the Borrower's address, fax number (419) 535-4544, and (ii) Jones Day, counsel to the

A00327
A0327

94

Loan Parties, at its address at 222 East 41st Street, New York, New York 10017, Attention: Robert L. Cunningham, fax number (212) 755-7306; if to any Initial Lender or the Initial Issuing Banks, at its Applicable Lending Office, respectively, specified opposite its name on Schedule I hereto; if to any other Lender Party, at its Applicable Lending Office specified in the Assignment and Acceptance pursuant to which it became a Lender Party; if to the Administrative Agent, at its address at 388 Greenwich Street, New York, New York 10013, fax number [_____], Attention: [_____], as well as to Shearman & Sterling, counsel to the Administrative Agent, at its address at 599 Lexington Avenue, New York, New York 10022, fax number (212) 848-7179, Attention: Maura O'Sullivan, Esq.; or, as to the Borrower, any Guarantor or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties. All such notices and communications shall, when mailed, telegraphed or telecopied, be effective three Business Days after being deposited in the U.S. mails, first class postage prepaid, delivered to the telegraph company or confirmed as received when sent by telecopier, respectively, except that notices and communications to the Administrative Agent pursuant to Article II, III or VII shall not be effective until received by the Administrative Agent. Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or the Notes or of any Exhibit hereto to be executed and delivered hereunder shall be effective as delivery of a manually executed counterpart thereof.

    (b)    The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a Conversion of an existing, Borrowing or other Extension of Credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other Extension of Credit thereunder (all such non-excluded communications being referred to herein collectively as "*Communications*"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to oploanswebadmin@citigroup.com. In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent. The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "*Platform*").

    (c)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER PARTY OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT,

A00328
A0328

95

CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender Party agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender Party for purposes of the Loan Documents. Each Lender Party agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender Party's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender Party to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 10.03 No Waiver; Remedies.  No failure on the part of any Lender Party or the Administrative Agent to exercise, and no delay in exercising, any right hereunder or under any Note shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 10.04 Costs, Fees and Expenses.   (a) The Borrower agrees (i) to pay or reimburse the Initial Lenders for all reasonable costs and expenses incurred in connection with the development, preparation, negotiation and execution of this Agreement (which shall be deemed to include any predecessor transaction contemplated to be entered into with the Initial Lenders) and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including the monitoring of, and participation in, all aspects of the Cases), including all fees, expenses and disbursements of one joint outside counsel for the Administrative Agent and the Initial Lenders, and (ii) to pay or reimburse the Initial Lenders (including, without limitation, CNAI in its capacity as Administrative Agent) for all reasonable costs and expenses incurred in connection with (A) the ongoing maintenance and monitoring of Borrowing Base Availability and (B) enforcement, attempted enforcement, or preservation of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any "workout" or restructuring in respect of the Obligations and during any legal proceeding, including any proceeding under any Debtor Relief Law), including all reasonable fees, expenses and disbursements of outside counsel for the Initial Lenders (including, without limitation, CNAI in its capacity as Administrative Agent).  The foregoing fees, costs and expenses shall include all search, filing, recording, title insurance, collateral review, monitoring, and appraisal charges and fees and taxes related thereto, and other reasonable out-of-pocket expenses incurred by the Initial Lenders and the cost of independent public accountants and other outside experts retained jointly by the Initial Lenders.  All amounts due under this Section 10.04(a) shall be payable within ten Business Days after demand therefor accompanied by an appropriate invoice.  The agreements in this Section shall survive the termination of the Commitments and repayment of all other Obligations.

A00329

A0329

96

(b)      Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold harmless each Agent-Related Person, each Lender and their respective Affiliates, directors, officers, employees, counsel, agents, advisors, attorneys-in-fact and representatives (collectively the "Indemnitees") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several that may be incurred by, or asserted or awarded against any Indemnitee, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment, Advance or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by an Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower or any other Loan Party, or any Liability related in any way to the Borrower or any other Loan Party in respect of Environmental Laws, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such claim, damage, loss, liability or expense is determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower or any of its Subsidiaries, any security holders or creditors of the foregoing an Indemnitee or any other Person, or an Indemnitee is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. No Indemnitee shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Borrower or any of its Subsidiaries for or in connection with the transactions contemplated hereby, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnitee's gross negligence or willful misconduct. In no event, however, shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings). No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement. All amounts due under this Section 10.04(b) shall be payable within two Business Days after demand therefor. The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

(c)      If any payment of principal of, or Conversion of, any Eurodollar Rate Advance is made by the Borrower to or for the account of a Lender Party other than on the last day of the Interest Period for such Advance, as a result of a payment or Conversion pursuant to Section 2.06, 2.09(b)(i) or 2.10(d), acceleration of the maturity of the Notes pursuant to Section 6.01 or for any other reason, or if the Borrower fails to make any payment or prepayment of an Advance for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to Section 2.04, 2.06 or 6.01 or otherwise, the Borrower shall, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party any amounts required to compensate such Lender Party for any additional losses, costs or expenses that it may

A00330

A0330

reasonably incur as a result of such payment or Conversion or such failure to pay or prepay, as the case may be, including, without limitation, any actual loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender Party to fund or maintain such Advance.

Section 10.05 <u>Right of Set-off</u>.  Subject to the DIP Financing Orders, upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Notes due and payable pursuant to the provisions of Section 6.01, each Lender Party and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender Party or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under this Agreement and the Note or Notes (if any) held by such Lender Party, irrespective of whether such Lender Party shall have made any demand under this Agreement or such Note or Notes and although such obligations may be unmatured.  Each Lender Party agrees promptly to notify the Borrower after any such set-off and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Lender Party and its respective Affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Lender Party and its respective Affiliates may have.

Section 10.06 <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by the Borrower, the Guarantors, each Agent, the Initial Issuing Banks and the Initial Swing Line Lender and the Administrative Agent shall have been notified by each Initial Lender that such Initial Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender Party and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender Party.

Section 10.07 <u>Successors and Assigns</u>.  (a)  Each Lender may assign all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment or Commitments, the Advances owing to it and the Note or Notes held by it); provided, however, that (i) each such assignment shall be of a uniform, and not a varying, percentage of all rights and obligations under and in respect of any or all Facilities, (ii) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of any Lender or an Approved Fund of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement, the aggregate amount of the Commitments being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $1,000,000 or, in the case of an assignment of the Revolving Credit Facility, $5,000,000 under each Facility for which a Commitment is being assigned, (iii) each such assignment shall be to an Eligible Assignee, and (iv) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with any Note or Notes (if any) subject to such assignment and a processing and recordation fee of $3,500.

(b)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender or Issuing Bank, as the case may be, hereunder and (ii) the Lender or Issuing Bank assignor thereunder shall, to the extent that rights and

A00331
A0331

98

obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Sections 2.10, 2.12 and 10.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's or Issuing Bank's rights and obligations under this Agreement, such Lender or Issuing Bank shall cease to be a party hereto).

(c)    By executing and delivering an Assignment and Acceptance, each Lender Party assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender Party or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender or Issuing Bank, as the case may be.

(d)    The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Borrower, shall maintain at its address referred to in Section 10.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lender Parties and the Commitment under each Facility of, and principal amount of the Advances owing under each Facility to, each Lender Party from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lender Parties may treat each Person whose name is recorded in the Register as a Lender Party hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Agent or any Lender Party at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender Party and an assignee, together with any Note or Notes subject to such assignment, the Administrative Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit C hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof and a copy of such Assignment and Acceptance to the Borrower and each other Agent. In the case of any assignment by a Lender, within five Business Days after its receipt of such notice, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes (if any) a new Note to the order of such Eligible Assignee in an amount equal to the Commitment assumed by it

NYDOCS02/757095.6                Dana – DIP Credit Agreement

under each Facility pursuant to such Assignment and Acceptance and, if any assigning Lender that had a Note or Notes prior to such assignment has retained a Commitment hereunder under such Facility, a new Note to the order of such assigning Lender in an amount equal to the Commitment retained by it hereunder. Such new Note or Notes shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in substantially the form of Exhibit A-1 or A-2 hereto, as the case may be.

(f)     Each Issuing Bank may assign to one or more Eligible Assignees all or a portion of its rights and obligations under the undrawn portion of its Letter of Credit Commitment at any time; provided, however, that (i) each such assignment shall be to an Eligible Assignee and (ii) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with a processing and recordation fee of $3,500.

(g)     Each Lender Party may sell participations to one or more Persons (other than any Loan Party or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Advances owing to it and any Note or Notes held by it); provided, however, that (i) such Lender Party's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender Party shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender Party shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, the Agents and the other Lender Parties shall continue to deal solely and directly with such Lender Party in connection with such Lender Party's rights and obligations under this Agreement, (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest (other than default interest) on, the Advances or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Advances or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release a substantial portion of the value of the Collateral or the value of the Guaranties and (vi) the participating banks or other entities shall be entitled to the benefit of Section 2.12 to the same extent as if they were a Lender Party but, with respect to any particular participant, to no greater extent than the Lender Party that sold the participation to such participant and only if such participant agrees to comply with Section 2.12(e) as though it were a Lender Party.

(h)     Any Lender Party may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender Party by or on behalf of the Borrower; provided, however, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender Party in accordance with Section 10.09 hereof.

(i)     Notwithstanding any other provision set forth in this Agreement, any Lender Party may at any time (and without the consent of the Administrative Agent or the Borrower) create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Advances owing to it and any Note or Notes held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System

(j)     Notwithstanding anything to the contrary contained herein, any Lender that is a fund that invests in bank loans may create a security interest in all or any portion of the Advances owing to it and the Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such fund as security for such obligations or securities, provided, however, that unless and until such

A00333

A0333

100

trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(k)    Notwithstanding anything to the contrary contained herein, any Lender Party (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Advance that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided, however,* that (i) nothing herein shall constitute a commitment by any SPC to fund any Advance, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Advance, the Granting Lender shall be obligated to make such Advance pursuant to the terms hereof.  The making of an Advance by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Advance were made by such Granting Lender.  Each party hereto hereby agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender Party would be liable, (ii) no SPC shall be entitled to the benefits of Sections 2.10 and 2.12 (or any other increased costs protection provision) and (iii) the Granting Lender shall for all purposes, including, without limitation, the approval of any amendment or waiver of any provision of any Loan Document, remain the Lender Party of record hereunder.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Debt of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof.  Notwithstanding anything to the contrary contained in this Agreement, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent, assign all or any portion of its interest in any Advance to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Advances to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC.  This subsection (k) may not be amended without the prior written consent of each Granting Lender, all or any part of whose Advances are being funded by the SPC at the time of such amendment.

Section 10.08  Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.09  Confidentiality; Press Releases and Related Matters.  (a)  No Agent or Lender Party shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (i) to such Agent's or such Lender Party's Affiliates and their officers, directors, employees, agents and advisors and to actual or prospective Eligible Assignees and participants, and then only on a confidential, need-to-know basis, (ii) as requested or required by any law, rule or regulation or judicial process or (iii) as requested or required by any state, federal or foreign authority or examiner regulating banks or banking.

(b)    Each of the parties hereto and each party joining hereafter agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of any Lender or its Affiliates or referring to this Agreement or any of the other Loan Documents without at least 2 Business Days' prior notice to such Lender and without the prior written consent of such Lender or

NYDOCS02/757095.6                     Dana – DIP Credit Agreement

101

unless (and only to the extent that) such party or Affiliate is required to do so under law and then, in any event, such party or Affiliate will consult with the Borrower, the Administrative Agent and such Lender before issuing such press release or other public disclosure. Each party consents to the publication by the Agents or any Lender Party of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement. The Agents reserve the right to provide to industry trade organizations such necessary and customary information needed for inclusion in league table measurements.

Section 10.10 Patriot Act Notice. Each Lender Party and each Agent (for itself and not on behalf of any Lender Party) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender Party or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act. The Borrower shall, and shall cause each of its Subsidiaries to, provide the extent commercially reasonable, such information and take such actions as are reasonably requested by any Agents or any Lender Party in order to assist the Agents and the Lender Parties in maintaining compliance with the Patriot Act.

Section 10.11 Jurisdiction, Etc. (a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 10.12 Governing Law. This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

[The remainder of this page left intentionally blank]

A00335

A0335

Section 10.13  <u>Waiver of Jury Trial</u>.  Each of the Guarantors, the Borrower, the Agents and the Lender Parties irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Advances or the actions of the Administrative Agent or any Lender Party in the negotiation, administration, performance or enforcement thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**The Borrower**

DANA CORPORATION, a debtor and a
debtor-in-possession, as Borrower

By_____
   Name:
   Title:

A00336

A0336

**The Guarantors**

[_____]
each a debtor and a debtor-in-possession, and
each a Guarantor


By_____
    Name:
    Title:    Authorized Person

Dana – DIP Credit Agreement

A00337

A0337

The Administrative Agent

CITICORP NORTH AMERICA, INC., as
Administrative Agent

By_____
   Name:
   Title:

A00338

A0338

**The Initial Issuing Banks**

CITIBANK NORTH AMERICA, INC., as
Initial Issuing Bank


By_____
  Name:
  Title:


BANK OF AMERICA, N.A., as Initial Issuing
Bank


By_____
  Name:
  Title:


JPMORGAN CHASE BANK, N.A., as Initial
Issuing Bank


By_____
  Name:
  Title:


**The Initial Swing Line Lender**

CITICORP NORTH AMERICA, INC. as Initial
Swing Line Lender


By_____
  Name:
  Title:


**The Initial Lenders**

CITICORP NORTH AMERICA, INC., as Initial
Lender


By_____
  Name:
  Title:

A00339

A0339

JPMORGAN CHASE BANK, N.A.., as Initial Lender

By_____
   Name:
   Title:

Dana – DIP Credit Agreement

A00340

A0340

**The Lenders**

[_____]

Dana – DIP Credit Agreement

A00341

A0341

**EXHIBIT C**

**MILLER DECLARATION**

NYI-2248844v1

A00342

A0342

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)

 - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox (HL 3046)
Jeffrey B. Ellman (JE 5638)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)

Proposed Attorneys for Debtors
  and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
Dana Corporation, et al.,               :   Case No. 06-_____ (___)
                                        :
                    Debtors.            :   (Jointly Administered)
                                        :
---------------------------------------------------x
```

**DECLARATION OF HENRY S. MILLER IN SUPPORT OF**
**MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR (I) AN**
**INTERIM ORDER SCHEDULING A FINAL HEARING PURSUANT TO**
**BANKRUPTCY RULES 4001 AND 9014 AND (II) INTERIM AND FINAL ORDERS**
**AUTHORIZING THEM TO (A) OBTAIN POSTPETITION FINANCING PURSUANT**
**TO SECTIONS 105, 362, 363, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1), 364(E)**
**AND 507 OF THE BANKRUPTCY CODE; (B) UTILIZE CASH COLLATERAL**
**PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; AND**
**(C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES**
**PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE**

NYI-2248081v6

A00343
A0343

STATE OF NEW YORK )
                           ) ss.
COUNTY OF NEW YORK )

       I, Henry S. Miller, being duly sworn, hereby depose and say:

          1.     I am the Chairman and a Managing Director of Miller Buckfire & Co., LLC ("Miller Buckfire"), a financial advisory services and investment banking firm that maintains offices located at 250 Park Avenue, 19th Floor, New York, New York 10177, and I make this Declaration (the "Declaration") on behalf of Miller Buckfire. I submit this Declaration in support of the Motion of Debtors and Debtors in Possession for (I) An Interim Order Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001 and 9014 and (II) Interim and Final Orders Authorizing Them to (A) Obtain Postpetition Financing Pursuant to Sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of the Bankruptcy Code; (B) Utilize Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; and (C) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code (the "Motion"), filed by the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").[1] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

### Miller Buckfire's Qualifications

         2.     On July 16, 2002, Miller Buckfire began operating as an independent firm, providing strategic and financial advisory services in large-scale corporate restructuring transactions. Miller Buckfire is owned and controlled by me, Kenneth A. Buckfire and by the employees of Miller Buckfire. Miller Buckfire currently has approximately 45 employees, many

---

[1]      Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

A00344

A0344

of whom were employees of the Financial Restructuring Group of Dresdner Kleinwort Wasserstein, Inc. prior to July 16, 2002.

     3.    Miller Buckfire's professionals have extensive experience in providing financial advisory and investment banking services to financially distressed companies, and to creditors, equity holders and other constituencies, in reorganization proceedings and complex financial restructurings, both in and out of court.  For example, Miller Buckfire's professionals are providing or have provided financial advisory, investment banking and other services in connection with the restructuring of Acterna Corporation; Aerovias Nacionales de Colombia S.A.; Allied Holdings, Inc.; Applied Extrusion Technologies, Inc.; AT&T Latin America; Aurora Foods Inc.; Avado Brands, Inc.; Bruno's Inc.; Burlington Industries, Inc.; Cajun Electric Power Corporation; Calpine Corporation; Cambridge Industries; Carmike Cinemas; Celotex Corporation; Centerpoint Energy; Citation Corporation; CMS Energy Corporation; Criimi Mae, Inc.; CTC Communications; Delta Air Lines, Inc.; Dow Corning Corporation; Drypers, Inc.; EaglePicher Holdings Inc.; Exide Technologies; Eurotunnel; Favorite Brands International Inc.; Foamex International, Inc.; Focal Communications Corporation; FPA Medical Management; Gate Gourmet; Grand Union Co.; Heartland Wireless; Horizon Natural Resources Company; Huntsman Corporation; ICG Communications; ICO Global Communication, Ltd.; IMPATH Inc.; Interstate Bakeries Corporation; Kmart Corporation; Level (3) Communications; The Loewen Group, Inc.; Micro Warehouse; Mirant Corp.; Montgomery Ward & Co., Inc.; National Airlines; Oakwood Homes; Pacific Crossing Limited; Pathmark Stores, Inc.; Pegasus Satellite Communications; PennCorp Financial Group, Inc.; Pioneer Companies; PSINet; Polaroid Corporation; Polymer Group, Inc.; The Spiegel Group; Sunbeam Corporation; TECO Energy;

A00345

A0345

Trans World Airlines; US Office Products; U.S. Generating Florida Partnerships; Vulcan, Inc.; and Women First Healthcare, Inc.

      4.    Miller Buckfire professionals have extensive experience in helping Debtors obtain large debtor in possession financing facilities including, among others, for the recent cases of Kmart ($2 billion), Calpine ($2 billion), Spiegel ($450 million), Foamex International ($320 million), Allied Holdings ($230 million) and Interstate Bakeries ($200 million).

      5.    In preparation for these chapter 11 cases, Miller Buckfire, among other things, has: (a) analyzed the Debtors' current liquidity and projected cash flow; (b) assisted the Debtors in evaluating their strategic alternatives with respect to proposals from various lenders to refinance the Debtors' existing debt, as well as other restructuring alternatives; and (c) conducted a comprehensive search process to secure postpetition financing for the Debtors on the most competitive terms and conditions available on behalf of the Debtors.

      6.    With respect to the DIP Facility, as discussed in greater detail below, Miller Buckfire worked with the Debtors in an accelerated timeframe to identify potential lenders, including the lenders under the Debtors' prepetition revolving credit facility and other third party lenders, willing to provide postpetition financing in an amount sufficient to provide adequate liquidity for the Debtors during their Chapter 11 Cases. This process resulted in that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of March __, 2006 (the "DIP Loan Agreement") among the Borrower, the Guarantors, Citicorp North America, Inc., as Administrative Agent (the "Administrative Agent"), JPMorgan Chase Bank, N.A. ("JPM") and Bank of America, N.A., as Co-Syndication Agents (together with the Administrative Agent, the "Agents"), acting as Agents for themselves, Citicorp North America,

A00346

A0346

Inc. and JPM, each as an Initial Issuing Bank (the "Initial Issuing Banks"), and a syndicate of financial institutions (together with the Agents and the Initial Issuing Banks, the "Lenders"), to be arranged by Citigroup Capital Markets Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers, and Citigroup Capital Markets Inc., J.P. Morgan Securities Inc., Banc of America Securities LLC as Joint Bookrunners, substantially in the form annexed to the Motion as Exhibit A, to provide up to $1,450,000,000 in postpetition financing to the Debtors.

### The Debtors' Urgent Need for Postpetition Financing

7.      A key responsibility assigned to Miller Buckfire by the Debtors was to assist the Debtors in evaluating their current and projected liquidity position and securing adequate postpetition financing to fund working capital and other operating requirements during the pendency of the Chapter 11 Cases.  To that end, Miller Buckfire helped the Debtors' management and the Debtors' other advisors produce a budget forecast (the "DIP Budget") for the remainder of 2006 and 2007 to be used in connection with the search for debtor in possession financing.

8.      Based on the Debtors' increasing liquidity difficulties, the Debtors determined that it was essential that they immediately commence a search for postpetition financing in preparation for a possible bankruptcy filing.  It was also determined that, in any bankruptcy cases commenced by the Debtors, they would require a significant immediate infusion of financing and the usage of Cash Collateral to continue operations.  Granting the relief sought in the Interim Order will enable them to continue their ordinary course, day-to-day operations, service their customers, accomplish their long-term strategic restructuring goals and effectuate their reorganization.

9.      As discussed in the Burns Affidavit, in recent months, the Debtors have faced substantial liquidity constraints because of (a) reduced sales to Dana's OEM customers and

A00347
A0347

increased commodity prices, (b) significantly increased scrutiny and demands from Dana's trade

creditors as a result of the restatements of Dana's financials and (c) the constraints in borrowing

availability under the Debtors' prepetition revolving credit facility and the U.S. Receivables

Program.  Immediate access to credit under the DIP Facility is therefore necessary to provide

necessary working capital during the pendency of these Chapter 11 Cases to deal with the

liquidity constraints described above and to provide customers, employees, vendors, suppliers

and other key constituencies with the confidence that the Debtors have sufficient resources

available to maintain their operations in the ordinary course.  Absent this liquidity, I believe that

the Debtors' business operations would come to an almost immediate halt, which would impair

their ability to maximize the value of their estates and reorganize successfully.

10.    Accordingly, without prompt access to the DIP Facility, the Debtors risk

significant harm to their businesses.  The availability of credit under the DIP Facility will instill

confidence in the Debtors' various stakeholders and encourage them to continue their

relationships with the Debtors, thereby facilitating a successful reorganization.  The DIP Facility

also will allow the Debtors to meet their working capital and capital expenditure requirements

and provide the Debtors with the flexibility to make strategic business decisions to maximize the

value of their estates.

### The Terms of the DIP Facility Are Fair And Reasonable

11.    In mid-February 2006, in order to prepare for a possible chapter 11 filing,

the Debtors and Miller Buckfire began to evaluate alternatives for debtor in possession financing.

12.    After some informal discussions with potential lenders, in late

February 2006, Miller Buckfire contacted a number of financing candidates to see if they had

any interest in providing debtor in possession financing along the lines needed by the Debtors.  A

number of institutions (collectively, the "Potential Lenders") were willing to execute, or had

A00348

A0348

already executed, confidentiality agreements with the Debtors and received due diligence materials from the Debtors in this time period — CIT Group ("CIT"), Citigroup, Credit Suisse First Boston ("Credit Suisse"), Deutsche Bank Securities, Inc. ("Deutsche Bank"), GE Commercial Credit Corp. ("GECCC") and Morgan Stanley.[2]  The due diligence materials provided to the Potential Lenders included preliminary financial results for Dana's 2005 fiscal year, the DIP Budget, real estate appraisals on the Debtors' major real estate holdings in the United Sates, an inventory appraisal conducted in the fall of 2005, information concerning accounts receivable and debt structure information.

13.    The Debtors, with Miller Buckfire's assistance, actively worked to obtain definitive proposals from each of the Potential Lenders and to improve the terms of the proposals that were made by the Potential Lenders.  The Debtors ultimately received four financing proposals from the Potential Lenders:  (a) a team of Citigroup with JPMorgan and Bank of America; (b) a team of Credit Suisse and CIT; (c) a team of Deutsche Bank with an asset based lender to be determined at a later date; and (d) a team of GECC and Morgan Stanley.  All of these proposals required that the Debtors grant liens in substantially all of their assets and that some of the proceeds of the proposed debtor in possession financing facilities be used to repurchase the Receivables Portfolio under the Existing Receivables Facility and to refinance the Pre-Petition Secured Indebtedness.

14.    Shortly before the Petition Date, it became clear that the team led by Citigroup was willing to offer debtor in possession financing on significantly better aggregate terms than any of the other Potential Lenders.  The proposal made by the team led by Citigroup

---

[2]    Prior to the Debtors' search for debtor in possession financing, they had been negotiating with a group led by Citigroup on a replacement for their existing credit facility. Citigroup had already executed a confidentiality agreement and conducted substantial due diligence in connection with such a facility.

A00349

A0349

called for significantly lower interest and fees than the proposals made by two of the other teams. While Citigroup's proposal was slightly more expensive than one of the other proposals received by the Debtors (assuming maximum pricing flex), the other terms of Citigroup's proposal were significantly more favorable. In addition, the proposal by Citigroup provided the greatest aggregate liquidity and the least onerous covenant package. Citigroup's proposal also enabled the Debtors to acquire substantial additional liquidity as its team was willing to effectively lend approximately 68% of the book value of receivables to the Debtors, which is substantially greater than the approximately 30% effective rate the Debtors were able to obtain under the Existing Receivables Facility.

15.     In addition, because of Citigroup's work as prepetition agent on the Debtors' revolving credit facility and the due diligence Citigroup had conducted on a replacement for that facility, Citigroup was willing to close on a debtor in possession financing facility without significant due diligence contingencies and on a highly expedited timetable. The team which made the proposal with the lowest average costs (assuming worst case pricing flex on the Citigroup proposal) included significant due diligence and credit approval contingencies in their proposal, which meant that the Debtors might not be able to close on debtor in possession financing on the Petition Date. Because of these sizeable contingencies, the Debtors were exposed to the risk that the pricing advantage for that proposal would disappear before the facility could be consummated. Based on these factors, the Debtors selected the Citigroup proposal. The Debtors then proceeded to negotiate with Citigroup concerning definitive documentation.

## The DIP Credit Agreement

16.     The Debtors and Citigroup engaged in good faith and extensive arms' length negotiations that culminated in an agreement by the Lenders to provide the Debtors with

A00350
A0350

up to $1,450,000,000 of secured postpetition financing on the terms and subject to the conditions set forth in the DIP Credit Agreement.

17.    The significant terms of the DIP Facility are set forth in the Motion.[3] To secure performance of their obligations under the DIP Credit Agreement, the Debtors have agreed to provide the Lenders with:  (a) first priority liens upon substantially all of their prepetition and postpetition property to the extent not subject to valid, perfected, non-avoidable and enforceable prepetition liens; (b) a first priority senior priming lien in all prepetition and postpetition property of the Debtors, whether now existing or hereafter acquired, that is subject to the existing liens presently securing Pre-Petition Secured Indebtedness; and (c) a junior lien in all property, whether now existing or hereafter acquired, which is subject to valid, perfected, non-avoidable and enforceable prepetition liens.  As is customary in chapter 11 cases, these liens are subject to a Carve-Out for the payment of professional fees after an Event of Default.

18.    The terms and conditions of the DIP Facility are fair, reasonable and adequate and were negotiated by the parties in good faith and at arm's length.  The interest and fees to be charged under the DIP Facility are comparable to the interest and fees charged for facilities of similar size to the Debtors in recent months, such as those charged in the Delphi, Calpine and Tower Automotive chapter 11 cases.  Entry into the DIP Facility is the best financing option available to the Debtors under the present circumstances and its pricing and other economic terms are fair, reasonable and consistent with current market practices.

**Adequate Protection for Use of Pre-Petition Secured Creditors'
Cash Collateral and Diminution in Value of Pre-Petition Collateral**

19.    As adequate protection for the interests of the Pre-Petition Secured Creditors in the Pre-Petition Collateral, including the Cash Collateral, and any diminution in the

---

3    This summary is qualified in its entirety by reference to the provisions of the DIP Loan Documents.

A00351

A0351

value thereof, the Debtors propose to grant the Pre-Petition Agent for the benefit of the Pre-Petition Secured Creditors adequate protection replacement liens in all of the Collateral, subject and subordinate only to the security interests and liens granted to the Administrative Agent. Furthermore, the proposed Interim Order provides for a superpriority administrative expense claim to protect the Pre-Petition Secured Creditors in the unlikely event that the replacement liens granted by the Interim Order prove inadequate to secure against any diminution in the value of the Pre-Petition Secured Creditors' interest in the Cash Collateral.

20.     Without the use of the Cash Collateral, I believe that the Debtors would experience a severe disruption of their businesses. Accordingly, because my team believes that the going concern value of the Debtors' businesses is significantly greater than their liquidation value, the Debtors must be authorized to use the Cash Collateral in order to prevent such a disruption.

21.     For all these reasons, I believe that the protections to be provided to the Pre-Petition Secured Creditors, as described above, are sufficient to protect against any diminution in the value of their interest during the period the Cash Collateral is used by the Debtors, and are fair and reasonable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March ___, 2006

         s/Henry S. Miller_____
         Henry S. Miller
         Chairman and Managing Director
         Miller Buckfire & Co., LLC

A00352

A0352